NO. 24-3481

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

PERIDOT TREE WA INC.,

*Plaintiff-Appellant*,

v.

WASHINGTON STATE LIQUOR AND CANNABIS BOARD; and
WILLIAM LUKELA, Director,

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

No. 3:23-cv-06111-TMC
The Honorable Tiffany M. Cartwright
United States District Court Judge

# DEFENDANTS-APPELLEES' ANSWERING BRIEF

ROBERT W. FERGUSON
*Attorney General*

TERA M. HEINTZ, WSBA 54921
*Deputy Solicitor General*
JONATHAN PITEL, WSBA 47516
*Assistant Attorney General*
PENNY ALLEN, WSBA 18821
*Senior Counsel*

1125 Washington Street SE
Olympia, WA 98504-0110
(360) 753-6200
Tera.Heintz@atg.wa.gov
Jonathan.Pitel@atg.wa.gov
PennyL.Allen@atg.wa.gov

*Counsel for Defendants-Appellees*

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. JURISDICTION .......... 4

III. STATUTORY AUTHORITIES .......... 4

IV. ISSUES PRESENTED .......... 4

V. STATEMENT OF THE CASE .......... 4

A. Congress Prohibited an Interstate Market for Cannabis .......... 4

B. State Cannabis Markets are Designed as Closed Systems .......... 7

C. Washington Adopted a Social Equity Program to Mitigate the Harms Resulting from Prior Enforcement of Cannabis-Related Laws .......... 12

D. Peridot Tree's Application .......... 16

E. The District Court Denied Peridot Tree's Motion for Preliminary Injunction and Subsequently Dismissed its Complaint .......... 17

VI. SUMMARY OF ARGUMENT .......... 20

VII. STANDARD OF REVIEW .......... 20

VIII. ARGUMENT .......... 22

A. The District Court Properly Dismissed Peridot Tree's Complaint .......... 22

1. The Dormant Commerce Clause does not apply to illegal interstate markets .......... 22

2. Out-of-Circuit case law extending the Dormant Commerce Clause to a state's medical marijuana market is unpersuasive ........ 29

B. This Court Should Affirm the District Court's Denial of Peridot Tree's Preliminary Injunction Motion ........ 36

1. Peridot Tree failed to demonstrate a likelihood of success or irreparable harm ........ 37

2. The remaining *Winter* factors support denial of a preliminary injunction ........ 39

IX. CONCLUSION ........ 42

## TABLE OF AUTHORITIES

Cases

*Abbott v. Perez,*
585 U.S. 579 (2018) ............................................................................ 40

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ........................................................... 21

*Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*,
No. C20-5661 BHS, 2023 WL 1798173
(W.D. Wash. Feb. 7, 2023) (unpublished) ............................................18, 35

*City of Philadelphia v. New Jersey*,
437 U.S. 617 (1978) ............................................................................ 25

*Dean Milk v. City of Madison*,
340 U.S. 349 (1951) ............................................................................ 26

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008) ............................................................................ 23

*DISH Network Corp. v. Fed. Commc'n Comm'n*,
653 F.3d 771 (9th Cir. 2011) ............................................................... 37

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ............................................................... 36

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ........................................................ 21-22, 37

*Finch v. Treto*,
82 F.4th 572 (7th Cir. 2023) ..................................................................36, 40

*Goldie's Bookstore, Inc. v. Superior Ct. of State of California*,
739 F.2d 466 (9th Cir. 1984) ............................................................ 37-38

*Gonzales v. Raich*,
545 U.S. 1 (2005) ....................................................................2, 5, 24

*Grandpa Bud, LLC v. Chelan Cnty. Wash.*,
No. 19-cv-51 RMP, 2020 WL 2736984
(E.D. Wash. May 26, 2020) (unpublished) ............................................... 29

*Granholm v. Heald*,
544 U.S. 460 (2005) ..............................................................23, 25

*James v. City of Costa Mesa*,
700 F.3d 394 (9th Cir. 2012) ..................................................... 29

*Jensen v. Md. Cannabis Admin.*,
No. 24-0273-BAH, 2024 WL 811479
(E.D. Md. Feb. 27 2024) (unpublished) ..................................................... 36

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) ..................................................... 21

*Lowe v. City of Detroit*,
544 F.Supp.3d 804 (E.D. Mich. 2021) ..................................................... 35

*Maine v. Taylor,*
477 U.S. 131 (1986) ..................................................... 42

*Narayanan v. British Airways*,
747 F.3d 1125 (9th Cir. 2014) ..................................................... 20

*Nken v. Holder*,
556 U.S. 418 (2009) ..................................................... 21

*Ne Patients Grp. v. United Cannabis Patients & Caregivers of Me.*,
45 F.4th 542 (1st Cir. 2022)............................................2, 18, 28, 30, 32-34

*NPG, LLC v. City of Portland*,
No. 2:20-CV-00208-NT, 2020 WL 4741913
(D. Me. Aug. 14, 2020) (unpublished)..................................................... 35

*Original Invs., LLC v. Oklahoma*,
542 F. Supp. 3d 1230 (W.D. Okla. 2021) .................................................. 35

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ..................................................................................... 27

*Prudential Ins. Co. v. Benjamin*,
328 U.S. 408 (1946) ................................................................................ 30-31

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ....................................................................... 21

*Shulman v. Kaplan*,
58 F.4th 404 (9th Cir. 2023) ........................................................................ 28

*Sligh v. Kirkwood*,
237 U.S. 52 (1915) ....................................................................................... 32

*Toigo v. Dep't of Health & Sr. Servs.*,
549 F.Supp.3d 985 (W.D. Mo. 2021) .......................................................... 35

*Twitter v. Paxton*,
56 F.4th 1170 (9th Cir. 2022) ...................................................................... 20

*U.S. v. McIntosh*,
833 F.3d 1163 (2016) ................................................................................... 33

*Variscite Four, LLC & Variscite NY Five, LLC v. NY State Cannabis Control Bd.*,
No. 1:23-cv-01599 (AMN/CFH), 2024 WL 406490
(N.D. NY 2024) (unpublished) ............................................................. 35-36

*Variscite NY One, Inc. v. New York*,
640 F.Supp.3d 232 (N.D.N.Y. 2022) ...................................................... 35-36

*W. Watersheds Project v. Salazar*,
692 F.3d 921 (9th Cir. 2012) ....................................................................... 40

*Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .................................................................. 40

*Winter v. Nat. Res. Def. Council., Inc.*,
555 U.S. 7 (2008) ......................................................3, 18, 20-21, 37, 39-40

Constitutional Provisions

Dormant Commerce Clause,
U.S. Const. art. 1, § 8, cl. 3 ............................1, 2, 4, 19-20, 22-32, 34-36, 41

Federal Statutes

Controlled Substances Act,
21 U.S.C. § 812 ................................................ 1, 4, 8, 24-25, 27, 29, 32, 34

21 U.S.C. § 812(c) ........................................................................................5, 8

21 U.S.C. § 841(a)(1)......................................................................................5, 8

28 U.S.C. § 1291............................................................................................... 4

28 U.S.C. § 1331............................................................................................... 4

28 U.S.C. § 1343............................................................................................... 4

Washington State Statutes

2013 Wash. Sess. Laws 28-67 (I-502)........................................................... 10

2013 Wash. Sess. Laws 29 ............................................................................. 10

2015 Wash. Sess. Laws 287 ........................................................................... 10

2015 Wash. Sess. Laws 299-300.................................................................... 10

2020 Wash. Sess. Laws, 1710-11 ................................................................... 13

Engrossed Second Substitute S.B. 5080,
68th Leg., Reg. Sess. (Wash. 2023), ......................................................... 13

*Former* Wash. Rev. Code § 69.50.331(1)(a) (2012) ........................................ 11

*Former* Wash. Rev. Code § 69.50.331(1)(b) (2013) ........................................ 11

*Former* Wash. Rev. Code § 69.50.335(1) (2022) ............................................ 13

Wash. Rev. Code § 34.05.413 ............................................................................ 17

Wash. Rev. Code § 43.06.490 ............................................................................ 12

Wash. Rev. Code § 69.50.331(4) ........................................................................ 10

Wash. Rev. Code § 69.50.331(8)(f) .................................................................... 12

Wash. Rev. Code § 69.50.335(2)(a) .................................................................... 13

Wash. Rev. Code § 69.50.342 ............................................................................ 10

Wash. Rev. Code § 69.50.345 ............................................................................ 10

Wash. Rev. Code § 69.50.369(3) ........................................................................ 12

Wash. Rev. Code § 69.50.369(4) ........................................................................ 12

Wash. Rev. Code § 69.50.382(1) ........................................................................ 11

Wash. Rev. Code § 69.50.4013(3) ...................................................................... 11

Wash. Rev. Code § 69.50.4013(4) ...................................................................... 11

Wash. Rev. Code § 69.50.4013(6) ...................................................................... 11

Other State Statutes

Alaska Stat. § 17.38.070 ...................................................................................... 8

Alaska Stat. § 17.38.900(12) ................................................................................ 8

Alaska Stat. § 17.38.900(14) ................................................................................ 8

Alaska Stat. § 17.38.900(16)-(18) ........ 8

Cal. Bus. & Prof. Code § 26053 ........ 8

Cal. Bus. & Prof. Code § 26080 ........ 8

Cal. Bus. & Prof. Code § 26152 ........ 10

Engrossed S.B. 755,
81st Leg., Reg. Sess. (Or. 2021) ........ 28

Haw. Rev. Stat. § 329D-6 ........ 8

Haw. Rev. Stat. § 329D-9 ........ 8

Nev. Rev. Stat.§ 201.353 ........ 28

Or. Rev. Stat. § 475C.057 ........ 9

Regulations

Wash. Admin. Code § 314-55-015(2) ........ 15

Wash. Admin. Code § 314-55-020(1)(d) ........ 15

Wash. Admin. Code § 314-55-083 ........ 11

Wash. Admin. Code § 314-55-095 ........ 12

Wash. Admin. Code § 314-55-105(2)(g)(ii) ........ 11

Wash. Admin. Code § 314-55-105(3)(h)(ii) ........ 11

Wash. Admin. Code § 314-55-105(4)(g)(ii) ........ 11

Wash. Admin. Code § 314-55-105(5)(f)(ii) ........ 12

Wash. Admin. Code § 314-55-105(6)(f)(ii) ........ 12

Wash. Admin. Code § 314-55-105(7(f)(i) ........ 12

Wash. Admin. Code § 314-55-135 .................................................................. 11

Wash. Admin. Code § 314-55-520 .................................................................. 12

Wash. Admin. Code § 314-55-570(2) ............................................................ 15

Wash. Admin. Code § 314-55-570(3)(c)(ii) ..................................................... 14

Other Authorities

Cannabis Law Deskbook § 2:18,
*Regulatory structure and key legal and policy considerations—*
*Intersection with federal law*, (2023-24 ed.) .................................................. 8

Cannabis Law Deskbook § 13:6,
*Case study: competing approaches to vertical integration* (2023-24 ed.) ..... 9

*Nat'l Council State Legislatures*,
Report on State Medical Cannabis Laws,
https://www.ncsl.org/health/state-medical-cannabis-laws ............................. 5

*The Cannabis Industry: Vertical Integration Laws* (2003)
https://presentations.curf.upenn.edu/sites/default/files/poster_upload/20
20-9/The%20Cannabis%20Industry_%20Vertical%20
Integration%20Laws.pdf ........................................................................ 9

# I. INTRODUCTION

Appellant Peridot Tree claims that the dormant Commerce Clause protects an interstate cannabis market, even though Congress has prohibited such a market under its affirmative Commerce Clause power. But it makes no sense to apply Congress's Commerce authority to foster an interstate market that Congress has outlawed. This Court should reject Peridot Tree's argument and affirm the district court's dismissal of its complaint.

In enacting the Controlled Substances Act in 1970, Congress categorized cannabis as a Schedule I drug, prohibiting its possession and distribution. Since then, about half of all states have legalized cannabis under state law. But in recognition of federal criminal enforcement priorities, these states have maintained closed intrastate markets to prevent diversion of cannabis into illegal channels and or states that outlaw cannabis. Washington's tightly regulated intrastate market has been hugely successful in displacing the illegal cannabis market within the state.

Peridot Tree now claims a constitutional right to participate in this closed intrastate market, effectively constitutionalizing an interstate cannabis market. Accepting Peridot Tree's argument, however, would threaten important state restrictions on the production, distribution, sale, and marketing of cannabis and

undermine Congress's authority over interstate commerce by bolstering the illegal interstate cannabis market in conflict with federal law.

Peridot Tree seeks to minimize the import of its request by implying that it only wants to *invest* across state lines, not *sell cannabis* across state lines, but its argument offers no limiting principle that would restrict its impact. And accepting its argument would call into question state authority on a range of other issues. Nevada, for example, has legalized prostitution, but this cannot mean it must permit trafficking of sex workers into its state under dormant Commerce Clause principles. There is simply no constitutional right to participate in a federally illegal market.

Peridot Tree's constitutional challenge relies almost entirely on *Northeast Patients Group v. United Cannabis Patients and Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022), but that non-binding decision misapplied Commerce Clause principles. It suggested that because the Supreme Court has recognized the existence of an illegal interstate market for cannabis, and that Congress can therefore regulate cannabis under its affirmative Commerce Clause power, *Gonzales v. Raich*, 545 U.S. 1 (2005), the dormant Commerce Clause must protect that same market. But that makes no sense. Just because an interstate market exists in some product *despite* Congress's effort to stamp it out in no way

indicates that Congress wants to protect that interstate market. As the district court aptly concluded, courts should not use the dormant Commerce Clause to "effectively legalize interstate participation in the cannabis market while Congress's exercise of its affirmative Commerce Clause power continues to declare that market illegal." ER-35-36. The district court properly dismissed Peridot Tree's complaint.

The court also appropriately denied Peridot Tree's motion for preliminary injunction. Peridot Tree not only failed to demonstrate a likelihood of success, but the court rightly concluded that the remaining *Winter* factors weigh against preliminary injunctive relief. *Winter v. Nat. Res. Def. Council., Inc.*, 555 U.S. 7 (2008). The court rejected Peridot Tree's discredited assertions of irreparable harm and found that a preliminary injunction would harm the reliance interests of non-parties, while undermining Washington's compliance with federal enforcement priorities. Peridot Tree fails to dispute most of these findings, let alone show they are illogical, implausible, or without support in the record.

This Court should affirm the district court's dismissal of Peridot Tree's claims and its denial of Peridot Tree's motion for preliminary injunction.

## II. JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291.

## III. STATUTORY AUTHORITIES

All applicable statutes are contained in the Addendum to this Brief.

## IV. ISSUES PRESENTED

1. Whether the district court properly dismissed Peridot Tree's complaint asserting a violation of the dormant Commerce Clause when Congress has affirmatively prohibited interstate commerce in cannabis.
2. Whether the district court properly declined to preliminarily enjoin a state residency requirement for a cannabis license program under the dormant Commerce Clause when Congress has affirmatively prohibited interstate commerce in cannabis, and a preliminary injunction would harm non-party applicants and disrupt the State's compliance with federal enforcement priorities for cannabis.

## V. STATEMENT OF THE CASE

### A. Congress Prohibited an Interstate Market for Cannabis

Congress passed the Controlled Substances Act (CSA) in 1970,

establishing "a comprehensive regime to combat the international and interstate traffic in illicit drugs." *Gonzales v. Raich,* 545 U.S. 1, 12 (2005). In passing the CSA, Congress classified cannabis as a Schedule I drug, a designation reserved for substances deemed by Congress as having a high potential for abuse and no accepted medical use. 21 U.S.C. § 812(c). The CSA makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" Schedule I drugs. 21 U.S.C. § 841(a)(1); *see also* 21 U.S.C. § 812(c).

Although federal law prohibits cannabis, many states have legalized possession and sales of cannabis as a matter of state law. Currently, 24 states, two territories, and the District of Columbia authorize cannabis for recreational purposes. *Nat'l Council State Legislatures*, Report on State Medical Cannabis Laws, https://www.ncsl.org/health/state-medical-cannabis-laws (last visited Sept. 6, 2024). Fourteen additional states and one territory authorize comprehensive medical cannabis programs. *Id*. The remaining states bar cannabis or only permit access to cannabidiol (CBD) or cannabis with a low-THC content for limited purposes. *Id.* Many states with legalized cannabis markets, like Washington, share a border with states that continue to criminalize the drug, such as Idaho.

Since states began legalizing cannabis more than a decade ago, federal prosecutors have outlined principles of prosecutorial discretion to decide whether to prosecute federal drug crimes against cannabis possession and distribution. ER-15. Specifically, in 2013, following the legalization of cannabis in Colorado and Washington, U.S. Deputy Attorney General James Cole issued a memorandum entitled "Guidance Regarding Marijuana Enforcement" (the Cole Memo). ER-15; SER-4-7. The memorandum identifies the primary enforcement priorities of the Department of Justice with respect to cannabis possession and sales.

These enforcement priorities are to prevent: (1) "distribution of marijuana to minors;" (2) "revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;" (3) "*the diversion of marijuana from states where it is legal under state law in some form to other states*;" (4) "state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or illegal activity;" (5) "violence and the use of firearms in the cultivation and distribution of marijuana;" (6) "drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use;" (7) "the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana

production on public lands;" and (8) "marijuana possession or use on federal property." ER-15 (emphasis added); SER-4-5. The memorandum specifies that states may comply with these enforcement priorities by, among other things, "implementing effective measures to prevent diversion of marijuana outside of the regulated system and to other states." SER-6.

In exercising prosecutorial discretion, the memorandum directs federal prosecutors to consider whether a cannabis "operation is demonstrably in compliance with a strong and effective state regulatory system" and "whether the conduct at issue implicates one or more of the enforcement priorities." *Id.* The memorandum warns that "[i]f state enforcement efforts are not sufficiently robust to protect against the harms . . . the federal government may seek to challenge the regulatory structure itself." ER-150; SER-6.

Although the Department of Justice later rescinded the memorandum, it continues to apply a policy of exercising prosecutorial discretion in states that have legalized cannabis. ER-150; SER-9-11.

**B. State Cannabis Markets are Designed as Closed Systems**

Given the federal prohibition of cannabis, cannabis businesses differ from businesses dealing with entirely lawful goods or services. Distributing or transporting cannabis across state lines constitutes drug trafficking in violation

of the CSA and other federal statutes. 21 U.S.C. § 841(a)(1); 21 U.S.C. § 812(c). As such, cannabis businesses cannot establish interstate operations. They cannot, for example, establish interstate cannabis supply chains, operate regional distribution centers, advertise products nationally, send cannabis products across state lines, access commercial banking services, or list directly on an American national stock exchange. 21 U.S.C. § 841(a)(1); 21 U.S.C. § 812(c).

Instead, consistent with the Cole Memorandum, states with legal cannabis markets maintain such markets as closed systems. *See, e.g.*, Cannabis Law Deskbook § 2:18, *Regulatory structure and key legal and policy considerations—Intersection with federal law*, (2023-24 ed.); *see also* Cal. Bus. & Prof. Code § 26053 ("All commercial cannabis activity shall be conducted between licensees."); § 26080 (prohibiting licensees to "transport or distribute or cause to be transported or distributed, cannabis or cannabis products outside the state."); Alaska Stat. §§ 17.38.070 (limiting activities to registered marijuana entities), .900(12), (14), (16)-(18) (requiring registration for marijuana cultivation, testing, manufacturing, and retail facilities); Haw. Rev. Stat. § 329D-9 (production limited to licensed dispensary), § 329D-6 (cannabis cannot be transported outside of county or to another island); Or. Rev.

Stat. § 475C.057 (only licensees and licensee representatives may produce, deliver, and possess marijuana items subject to the provisions of state law).

Within these closed systems, legal cannabis must be cultivated, distributed, and sold entirely within the same state, and each state regulates the possession and sale of cannabis in different ways. Cannabis Law Deskbook § 13:6, *Case study: competing approaches to vertical integration* (2023-24 ed.). For example, some states, like Washington, prohibit vertical integration of cannabis-related operations, precluding a single business from both producing and selling cannabis products. *Id.*; *see also The Cannabis Industry: Vertical Integration Laws* (2003).[1] Other states like California, Arizona, and Nevada, permit vertical integration by cannabis retailers. *Id.*

States also impose differing packaging and labeling requirements, and differing restrictions on retail sales. Some states, like California, Vermont, Oregon, and New York, for example, allow retail delivery of cannabis under certain conditions, while most states generally prohibit such services. *Id.* Many states prohibit advertising of state cannabis businesses outside the state. For example, California recently enacted a law prohibiting billboard advertising on

---

[1] https://presentations.curf.upenn.edu/sites/default/files/poster_upload/2020-9/The%20Cannabis%20Industry_%20Vertical%20Integration%20Laws.pdf (last viewed Sept. 5, 2024).

in-state highways heading out of state. *See, e.g.*, Cal. Bus. & Prof. Code § 26152 (prohibiting cannabis advertising on an Interstate Highway or State Highway that crosses the California border).

Washington has maintained a closed legal cannabis market for more than a decade. In 2012, Washington voters approved Initiative Measure No. 502 (I-502). ER 145-46. I-502 established a regulatory system for the sale, production, and processing of limited amounts of cannabis for recreational use by adults. I-502, 2013 Wash. Sess. Laws 28-67. Washingtonians empowered the Liquor and Cannabis Board (Board) to enforce I-502 and to implement rules to meet the goal of "tak[ing] marijuana out of the hands of illegal drug organizations" and creating "a tightly regulated, state-licensed system similar to that for controlling hard alcohol." 2013 Wash. Sess. Laws 29; Wash. Rev. Code §§ 69.50.331(4), .342, .345; ER-145-46. The initiative limited participation in the state-regulated market to Washington residents. ER-146.

In 2015, Washington merged its adult-use and medical marijuana markets and expanded the number of retail licenses available. 2015 Wash. Sess. Laws 287, 299-300; ER-147. The Legislature mandated that priority for these new licenses be given to those who had previously operated a Washington

collective garden and paid Washington taxes. *See Former* Wash. Rev. Code § 69.50.331(1)(a) (2015). ER-147.

Washington has enacted dozens of laws to maintain its legal cannabis market as a closed system and to prevent diversion of legal cannabis to neighboring states, including to Idaho, where cannabis remains illegal. Since 2012, the State has permitted only Washington residents to obtain a cannabis business license. ER-146 (citing *Former* Wash. Rev. Code § 69.50.331(1)(b) (2013)). Washington also permits purchase and receipt of cannabis concentrates, useable cannabis, or cannabis-infused products only when the products have been properly packaged and labeled from a cannabis processor licensed by the State, from an authorized location within the State. *See* Wash. Rev. Code §§ 69.50.360(1); .4013(3), (4), (6); Wash. Admin. Code § 314-55-135. Only licensed common carriers may transport cannabis and may do so only within the State. Wash. Rev. Code § 69.50.382(1).

The State also mandates seed-to-sale traceability of all cannabis products to prevent illegally cultivated cannabis from entering the regulated market and requires packaging of cannabis products to include the traceability number, as well as a warning that the product is "unlawful outside Washington State." Wash. Admin. Code §§ 314-55-083, -105(2)(g)(ii), (3)(h)(ii), (4)(g)(ii),

(5)(f)(ii), (6)(f)(ii), (7(f)(i). Washington imposes possession limits as another mechanism to prevent out-of-state diversion. Wash. Admin. Code § 314-55-095.

In addition, Washington limits out-of-state marketing of cannabis, as well as cannabis advertising at transportation hubs, such as bus stops, train stations, and airports. Wash. Rev. Code §§ 69.50.369 (3), (4). Washington cannot license the sale or possession of cannabis on federal property located within the State and requires a tribal agreement for sale of Washington-produced cannabis on tribal lands. Wash. Rev. Code §§ 69.50.331(8)(f), 43.06.490. State law imposes license cancellation penalties for diverting product, selling or purchasing cannabis from non-Washington licensed entities, transporting cannabis out-of-state, or allowing a true party of interest to operate a cannabis licensed business who is not qualified under Washington law. Wash. Admin. Code § 314-55-520.

### C. Washington Adopted a Social Equity Program to Mitigate the Harms Resulting from Prior Enforcement of Cannabis-Related Laws

Washington's Legislature adopted a Social Equity Program in 2020 to mitigate "harms resulting from the enforcement of cannabis-related laws in disproportionally impacted areas . . ." and to "further an equitable cannabis industry by promoting business ownership among individuals who have resided

in areas of high poverty and high enforcement of cannabis-related laws." 2020 Wash. Sess. Laws 1710-11.

The Social Equity Program required the Board to hold all retail cannabis licenses "that had been subject to forfeiture, revocation or cancellation by the board," and any cannabis license that could have been issued but had not been issued from December 1, 2020, to July 1, 2029. *Former* Wash. Rev. Code § 69.50.335(1) (2022).[2] Under the law, these reserved licenses may only be awarded to Social Equity applicants. Wash. Rev. Code § 69.50.335(2)(a).

To qualify for the program, applicants must meet statutory age and residency requirements, and two of the following three criteria:

- Lived in a disproportionately impacted area in Washington for a minimum of five years between 1980 and 2010
- Been arrested or convicted of a cannabis offense, or had a family member arrested or convicted of a cannabis offense
- Had a household income in the year prior to submitting an application of less than the median household income in Washington.

[2] In 2023, Washington's Legislature adopted ESSB 5080, which changed the definition of a disproportionally impacted area and of a Social Equity applicant. *See* Engrossed Second Substitute S.B. 5080, §3, 68th Leg., Reg. Sess. (Wash. 2023), codified in Wash. Rev. Code § 69.50.335(6) (2023).

Wash. Admin. Code § 314-55-570 (2)(b)(i)-(iii); Wash. Rev. Code § 69.50.335; ER-151.

Qualified applicants are then scored based on criteria adopted in Wash. Admin Code § 314-55-570(3)(c)(viii) to determine allocation of the limited licenses available under the program. ER-169-70. Applicants with the highest scores within their county are selected to continue the licensing process to obtain an available retail cannabis license. Wash. Admin Code § 314-55-570(3)(d). In the event of a tie between applicants, a double-blind lottery is conducted to select the applicants to complete the process for obtaining a license. *Id*.

The Social Equity application window opened on March 1, 2023, and closed April 27, 2023. The Board received approximately 500 Social Equity applications for 46 open retail license allotments in counties throughout the State. ER-160. A third-party contractor, Ponder Diversity Group, began evaluating and scoring applications in May 2023. Ponder required each applicant to complete an online application and questionnaire and provide supporting documents. ER-160-61; *see also* Wash. Admin. Code § 314-55-570(3)(c)(ii). Ponder then conducted a Preliminary Qualification Review to ensure that an applicant met the basic criteria for licensure and the requirements for the Social Equity Program.

*See* ER-160-61; Wash. Admin. Code §§ 314-55-015(2), -020(1)(d), -570(2). If an applicant was not qualified, Ponder did not score the applicant. ER-160-61. For qualified applicants, Ponder verified the applicant's answers and scored the applicant. *Id.*

Ponder completed its review of all Social Equity applications on August 31, 2023, and submitted a list of eligible applicants and their scores to the Board, as well as a list of ineligible candidates. ER-161. Ponder also provided the Board with its review spreadsheets, score sheets, and supporting documentation submitted by each applicant. *Id.*

Qualified applicants with the highest scores in each county, or who were selected by lottery, were notified on September 17, 2023, and allowed to start the licensing process. ER-161. The licensing process includes finding a location for a retail marijuana store within the selected county, building out the location to meet all applicable legal requirements, including those of the local jurisdiction, and purchasing required equipment. ER-161-62. Once everything is in place, and after payment of the license fee, the Board conducts a final inspection of the location and then issues a license.

At the time of the preliminary injunction hearing below, at least two applicants had acquired rights to specific locations, and had built out, or were in

the process of building out, their retail marijuana stores. ER-161-62. The cost of these buildouts can range from $40,000 to $125,000, in addition to the costs associated with buying or leasing the premises. *Id*.

**D. Peridot Tree's Application**

Peridot Tree filed its application for a retail marijuana store under the Social Equity Program, and its application was sent to Ponder for evaluation. In its answer to Ponder's questionnaire, Peridot Tree indicated a majority owner (51%) had lived in a Washington "disproportionally impacted area" for a minimum of five years, had been convicted of a cannabis offense, and had a household income less than the median household income ($82,400) within the state of Washington as calculated by the United States Census Bureau.

As part of its supporting documentation, however, Peridot Tree submitted information attempting to validate that its majority owner lived in a disproportionately impacted area in Michigan. The majority owner, Kenneth Gay, claimed to have lived in the same location for 20 years and that his address was designated as a disproportionately impacted area by Michigan. Peridot Tree submitted no proof that the criteria Michigan uses to designate a disproportionately impacted area are identical to Washington's criteria, or

specifying the periods in which his area of residence was considered a disproportionately impacted area. ER-149.

At the end of August 2023, Ponder notified the Board that Peridot Tree was not qualified for the Social Equity Program because its members did not meet Washington's residency requirement. ER-161. Based on Ponder's conclusion, on September 17, 2023, the Board sent a letter by email to Peridot Tree stating it was withdrawing Peridot Tree's application because it did not meet the minimum qualifications for the program. ER-171-74.

The Board also sent information about how to challenge the determination and a form for the applicant to request a formal administrative hearing pursuant to Wash. Rev. Code § 34.05.413. ER-165. By statute, an applicant must file its formal request for a hearing within 20 days of service of the Statement of Intent or forfeit any challenge to the decision. *Id*. Peridot Tree did not submit an appeal, and the decision is now final and cannot be challenged.

### E. The District Court Denied Peridot Tree's Motion for Preliminary Injunction and Subsequently Dismissed its Complaint

Peridot Tree did not file its complaint and motion for temporary restraining order and preliminary injunction until early December 2023. ER-21. The district court denied Peridot Tree's motion for preliminary injunction,

finding that Peridot failed to meet any of the four *Winter* factors. Starting with the likelihood of success, the district court agreed with the "persuasive[]" dissent by Judge Gelpí in *Northeast Patients Group v. United Cannabis Patients and Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022), that "illegal markets are constitutionally different in kind" than legal markets and that "it makes little sense why the dormant Commerce Clause would protect an interstate market that Congress affirmatively prohibited, given that protecting this market would facilitate illegal interstate activity." ER-29-32 (also citing *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023) (unpublished) (holding that dormant Commerce Clause does not apply to federally illegal interstate markets)).

The district court held that Peridot Tree also failed to demonstrate the remaining *Winter* factors, rejecting its factual arguments regarding irreparable harm, including that it would be blocked altogether from Washington's cannabis market or from early entry in the market if the Social Equity Program were not enjoined. ER-32-34. The court likewise found that the balance of equities and public interest favored denial of the preliminary injunction. It found that a preliminary injunction would harm successful applicants in the Social Equity Program, who had spent thousands of dollars in reliance on approval of their

applications. ER-34-36. It further found that "Washington's comprehensive regulatory system serves its citizens' interests in maintaining their local autonomy to experiment with cannabis legalization while minimizing their risk of federal prosecution." ER-34-35. The district court noted the delicate balance of federalism at play in state-regulated cannabis markets and held it was not the court's "role to use the dormant Commerce Clause to shortcut that process and effectively legalize interstate participation in the cannabis market while Congress's exercise of its affirmative Commerce Clause power continues to declare that market illegal." ER-35-36.

Peridot Tree appealed the denial of its preliminary injunction motion. While that appeal was pending, the district court granted the State's motion to dismiss on May 31, 2004. The district court adopted its analysis of the merits of Peridot Tree's dormant Commerce Clause challenge from the Preliminary Injunction Order. ER-12.

The State thereafter moved to dismiss Peridot Tree's appeal of the order denying its motion for preliminary injunction, which this Court granted on June 21, 2004. Peridot Tree then filed this appeal.

## VI. SUMMARY OF ARGUMENT

This Court should affirm the district court's dismissal of Peridot Tree's complaint and the denial of its preliminary injunction motion. The district court correctly held that the dormant Commerce Clause does not protect Peridot Tree's right to participate in an interstate market that Congress has declared illegal. Extending dormant Commerce Clause protections to an illegal interstate market would conflict with the purpose of the doctrine and undermine Congress's primary authority over interstate commerce. On these grounds alone, this Court should affirm both of the district court's orders.

This Court should also affirm the denial of a preliminary injunction because Peridot Tree failed to demonstrate irreparable harm and cannot show that the district court abused its discretion or committed clear error in finding the remaining *Winter* factors weigh against preliminarily enjoining Washington's Social Equity Program.

## VII. STANDARD OF REVIEW

This Court reviews a grant of a motion to dismiss de novo. *Narayanan v. British Airways*, 747 F.3d 1125, 1127 (9th Cir. 2014). A district court's decision may be affirmed on any ground supported by the record, even if not relied on by the district court. *Twitter v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022).

A district court's denial of a preliminary injunction is reviewed for an abuse of discretion, while its factual findings are reviewed for clear error. *Doe v. Snyder*, 28 F.4th 103, 111–12 (9th Cir. 2022). "This review is 'limited and deferential,' and it does not extend to the underlying merits of the case." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

The party seeking injunctive relief bears the burden of making a clear showing that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Where, as here, the nonmovant is the government, the last two *Winter* factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020) (per curiam).

Because Peridot Tree seeks to "unwind any licenses Respondents granted after December 4, 2023," (Opening Br. at 50),[3] the heightened standard

[3] This is newly requested relief, as Peridot Tree sought only a prohibitory injunction below.

governing mandatory injunctions applies. *Snyder*, 28 F.4th at 111 (defining a "mandatory injunction as one that goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits"). In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id*.

# VIII. ARGUMENT

## A. The District Court Properly Dismissed Peridot Tree's Complaint

### 1. The Dormant Commerce Clause does not apply to illegal interstate markets

This Court should affirm the dismissal of Peridot Tree's complaint because the dormant Commerce Clause does not apply to illegal interstate markets like the interstate market for cannabis. The fundamental purpose of the dormant Commerce Clause is to protect and foster the free commerce of legal goods and services among states. But because federal law broadly prohibits cannabis, there is no legal interstate cannabis market. Using Congress's own Commerce authority to protect and bolster an interstate market that Congress has specifically chosen to outlaw would conflict with the purpose of the dormant Commerce Clause, weaken federal law, and lead to absurd results.

The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court long ago recognized that the Commerce Clause also has a negative aspect to it, referred to as the dormant Commerce Clause. As a judicially created doctrine implied from the intent and purpose of the Commerce Clause rather than its text, the Supreme Court has applied the doctrine and defined its outer limits according to its core purpose. This core purpose is to "preserve a national market for goods and services" and "to avoid tendencies toward economic Balkanization that had plagued relations" among the colonies and early states. *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325-326 (1979)). Accordingly, the dormant Commerce Clause limits state laws that unduly restrict interstate commerce, including discriminatory state laws that favor in-state economic interests by burdening out-of-state competitors. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008).

The Supreme Court, however, has never applied the dormant Commerce Clause to protect and bolster an interstate market that Congress has specifically prohibited. Here, Congress enacted the CSA and outlawed cannabis using its affirmative Commerce Clause power. *Gonzales*, 545 U.S. at 15. Using the

dormant Commerce Clause to protect an interstate market that Congress specifically prohibited would conflict with the purpose of the doctrine.

As detailed above, cannabis occupies a unique, liminal space in U.S. markets: it is federally prohibited but authorized under state law in approximately half of the states. Federal prosecutors have indicated a détente in prosecuting federal law against cannabis possession and distribution that complies with state law, as long as states prevent diversion of regulated cannabis into other states or illegal channels. While states authorize intrastate cannabis markets subject to these conditions, the CSA prohibits any interstate market in cannabis. As long as cannabis remains a federally prohibited drug, cannabis businesses cannot operate like ordinary businesses that deal in wholly lawful goods or services. They are not permitted under federal law to sell their products across state lines, operate regional distribution centers, or even have commercial bank accounts.

Extending dormant Commerce Clause protections to state cannabis businesses would severely undermine the CSA's prohibition of interstate commerce in cannabis. Applying dormant Commerce Clause rules to the cannabis market would not only permit nonresidents to become licensed in a particular state's legal market but would also jeopardize all manner of state laws

aimed at preventing diversion of cannabis out-of-state or into illegal channels and to prevent criminal elements from overtaking regulated state cannabis markets.

The Supreme Court, for example, has applied the dormant Commerce Clause to strike down numerous state laws prohibiting out-of-state economic actors from selling to in-state consumers or otherwise closing its borders to out-of-state products. *See, e.g., Granholm*, 544 U.S. at 466 (striking down California law allowing in-state wineries to ship wine directly to state's consumers but prohibiting out-of-state wineries from doing so); *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978) (striking down New Jersey statute closing state borders to importation of most out-of-state waste). Applying these rules to state-regulated cannabis markets would require states to permit interstate cannabis sales in direct contravention of the CSA. Because Washington allows cannabis to be sold to Washington residents by Washington retailers, if dormant Commerce Clause protections applied to the market, the State could be required to allow sales to its residents from out-of-state cannabis businesses, with little ability to track whether these sales came from legal or illegal sources. Similarly, if Washington allows common carriers to transport cannabis within the State for in-state sales, it could be required to allow transport of cannabis for interstate

sales, including to transport Washington-grown cannabis to other states. And states that allow in-state retailers to deliver cannabis to in-state customers would presumably be required to allow deliveries to out-of-state customers, or to allow out-of-state sellers to deliver cannabis to in-state customers. The interstate cannabis market would likely flourish in such circumstances, diminishing states' ability to track legal cannabis cultivation, provenance, distribution, and sales, and facilitating interstate trafficking of cannabis. ER 155-58, 149-54.

Extending dormant Commerce Clause protections would not only promote interstate trafficking of cannabis, it could also jeopardize states' licensing regimes for cannabis markets, as well as states' labeling and packaging requirements, designed to ensure legal cultivation and prevent diversion. For example, in *Dean Milk v. City of Madison*, 340 U.S. 349, 353-54 (1951), the Supreme Court struck down a local ordinance prohibiting the sale, importation, or storage of milk within city limits unless sourced from a supplier issued a permit by city officials after an inspection. The court found that the ordinance had the practical effect of discriminating against milk produced and pasteurized outside the state. And in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 144-46 (1970), the Supreme Court held that a non-discriminatory agency order prohibiting state-grown fruit from being shipped out-of-state for packing and

processing violated the dormant Commerce Clause because it imposed a burden on interstate commerce that was "clearly excessive in relation to the putative local benefits."

Applying these rules to state-regulated cannabis markets could bar states from limiting their legal cannabis markets to cannabis cultivated, distributed, or sold by licensed businesses after inspection by the state. This would inhibit states' ability to prevent diversion and exclude cartels and gangs from participating in legal cannabis markets. ER 156-58, 151-52. And under the *Pike* balancing test, state packaging and labeling requirements could also be challenged as imposing burdens that are "clearly excessive in relation to the putative local benefits." *Id.* It is hard to fathom how it furthers the purpose of the Commerce Clause to use Congress's Commerce power to thwart a law—the CSA—that Congress passed using that same authority.

While Peridot Tree claims that this case does not involve cannabis crossing state lines, it offers no limiting principle that would allow application of dormant Commerce Clause principles here, but otherwise permit state laws restricting diversion of legal cannabis out-of-state.

The absurdity of extending constitutional protections to illegal interstate markets is even more stark when these rules are applied to other Schedule I

drugs, or other illegal commerce. *See, e.g., Ne. Patients Grp.*, 45 F.4th at 559 (J. Gelpí, dissenting). Oregon, for example, had previously decriminalized most Schedule I drugs as a matter of state law. *See* Engrossed S.B. 755, 81st Leg., Reg. Sess. (Or. 2021). And Nevada has legalized prostitution as a matter of state law. *See* Nev. Rev. Stat.§ 201.353. But this cannot mean that these states would be required to permit trafficking of heroin or sex workers into their states by operation of the dormant Commerce Clause.

In other contexts, this Court has recognized the absurdity of allowing individuals to come to federal court to vindicate alleged statutory or constitutional interests in illegal goods or commerce. *See, e.g., Shulman v. Kaplan*, 58 F.4th 404, 411 (9th Cir. 2023) (holding that plaintiffs cannot assert RICO claims based on asserted property interests in cannabis when it is "clearly illegal under federal law" and comparing claim to heroin dealer suing in federal court to recover stolen heroin shipment); *James v. City of Costa Mesa*, 700 F.3d 394, 405 (9th Cir. 2012) (rejecting plaintiffs' equal protection argument that implementation of a D.C. medical marijuana initiative resulted in unequal treatment of D.C. and California residents, noting that "[l]ocal decriminalization notwithstanding, the unambiguous *federal* prohibitions on medical marijuana use set forth in the CSA continue to apply equally in [all] jurisdictions"); *see*

*also, e.g.*, *Grandpa Bud, LLC v. Chelan Cnty. Wash.*, No. 19-cv-51 RMP, 2020 WL 2736984, at *4 (E.D. Wash. May 26, 2020) (unpublished) ("Even when cannabis production is a legitimate use of one's property at the state level, such use is not recognized as a protectable property interest under the U.S. Constitution.").

This Court should draw the same line here. As the district court rightly concluded: "Peridot cannot use the dormant Commerce Clause to demand a constitutional right to participate in an illegal interstate market." ER-31.

**2. Out-of-Circuit case law extending the Dormant Commerce Clause to a state's medical marijuana market is unpersuasive**

Peridot Tree does not grapple with any of these implications of its arguments, but instead relies entirely on out-of-circuit cases that applied dormant Commerce Clause protections to state medical cannabis markets. Peridot Tree relies primarily on the First Circuit's decision in *Northeast Patients Group*, but that decision is not persuasive here for numerous reasons.

First, the court in *Northeast Patients Group* erroneously blurred the distinction between Congress's affirmative authority under the Commerce Clause and limits on state authority under the dormant Commerce Clause. The First Circuit relied primarily on the Supreme Court's decision in *Gonzales*, which held that Congress did not exceed its affirmative Commerce Clause

authority by prohibiting cultivation of cannabis for personal medical use because cannabis is a "fungible commodity for which there is an established, albeit illegal, interstate market." *Ne. Patients Grp.*, 45 F.4th at 547 (emphasis in original) (quoting *Gonzales*, 545 U.S. at 18). But while the existence of an illegal interstate cannabis market certainly supports exercise of Congress's affirmative authority under the Commerce Clause, the Supreme Court has never held that this alone supports extending dormant Commerce Clause protections to that same illegal market.

To the contrary, the Supreme Court has long warned *against* equating Congress's affirmative Commerce Clause authority and the implied prohibitions on state power under the dormant Commerce Clause. *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 423 (1946). That is because the Commerce Clause grants Congress "plenary and supreme authority" over interstate and foreign commerce, including the power to both "promote and to prohibit interstate commerce." *Id.*at 423, 434 This authority is "entirely distinct from the implied prohibition of the commerce clause," which limits state power with respect to "matters within the field of commerce, once this is defined." *Id*. at 423. While this distinction is not "always clearly observed," "to blur them, and thereby

equate the implied prohibition with the affirmative endowment is altogether fallacious. There is no such equivalence." *Id.*

The First Circuit did exactly what *Prudential* forbade. It cited Congress's broad affirmative authority to *prohibit* an illegal interstate cannabis market as the basis to *protect* that same illegal market under the dormant Commerce Clause. But it makes no sense to interpret the dormant Commerce Clause in such a self-sabotaging way. Just because something is traded in interstate commerce and thus properly regulated by Congress, such as illegal drugs or trafficking victims, does not mean that the dormant Commerce Clause protects those illegal interstate markets.

Rather, the Supreme Court has recognized that certain articles of commerce, such as impure foods, "are not the legitimate subject of trade or commerce, nor within the protection of the commerce clause of the Constitution." *Sligh v. Kirkwood*, 237 U.S. 52, 59–60 (1915). By classifying cannabis as a prohibited drug under the CSA, Congress has effectively deemed cannabis "not the legitimate subject of trade or commerce" in the interstate market and thus outside the protections of the dormant Commerce Clause. *Id.* Courts should not allow the mere existence of an illegal market to be weaponized against Congress's own laws.

Second, *Northeast Patients Group* also erred by suggesting, in response to arguments by the dissent, that Congress may have a legitimate interest in preventing cannabis trade wars between states despite the illegality of an interstate cannabis market. *Ne. Patients Grp.*, 45 F.4th at 553. But this concern makes no sense in light of the prohibitions of the CSA. Given that Congress has made clear that it wants no interstate market in cannabis at all, why would Congress oppose states restricting their cannabis markets to their own residents? Indeed, the Department of Justice has made clear that states must restrict cannabis markets to their own residents to limit their risk of prosecution. *See* pp. 5-7 *supra*. States have also passed numerous laws to ensure their markets remain closed. pp. 7-11 *supra.* Given the CSA, there is no risk of a trade war: and, in any event, such a risk would not justify fostering a federally illegal market.

Third, this case is also distinguishable from *Northeast Patients Group* because the First Circuit addressed only the medical marijuana market and relied in part on its determination that, with the Rohrbacher-Farr Amendment, Congress "acknowledged the existence of a market in medical marijuana" and that "this market may continue to exist in some circumstances free from federal criminal enforcement and thus subject only to state regulation." *Ne. Patients*

*Grp.*, 45 F.4th at 547 (citing Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, § 531, 136 Stat. 49 (2022) (providing that "[n]one of the funds made available under this Act to the Department of Justice may be used, with respect to [Maine and other states], to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana")). This Court, however, has interpreted the Rohrbacher-Farr Amendment differently. *See, e.g.*, *U.S. v. McIntosh*, 833 F.3d 1163, 1179 n.5 (2016) (recognizing that, while "Congress currently restricts the government from spending certain funds to prosecute certain individuals," that can change at any time with Congress restoring funding, permitting the government to prosecute individuals who committed offenses while the government lacked funding, or with a change of administration and enforcement priorities). And in any event, the Rohrbacher-Farr amendment has no application to the recreational cannabis market and thus distinguishes *Northeast Patients Group* from this case.

Fourth, the First Circuit erroneously held that the dormant Commerce Clause protects the interstate cannabis market because the CSA does not "expressly state" or make "unmistakably clear" Congress's intent to obviate dormant Commerce Clause's protections with respect to cannabis. *Ne. Patients*

*Grp.*, 45 F.4th at 551. But it makes no sense to apply this test the same way to an *illegal* interstate market, as opposed to a legal market. As the dissent in *Northeast Patients Group* recognized, courts should not expect "Congress to speak out of both sides of its mouth on this issue, simultaneously illegalizing marijuana while affirmatively granting states the power to burden interstate commerce 'in a manner which would otherwise not be permissible.' '" *Id*. at 559 (J. Gelpí, dissenting) (quoting *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982)). Congress made it "unmistakably clear" in the CSA that an interstate cannabis market is prohibited. This Court should not use the dormant Commerce Clause to thwart Congress's determination on this issue.

Finally, most of the district court cases cited by Peridot Tree followed the similarly faulty logic of the Maine District Court in *NPG, LLC v. City of Portland*, without additional analysis, and are unpersuasive for the same reasons. *See NPG, LLC v. City of Portland*, No. 2:20-CV-00208-NT, 2020 WL 4741913 at *10 (D. Me. Aug. 14, 2020) (unpublished); *Lowe v. City of Detroit*, 544 F.Supp.3d 804, 816 (E.D. Mich. 2021); *Toigo v. Dep't of Health & Sr. Servs.*, 549 F.Supp.3d 985, 990 (W.D. Mo. 2021); *Variscite NY One, Inc. v. New York*, 640 F.Supp.3d 232 (N.D.N.Y. 2022); *but see Brinkmeyer*, 2023 WL 1798173, *11 (dormant Commerce Clause has no role in protecting illegal interstate

commerce); *Original Invs., LLC v. Oklahoma*, 542 F. Supp. 3d 1230, 1235 (W.D. Okla. 2021) (dismissing plaintiff's dormant Commerce Clause challenge to residency bar in state medical cannabis market because plaintiff seeks "relief in order to engage in activities that Congress has expressly declared to be criminal under federal law").

Notably, since the district court's well-reasoned decision in this case, the tide has turned, with most district courts following the decision below. *See, e.g.*, *Variscite Four, LLC & Variscite NY Five, LLC v. NY State Cannabis Control Bd.*, No. 1:23-cv-01599 (AMN/CFH), 2024 WL 406490 (N.D. NY 2024) (unpublished) (citing *Peridot Tree WA, Inc. v. Wash. State Liquor & Cannabis Control Bd.*, 3:23-cv-06111-TMC, 2024 WL 69733(W.D. Wash. Jan. 5, 2024) (unpublished) to hold that dormant Commerce Clause does not apply to illegal interstate markets); *Jensen v. Md. Cannabis Admin.*, No. 24-0273-BAH, 2024 WL 811479(E.D. Md. Feb. 27 2024) (unpublished) (same).[4] Peridot Tree also cites the Second Circuit's inapposite decision denying a stay in *Variscite NY One*, 640 F.Supp.3d at 232, but that was not a decision on the merits, as

[4] Peridot Tree also cites a Seventh Circuit case but acknowledges that it did not squarely address the constitutional issue and instead upheld the district court's denial of a preliminary injunction on other grounds. *Finch v. Treto*, 82 F.4th 572, 579 (7th Cir. 2023).

evidenced by the most recent New York district court case refusing to extend dormant Commerce Clause protections to cannabis. *Variscite Four,* 2024 WL 406490.

In sum, this Court should affirm dismissal of Peridot Tree's claims because dormant Commerce Clause protections do not apply to the illegal interstate cannabis market.

## B. This Court Should Affirm the District Court's Denial of Peridot Tree's Preliminary Injunction Motion

This Court should also affirm the denial of Peridot Tree's preliminary injunction. As detailed above, Peridot Tree failed to demonstrate a likelihood of success on the merits of its dormant Commerce Clause claim, which alone warrants affirmance. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) ("if a movant fails to meet this "threshold inquiry, of [the likelihood of success] the court need not consider the other factors") (internal quotation marks omitted). Peridot Tree also failed to demonstrate the other *Winter* factors.

### 1. Peridot Tree failed to demonstrate a likelihood of success or irreparable harm

The district court properly concluded that Peridot Tree failed to demonstrate a likelihood of irreparable harm. Peridot Tree leans most heavily on

its assertion of a constitutional violation to establish irreparable harm. Opening Br. at 16-17. But as detailed above, Peridot Tree cannot establish irreparable harm on that basis. *See Goldie's Bookstore, Inc. v. Superior Ct. of State of California*, 739 F.2d 466, 472 (9th Cir. 1984) (holding that weak or attenuated constitutional claim is insufficient to establish irreparable harm). And even in a case involving alleged constitutional violations, showing a likelihood of success is "not enough" to warrant a preliminary injunction. *DISH Network Corp. v. Fed. Commc'n Comm'n*, 653 F.3d 771, 776 (9th Cir. 2011).

Here, Peridot Tree does not dispute most of the district courts' findings rejecting its claims of irreparable harm, much less show that the findings are "illogical[,] implausible, or without support in inferences that may be drawn from the facts in the record" as required to demonstrate that the district court clearly erred. *Snyder*, 28 F.4th at 111-12 (district court's evaluation of plaintiffs' alleged harm in preliminary injunction motion is a factual determination reviewed for clear error). Peridot Tree does not challenge the district court's rejection of its bald assertions that it would be excluded from Washington's cannabis market without a preliminary injunction. ER-33. The district court rightly found that Washington's Legislature had approved additional licenses

beyond those at issue in this case and that the Board had begun rulemaking for those licenses. ER-33.

The district court also properly rejected Peridot Tree's argument that it would be denied early entry into Washington's cannabis market, noting that that ship had sailed long before Peridot Tree had applied for the license at issue here. ER-33. And, in any event, Peridot Tree failed to show it would have scored high enough to win one of the eight available King County licenses (among 124 total applicants) but for the residency requirement challenged here, undermining any alleged harm from its exclusion from the market. ER-33. *See Goldie's Bookstore*, 739 F.2d at 472 ("speculative injury does not constitute irreparable injury" sufficient to warrant granting a preliminary injunction).

Peridot Tree challenges the district court's finding that its delay in bringing an action here implied a lack of urgency, claiming it had good reasons for delay in filing suit *after* its application was rejected. Opening Br. at 52-54; ER-34-35 (citing *Oakland Trib., Inc. v. Chron. Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.")). But this is no basis to challenge the district court's findings because the court acknowledged and credited these explanations. ER-33. The district court rightly found, however,

that Washington has had a residency requirement for cannabis licenses since 2012, the Board created the Social Equity Program in 2020, the program's regulations became effective in November 2022, and the program accepted applications from March 1 to April 27, 2023. ER-33-34. The district court appropriately considered Peridot Tree's delay in challenging the State's long-standing residency requirement, particularly given Peridot Tree's concession at oral argument that it knew when it applied for the program that it could not meet the minimum residency requirement. ER-33-34 ("[S]tanding does not require exercises in futility."); ER-62-63. Peridot Tree fails to demonstrate irreparable harm, warranting affirmance of the district court order.

#### 2. The remaining *Winter* factors support denial of a preliminary injunction

Peridot Tree similarly fails to establish the remaining *Winter* factors—that the balance of equities and the public interest weigh sharply in its favor. Peridot Tree again leans heavily on its assertion of a constitutional violation, which fails for the reasons stated above. Peridot Tree's remaining arguments also fail to move the needle. It dismisses the harm that a preliminary injunction would cause other applicants, whom the district court rightly found "have secured storefronts, purchased equipment, or incurred other costs in reliance on the LCB's communications allowing them to begin the licensing process." ER-36. But an

injunction is a matter of equitable discretion and the "assignment of weight to particular harms is a matter for district courts to decide." *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012). The district court appropriately considered such harm to non-parties as a key factor under the public interest prong. *Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (the public interest factor of the *Winter* test "primarily addresses impact on non-parties rather than parties."); *see also Finch*, 82 F.4th at 579 (7th Cir. 2023) (weighing harm to third-party applicants in affirming denial of preliminary injunction to cannabis social equity program).

Peridot Tree also criticizes the weight the district court accorded to the State's efforts to tightly regulate its cannabis market and follow the dictates of the Cole Memorandum to avoid federal prosecution of state-licensed cannabis businesses abiding by state law. But Peridot Tree is wrong. The district court appropriately considered such harms in weighing a preliminary injunction. *See Abbott v. Perez,* 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State") (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury")). And

Peridot Tree is also wrong that this case has nothing to do with selling cannabis across state lines. *See* Opening Br. at 4. That Peridot makes this argument underscores how it has failed to grapple with the full implications of extending dormant Commerce Clause protections to an illegal interstate market. As detailed above, if Peridot prevails on the merits here, this case absolutely could jeopardize the State's ability to prevent cannabis from crossing state lines. Accordingly, this Court should affirm the district court's denial of Peridot Tree's preliminary injunction.

Alternatively, to the extent this Court concludes that dormant Commerce Clause protections apply to state cannabis markets, this Court should remand this case to the district court to determine the validity of state requirements for Washington's Social Equity Program. Even facially discriminatory laws will be upheld where the legislation "serves legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives"—a determination that should be made by district courts in the first instance, not appellate courts. *Maine v. Taylor,* 477 U.S. 131, 145-52 (1986) (upholding absolute ban on the importation of baitfish into Maine).

Here, the State's Social Equity Program for cannabis licenses is not economic protectionism, but a narrowly targeted effort to ameliorate the

negative impacts of the State's historical prosecution of now repealed cannabis-possession laws. If this Court concludes that dormant Commerce Clause protections apply to the cannabis market, it should remand this case to the district court to evaluate the State's Social Equity Program under the appropriate standard.

## IX. CONCLUSION

For the foregoing reasons, this Court should affirm the district court's dismissal of Peridot Tree's claims and denial of Peridot Tree's motion for preliminary injunction.

RESPECTFULLY SUBMITTED this 13th day of September 2024

ROBERT W. FERGUSON
*Attorney General*

*s/ Tera M. Heintz*
TERA M. HEINTZ, WSBA 54921
*Deputy Solicitor General*
JONATHAN PITEL, WSBA 47516
*Assistant Attorney General*
PENNY ALLEN, WSBA 18821
*Senior Counsel*
1125 Washington St SE
Olympia, WA 98504-0110
Phone: (360) 753-2702
Tera.Heintz@atg.wa.gov
Jonathan.Pitel@atg.wa.gov
PennyL.Allen@atg.wa.gov
*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C), and Ninth Circuit Rule 32-1, I certify that the attached response brief is proportionately spaced, has a typeface of 14 points or more, and contains 8318 words.

DATED this 13th day of September 2024.

*s/Tera M. Heintz*
TERA M. HEINTZ, WSBA 54921
*Deputy Solicitor General*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, counsel for Defendants-Appellees is aware of no related cases pending before this Court.

DATED this 13th day of September 2024.

*s/Tera M. Heintz*
TERA M. HEINTZ, WSBA 54921
*Deputy Solicitor General*

# ADDENDUM

**Alaska Stat. § 17.38.070**

**Lawful operation of marijuana-related facilities.**

(a) Notwithstanding any other provision of law, the following acts, when performed by a retail marijuana store with a current, valid registration, or a person 21 years of age or older who is acting in the person's capacity as an owner, employee, or agent of a retail marijuana store, are lawful and are not an offense under state law or a basis for seizure or forfeiture of assets under state law:

(1) possessing, displaying, storing, or transporting marijuana or marijuana products, except that marijuana and marijuana products may not be displayed in a manner that is visible to the general public from a public right-of-way;

(2) delivering or transferring marijuana or marijuana products to a marijuana testing facility;

(3) receiving marijuana or marijuana products from a marijuana testing facility;

(4) purchasing marijuana from a marijuana cultivation facility;

(5) purchasing marijuana or marijuana products from a marijuana product manufacturing facility; and

(6) delivering, distributing, or selling marijuana or marijuana products to consumers.

(b) Notwithstanding any other provision of law, the following acts, when performed by a marijuana cultivation facility with a current, valid registration, or a person 21 years of age or older who is acting in the person's capacity as an owner, employee, or agent of a marijuana cultivation facility, are lawful and are not an offense under state law or a basis for seizure or forfeiture of assets under state law:

(1) cultivating, manufacturing, harvesting, processing, packaging, transporting, displaying, storing, or possessing marijuana;

(2) delivering or transferring marijuana to a marijuana testing facility;

(3) receiving marijuana from a marijuana testing facility;

(4) delivering, distributing, or selling marijuana to a marijuana cultivation facility, a marijuana product manufacturing facility, or a retail marijuana store;

(5) receiving or purchasing marijuana from a marijuana cultivation facility; and

(6) receiving marijuana seeds or immature marijuana plants from a person 21 years of age or older.

(c) Notwithstanding any other provision of law, the following acts, when performed by a marijuana product manufacturing facility with a current, valid registration, or a person 21 years of age or older who is acting in the person's capacity as an owner, employee, or agent of a marijuana product manufacturing facility, are lawful and are not an offense under state law or a basis for seizure or forfeiture of assets under state law:

(1) packaging, processing, transporting, manufacturing, displaying, or possessing marijuana or marijuana products;

(2) delivering or transferring marijuana or marijuana products to a marijuana testing facility;

(3) receiving marijuana or marijuana products from a marijuana testing facility;

(4) delivering or selling marijuana or marijuana products to a retail marijuana store or a marijuana product manufacturing facility;

(5) purchasing marijuana from a marijuana cultivation facility; and

(6) purchasing marijuana or marijuana products from a marijuana product manufacturing facility.

(d) Notwithstanding any other provision of law, the following acts, when performed by a marijuana testing facility with a current, valid registration, or a person 21 years of age or older who is acting in the person's capacity as an owner, employee, or agent of a marijuana testing facility, are lawful and are not an offense under state law or a basis for seizure or forfeiture of assets under state law:

(1) possessing, cultivating, processing, repackaging, storing, transporting, displaying, transferring, or delivering marijuana;

(2) receiving marijuana or marijuana products from a marijuana cultivation facility, a marijuana retail store, a marijuana products manufacturer, or a person 21 years of age or older; and

(3) returning marijuana or marijuana products to a marijuana cultivation facility, a marijuana retail store, a marijuana products manufacturer, or a person 21 years of age or older.

(e) Notwithstanding any other provision of law, it is lawful and is not an offense under state law or a basis for seizure or forfeiture of assets under state law to lease or otherwise allow the use of property owned, occupied, or controlled by any person, corporation, or other entity for any of the activities conducted lawfully in accordance with (a)--(d) of this section.

(f) Nothing in this section prevents the imposition of penalties upon marijuana establishments for violating this chapter or rules adopted by the board or local governments pursuant to this chapter.

(g) The provisions of AS 17.30.020 do not apply to marijuana establishments.

**Alaska Stat. § 17.38.900**

**Definitions.**

As used in this chapter, unless the context otherwise requires,

(12) "marijuana cultivation facility" means an entity registered to cultivate, prepare, and package marijuana and to sell marijuana to retail marijuana stores, to marijuana product manufacturing facilities, and to other marijuana cultivation facilities, but not to consumers;

(14) "marijuana product manufacturing facility" means an entity registered to purchase marijuana; manufacture, prepare, and package marijuana products; and sell marijuana and marijuana products to other marijuana product manufacturing facilities and to retail marijuana stores, but not to consumers;

(16) "marijuana testing facility" means an entity registered to analyze and certify the safety and potency of marijuana;

(17) "registration" means registration or licensure, as determined by regulation;

(18) "retail marijuana store" means an entity registered to purchase marijuana from marijuana cultivation facilities, to purchase marijuana and marijuana products from marijuana product manufacturing facilities, and to sell marijuana and marijuana products to consumers;

**Cal. Bus. & Prof. Code § 26053**

**License required for all commercial cannabis activity; multiple licenses.**

(a) All commercial cannabis activity shall be conducted between licensees, except as otherwise provided in this division.

(b)(1) A person that holds a state testing laboratory license under this division is prohibited from licensure for any other activity, except testing, as authorized under this division. A person that holds a state testing laboratory license shall not employ an individual who is also employed by any other licensee that does not hold a state testing laboratory license.

(2) A person with a financial interest in a state testing laboratory license under this division is prohibited from holding a financial interest in any other type of cannabis license.

(c) Except as provided in subdivision (b), a **person** may apply for and be issued more than one license under this division.

(d) Each applicant or licensee shall apply for, and if approved, shall obtain, a separate license for each location where it engages in commercial cannabis activity.

**Cal. Bus. & Prof. Code § 26080**

**Transport or distribution outside the state; local jurisdictions**

(a) Except as provided in Chapter 25 (commencing with Section 26300), this division does not authorize or permit a licensee to transport or distribute, or cause to be transported or distributed, cannabis or cannabis products outside the state.

**Cal. Bus. & Prof. Code § 26152**

**Advertising and marketing standards.**

(a)(1) All advertisements and marketing shall accurately and legibly identify the licensee responsible for its content, by adding, at a minimum, the licensee's license number.

(2) A technology platform shall not display an advertisement by a licensee on an Internet Web page unless the advertisement displays the license number of the licensee.

(3) An outdoor advertising company subject to the Outdoor Advertising Act (Chapter 2 (commencing with Section 5200) of Division 3) shall not display an advertisement by a licensee unless the advertisement displays the license number of the licensee.

(b) Any advertising or marketing placed in broadcast, cable, radio, print, and digital communications shall only be displayed where at least 71.6 percent of the audience is reasonably expected to be 21 years of age or older, as determined by reliable, up-to-date audience composition data.

(c) Any advertising or marketing involving direct, individualized communication or dialogue controlled by the licensee shall utilize a method of age affirmation to verify that the recipient is 21 years of age or older before engaging in that communication or dialogue controlled by the licensee. For purposes of this section, that method of age affirmation may include user confirmation, birth date disclosure, or other similar registration method.

(d) All advertising shall be truthful and appropriately substantiated.

**Haw. Rev. Stat. § 329D-6**

**Dispensary operations**

(a) No person shall operate a dispensary, or engage in the production, manufacture, or sale of cannabis or manufactured cannabis products, unless the person has obtained a license from the department pursuant to this chapter.

(b) No dispensary licensee, its officers, employees, or agents shall provide written certification for the use of medical cannabis or manufactured cannabis products for any person.

(c) No person under the age of twenty-one shall be employed by a dispensary licensee.

(d) Notwithstanding any other law to the contrary, including sections 378-2 and 378-2.5, dispensaries:

(1) Shall deny employment to any individual who has been:

(A) Convicted of murder in any degree;

(B) Convicted of a class A or class B felony; or

(C) Convicted of a class C felony involving trafficking, distributing, or promoting a schedule I or II controlled substance other than cannabis within the last ten years; and

(2) May deny employment to any individual who has been convicted of a class C felony involving:

(A) Fraud, deceit, misrepresentation, embezzlement, or theft; or

(B) Endangering the welfare of a minor.

Employment under this chapter shall be exempt from section 378-2(a)(1), as it relates to arrest and court record discrimination, and section 378-2.5.

(e) Retail dispensing locations shall not be open for retail sales before 8:00 a.m. or after 8:00 p.m., Hawaii-Aleutian Standard Time, Monday through Sunday.

(f) All dispensary facilities, including production centers and retail dispensing locations, shall be enclosed indoor facilities and shall maintain twenty-four hour security measures, including an alarm system, video monitoring and recording on the premises, and exterior lighting. A dispensary licensee that intends to utilize, as a production center, an enclosed indoor facility that includes a roof that is partially or completely transparent or translucent, as provided under section 329D-1, shall notify the department of that intention before altering or constructing the facility. Production centers shall remain locked at all times. Retail dispensing locations shall remain locked at all times, other than business hours as authorized by subsection (e), and shall only be opened for authorized persons.

(g) In all dispensary facilities, only the licensee, if an individual, registered employees of the dispensary licensee, registered employees of a subcontracted production center or retail dispensing location, employees of a certified laboratory for testing purposes, state employees authorized by the director of

health, and law enforcement and other government officials acting in their official capacity shall be permitted to touch or handle any cannabis or manufactured cannabis products, except that a qualifying patient, primary caregiver, qualifying out-of-state patient, or caregiver of a qualifying out-of-state patient may receive manufactured cannabis products at a retail dispensing location following completion of a sale.

(h) A dispensary shall provide the department with the address, tax map key number, and a copy of the premises lease, if applicable, of the proposed location of a production center allowed under a license for a county no later than thirty days before any medical cannabis or manufactured cannabis products being produced or manufactured at that production center.

(i) A dispensary shall provide the department with the address, tax map key number, and a copy of the premises lease, if applicable, of the proposed location of each retail dispensing location allowed under a license no less than sixty days before opening for business.

(j) The department shall establish, maintain, and control a computer software tracking system that shall have real time, twenty-four-hour access to the data of all dispensaries.

(1) The computer software tracking system shall collect data relating to:

(A) The total amount of cannabis in possession of all dispensaries from either seed or immature plant state, including all plants that are derived from cuttings or cloning, until the cannabis, cannabis plants, or manufactured cannabis product is sold or destroyed pursuant to section 329D-7;

(B) The total amount of manufactured cannabis product inventory, including the equivalent physical weight of cannabis that is used to manufacture manufactured cannabis products, purchased by a qualifying patient, primary caregiver, qualifying out-of-state patient, and caregiver of a qualifying out-of-state patient from all retail dispensing locations in the State in any fifteen-day period;

(C) The amount of waste produced by each plant at harvest; and

(D) The transport of cannabis and manufactured cannabis products between production centers and retail dispensing locations and as authorized by subsection (r), including tracking identification issued by the tracking system, the identity of the person transporting the

cannabis or manufactured cannabis products, and the make, model, and license number of the vehicle being used for the transport;

(2) The procurement of the computer software tracking system established pursuant to this subsection shall be exempt from chapter 103D; provided that:

(A) The department shall publicly solicit at least three proposals for the computer software tracking system; and

(B) The selection of the computer software tracking system shall be approved by the director of the department and the chief information officer; and

(3) Notwithstanding any other provision of this subsection to the contrary, once the department has authorized a licensed dispensary to commence sales of cannabis or manufactured cannabis products, if the department's computer software tracking system is inoperable or is not functioning properly, as an alternative to requiring dispensaries to temporarily cease operations, the department may implement an alternate tracking system that will enable a qualifying patient, primary caregiver, qualifying out-of-state patient, and caregiver of a qualifying out-of-state patient to purchase cannabis or manufactured cannabis products from a licensed dispensary on a temporary basis. The department shall seek input regarding the alternate tracking system from medical cannabis licensees. The alternate tracking system may operate as follows:

(A) The department may immediately notify all licensed dispensaries that the computer software tracking system is inoperable; and

(B) Once the computer software tracking system is operational and functioning to meet the requirements of this subsection, the department may notify all licensed dispensaries, and the alternate tracking system in this subsection shall be discontinued.

(k) A dispensary licensed pursuant to this chapter shall purchase, operate, and maintain a computer software tracking system that shall:

(1) Interface with the department's computer software tracking system established pursuant to subsection (j);

(2) Allow each licensed dispensary's production center to submit to the department in real time, by automatic identification and data capture, all

cannabis, cannabis plants, and manufactured cannabis product inventory in possession of that dispensary from either seed or immature plant state, including all plants that are derived from cuttings or cloning, until the cannabis or manufactured cannabis product is sold or destroyed pursuant to section 329D-7;

(3) Allow the licensed dispensary's retail dispensing location to submit to the department in real time for the total amount of cannabis and manufactured cannabis product purchased by a qualifying patient, primary caregiver, qualifying out-of-state patient, and caregiver of a qualifying out-of-state patient from the dispensary's retail dispensing locations in the State in any fifteen day period; provided that the software tracking system shall impose an automatic stopper in real time, which cannot be overridden, on any further purchases of cannabis or manufactured cannabis products, if the maximum allowable amount of cannabis has already been purchased for the applicable fifteen day period; provided further that additional purchases shall not be permitted until the next applicable period; and

(4) Allow the licensed dispensary to submit all data required by this subsection to the department and permit the department to access the data if the department's computer software tracking system is not functioning properly and sales are made pursuant to the alternate tracking system under subsection (j).

(l) No free samples of cannabis or manufactured cannabis products shall be provided at any time, and no consumption of cannabis or manufactured cannabis products shall be permitted on any dispensary premises.

(m) Except as authorized by subsection (r), a dispensary shall not transport cannabis or manufactured cannabis products to another county or another island; provided that this subsection shall not apply to the transportation of cannabis or any manufactured cannabis product solely for the purposes of laboratory testing pursuant to section 329D-8, and subject to subsection (j), if no certified laboratory is located in the county or on the island where the dispensary is located; provided further that a dispensary shall only transport samples of cannabis and manufactured cannabis products for laboratory testing for purposes of this subsection in an amount and manner prescribed by the department, in rules adopted pursuant to this chapter, and with the understanding that state law and its protections do not apply outside of the jurisdictional limits of the State.

(n) A dispensary shall be prohibited from off-premises delivery of cannabis or manufactured cannabis products to a qualifying patient, primary caregiver, qualifying out-of-state patient, or caregiver of a qualifying out-of-state patient.

(o) A dispensary shall not:

(1) Display cannabis or manufactured cannabis products in windows or in public view; or

(2) Post any signage other than one or two signs, each no greater than one thousand six hundred square inches bearing only the business or trade name in text without any pictures or illustrations; provided that if any applicable law or ordinance restricting outdoor signage is more restrictive, that law or ordinance shall govern.

(p) No cannabis or manufactured cannabis products shall be transported to, from, or within any federal fort or arsenal, national park or forest, any other federal enclave, or any other property possessed or occupied by the federal government.

(q) A dispensary licensed pursuant to this chapter shall be prohibited from providing written certification pursuant to section 329-122 for the use of medical cannabis for any person.

(r) The department may authorize a dispensary to purchase cannabis and manufactured cannabis products from another dispensary in a manner prescribed by the department by rules adopted pursuant to section 329D-27; provided that:

(1) The purchasing dispensary establishes to the department's satisfaction that:

(A) The purchase is necessary to ensure that qualifying patients have continuous access to cannabis for medical use; or

(B) The cannabis and manufactured cannabis products are for medical, scientific, or other legitimate purposes approved by the State;

(2) The selling dispensary may transport no more than eight hundred ounces, or other amounts with prior approval by the department, of cannabis or manufactured cannabis products to the purchasing dispensary within a thirty-day period;

(3) The cannabis and manufactured cannabis products are transported between the dispensaries for medical, scientific, or other legitimate purposes approved by the State; and

(4) Nothing in this subsection shall relieve any dispensary of its responsibilities and obligations under this chapter and chapter 329.

**Haw. Rev. Stat. § 329D-9**

**Manufacturing of medical cannabis products**

(a) Any medical cannabis dispensary licensed by the department pursuant to this chapter shall be permitted to manufacture cannabis products; provided that the dispensary shall also obtain any other state or county permits or licenses that may be necessary for a particular manufacturing activity.

(b) The department shall establish health, safety, and sanitation standards regarding the manufacture of manufactured cannabis products.

(c) A manufacturer of a manufactured cannabis product shall calculate the equivalent physical weight of the cannabis that is used to manufacture the product and shall make the equivalency calculations available to the department and to a consumer of the manufactured cannabis product.

**Nev. Rev. Stat. § 201.353**

**Unlawful for prostitute to engage in prostitution or solicitation for prostitution except in licensed house of prostitution: Penalty; provision of certain information; dismissal.**

1. It is unlawful for a prostitute to engage in prostitution or solicitation therefor, except in a licensed house of prostitution.

2. A person who violates subsection 1 is guilty of a misdemeanor.

3. A peace officer who:

(a) Detains but does not arrest or issue a citation to a person for a violation of subsection 1 shall, before releasing the person, provide information regarding and opportunities for connecting with social service agencies that may provide assistance to the person. The Department of Health and Human Services shall assist law enforcement agencies in providing information regarding and opportunities for connecting with such social service agencies pursuant to this paragraph.

(b) Arrests or issues a citation to a person for a violation of subsection 1 shall, before the person is released from custody or cited:

(1)Inform the person that he or she may be eligible for assignment to a preprosecution diversion program established pursuant to NRS 174.032; and

(2) Provide the information regarding and opportunities for connecting with social service agencies described in paragraph (a).

4. If, at any time before the trial of a person charged with a violation of subsection 1, the prosecuting attorney has reason to believe that the person is a victim of sex trafficking, the prosecuting attorney shall dismiss the charge. As used in this subsection, "sex trafficking" means a violation of subsection 2 of NRS 201.300.

**Or. Rev. Stat. § 475C.057**

**Lawful production, delivery and possession of marijuana items**

Licensees and licensee representatives may produce, deliver and possess marijuana items subject to the provisions of ORS 475C.005 to 475C.525 and rules adopted under ORS 475C.005 to 475C.525. The production, delivery or possession of marijuana items by a licensee or a licensee representative in compliance with ORS 475C.005 to 475C.525 and rules adopted under ORS 475C.005 to 475C.525 does not constitute a criminal or civil offense under the laws of this state.

**Wash. Rev. Code § 34.05.413**

**Commencement—When required.**

(1) Within the scope of its authority, an agency may commence an adjudicative proceeding at any time with respect to a matter within the agency's jurisdiction.

(2) When required by law or constitutional right, and upon the timely application of any person, an agency shall commence an adjudicative proceeding.

(3) An agency may provide forms for and, by rule, may provide procedures for filing an application for an adjudicative proceeding. An agency may require by rule that an application be in writing and that it be filed at a specific address, in a specified manner, and within specified time limits. The

agency shall allow at least twenty days to apply for an adjudicative proceeding from the time notice is given of the opportunity to file such an application.

(4) If an agency is required to hold an adjudicative proceeding, an application for an agency to enter an order includes an application for the agency to conduct appropriate adjudicative proceedings, whether or not the applicant expressly requests those proceedings.

(5) An adjudicative proceeding commences when the agency or a presiding officer notifies a party that a prehearing conference, hearing, or other stage of an adjudicative proceeding will be conducted.

**Wash. Rev. Code § 43.06.490**

**Cannabis agreements—Federally recognized Indian tribes—Tribal cannabis tax—Tax exemption.**

(1) The governor may enter into agreements with federally recognized Indian tribes concerning cannabis. Cannabis agreements may address any cannabis-related issue that involves both state and tribal interests or otherwise has an impact on tribal-state relations. Such agreements may include, but are not limited to, the following provisions and subject matter:

(a) Criminal and civil law enforcement;

(b) Regulatory issues related to the commercial production, processing, sale, and possession of cannabis, and processed cannabis products, for both recreational and medical purposes;

(c) Medical and pharmaceutical research involving cannabis;

(d) Taxation in accordance with subsection (2) of this section;

(e) Any tribal immunities or preemption of state law regarding the production, processing, or marketing of cannabis; and

(f) Dispute resolution, including the use of mediation or other nonjudicial process.

(2)(a) Each cannabis agreement adopted under this section must provide for a tribal cannabis tax that is at least one hundred percent of the state cannabis excise tax imposed under RCW 69.50.535 and state and local sales and use taxes on sales of cannabis. Cannabis agreements apply to sales in which tribes, tribal

enterprises, or tribal member-owned businesses (i) deliver or cause delivery to be made to or receive delivery from a cannabis producer, processor, or retailer licensed under chapter 69.50 RCW or (ii) physically transfer possession of the cannabis from the seller to the buyer within Indian country.

(b) The tribe may allow an exemption from tax for sales to the tribe, tribal enterprises, tribal member-owned businesses, or tribal members, on cannabis grown, produced, or processed within its Indian country, or for activities to the extent they are exempt under state or federal law from the state cannabis excise tax imposed under RCW 69.50.535 or state and local sales or use taxes on sales of cannabis. Medical cannabis products used in the course of medical treatments by a clinic, hospital, or similar facility owned and operated by a federally recognized Indian tribe within its Indian country may be exempted from tax under the terms of an agreement entered into under this section.

(3) Any cannabis agreement relating to the production, processing, and sale of cannabis in Indian country, whether for recreational or medical purposes, must address the following issues:

(a) Preservation of public health and safety;

(b) Ensuring the security of production, processing, retail, and research facilities; and

(c) Cross-border commerce in cannabis.

(4) The governor may delegate the power to negotiate cannabis agreements to the state liquor and cannabis board. In conducting such negotiations, the state liquor and cannabis board must, when necessary, consult with the governor and/or the department of revenue.

(5) The definitions in this subsection apply throughout this section unless the context clearly requires otherwise.

(a) "Indian country" has the same meaning as in RCW 82.24.010.

(b) "Indian tribe" or "tribe" means a federally recognized Indian tribe located within the geographical boundaries of the state of Washington.

(c) "Cannabis" means "cannabis," "cannabis concentrates," "cannabis-infused products," and "useable cannabis," as those terms are defined in RCW 69.50.101.

**Former Wash. Rev. Code § 69.50.331 (2015)**

**Application for license.**

(1) For the purpose of considering any application for a license to produce, process, research, transport, or deliver marijuana, useable marijuana, marijuana concentrates, or marijuana-infused products subject to the regulations established under RCW 69.50.385, or sell marijuana, or for the renewal of a license to produce, process, research, transport, or deliver marijuana, useable marijuana, marijuana concentrates, or marijuana-infused products subject to the regulations established under RCW 69.50.385, or sell marijuana, the state liquor and cannabis board must conduct a comprehensive, fair, and impartial evaluation of the applications timely received.

(a) The state liquor and cannabis board must develop a competitive, merit-based application process that includes, at a minimum, the opportunity for an applicant to demonstrate experience and qualifications in the marijuana industry. The state liquor and cannabis board must give preference between competing applications in the licensing process to applicants that have the following experience and qualifications, in the following order of priority:

(i) First priority is given to applicants who:

(A) Applied to the state liquor and cannabis board for a marijuana retailer license prior to July 1, 2014;

(B) Operated or were employed by a collective garden before January 1, 2013;

(C) Have maintained a state business license and a municipal business license, as applicable in the relevant jurisdiction; and

(D) Have had a history of paying all applicable state taxes and fees;

(ii) Second priority must be given to applicants who:

(A) Operated or were employed by a collective garden before January 1, 2013;

(B) Have maintained a state business license and a municipal business license, as applicable in the relevant jurisdiction; and

(C) Have had a history of paying all applicable state taxes and fees; and

(iii) Third priority must be given to all other applicants who do not have the experience and qualifications identified in (a)(i) and (ii) of this subsection.

**Wash. Rev. Code § 69.50.331**

**Application for license—Renewal fee reimbursement, social equity plan.**

(8)(f) The board may not issue a license for any premises within Indian country, as defined in 18 U.S.C. Sec. 1151, including any fee patent lands within the exterior boundaries of a reservation, without the consent of the federally recognized tribe associated with the reservation or Indian country.

**Wash. Rev. Code § 69.50.335**

**Cannabis retailer, processor, producer licenses—Issue, reissue of licenses—Social equity applicants—Rules—Definitions.**

(1)(a) Beginning December 1, 2020, and until July 1, 2032, cannabis retailer licenses, cannabis processor licenses, and cannabis producer licenses that have been subject to forfeiture, revocation, or cancellation by the board, or cannabis retailer licenses that were not previously issued by the board but could have been issued without exceeding the limit on the statewide number of cannabis retailer licenses established before January 1, 2020, by the board, may be issued or reissued to an applicant who meets the cannabis retailer license, cannabis processor license, or cannabis producer license requirements of this chapter.

(b) In accordance with (a) of this subsection, the board may issue or reissue:

(i) Up to 100 cannabis processor licenses immediately; and

(ii) Beginning January 1, 2025, up to 10 cannabis producer licenses, which must be issued in conjunction with a cannabis processor license.

(c) In addition to the cannabis retailer licenses and cannabis producer licenses that may be issued under (a) and (b) of this subsection, beginning January 1, 2023, and continuing every three years until July 1, 2032, the board may, with the approval of the legislature through the passage of a bill, increase

the number of cannabis retailer licenses and cannabis producer licenses for the social equity program based on:

(i) The most recent census data available as of January 1, 2023; and

(ii) The annual population estimates published by the office of financial management.

(d) In addition to the cannabis retailer licenses that may be issued under (a) of this subsection, beginning January 1, 2024, and until July 1, 2032, the board may issue up to 52 cannabis retailer licenses for the social equity program.

(e)(i) At the time of licensure, all licenses issued under the social equity program under this section may be located in any city, town, or county in the state that allows cannabis retail, cannabis production, or cannabis processing business activities, as applicable, at the proposed location, regardless of:

(A) Whether a cannabis retailer license, cannabis producer license, or cannabis processor license was originally allocated to or issued in another city, town, or county; and

(B) The maximum number of retail cannabis licenses established by the board for each county under RCW 69.50.345.

(ii) The board must adopt rules establishing a threshold of the number of licenses created by this section that can be located in each county.

(f) After a social equity license has been issued under this section for a specific location, the location of the licensed business may not be moved to a city, town, or county different from the city, town, or county for which it was initially licensed.

(6) The definitions in this subsection apply throughout this section unless the context clearly requires otherwise.

(a) "Disproportionately impacted area" means a census tract or comparable geographic area within Washington state where community members were more likely to be impacted by the war on drugs. These areas must be determined in rule by the board, in consultation with the office of equity, using a standardized statistical equation to identify areas with demographic indicators consistent with populations most impacted by the war on drugs. These areas must be assessed to account for demographic changes in the composition of the population over time. Disproportionately impacted areas must include census tracts or comparable geographic areas in the top 15th percentile in at least

two of the following demographic indicators of populations most impacted by the war on drugs:

(i) The area has a high rate of people living under the federal poverty level;

(ii) The area has a high rate of people who did not graduate from high school;

(iii) The area has a high rate of unemployment; or

(iv) The area has a high rate of people receiving public assistance.

(b) "Social equity applicant" means an applicant who has at least 51 percent ownership and control by one or more individuals who meet at least two of the following qualifications:

(i) Lived in a disproportionately impacted area in Washington state for a minimum of five years between 1980 and 2010;

(ii) Has been arrested or convicted of a cannabis offense or has a family member who has been arrested or convicted of a cannabis offense;

(iii) Had a household income in the year prior to submitting an application under this section that was less than the median household income within the state of Washington as calculated by the United States census bureau; or

(iv) Is both a socially and economically disadvantaged individual as defined by the office of minority and women's business enterprises under chapter 39.19 RCW.

(c) "Social equity goals" means:

(i) Increasing the number of cannabis retailer, producer, and processor licenses held by social equity applicants from disproportionately impacted areas; and

(ii) Reducing accumulated harm suffered by individuals, families, and local areas subject to severe impacts from the historical application and enforcement of cannabis prohibition laws.

**Wash. Rev. Code § 69.50.360**

**Cannabis retailers, employees of retail outlets—Certain acts not criminal or civil offenses.**

The following acts, when performed by a validly licensed cannabis retailer or employee of a validly licensed retail outlet in compliance with rules adopted by the board to implement and enforce chapter 3, Laws of 2013, do not constitute criminal or civil offenses under Washington state law:

(1) Purchase and receipt of cannabis concentrates, useable cannabis, or cannabis-infused products that have been properly packaged and labeled from a cannabis processor validly licensed under this chapter;

**Wash. Rev. Code § 69.50.369**

**Cannabis producers, processors, researchers, retailers—Advertisements—Rules—Penalty.**

(3) A cannabis licensee may not utilize transit advertisements for the purpose of advertising its business or product line. "Transit advertisements" means advertising on or within private or public vehicles and all advertisements placed at, on, or within any bus stop, taxi stand, transportation waiting area, train station, airport, or any similar transit-related location.

(4) A cannabis licensee may not engage in advertising or other marketing practice that specifically targets persons residing outside of the state of Washington.

**Wash. Rev. Code § 69.50.382**

**Common carriers—Transportation or delivery of cannabis, useable cannabis, cannabis concentrates, immature plants or clones, cannabis seeds, and cannabis-infused products—Employees prohibited from carrying or using firearm during such services—Exceptions—Use of state ferry routes.**

(1) A licensed cannabis producer, cannabis processor, cannabis researcher, or cannabis retailer, or their employees, in accordance with the requirements of this chapter and the administrative rules adopted thereunder, may use the services of a common carrier subject to regulation under chapters 81.28 and 81.29 RCW and licensed in compliance with the regulations established under RCW 69.50.385, to physically transport or deliver, as authorized under this chapter, cannabis, useable cannabis, cannabis concentrates,

immature plants or clones, cannabis seeds, and cannabis-infused products between licensed cannabis businesses located within the state.

**Wash. Rev. Code § 69.50.4013**

**Possession, use of controlled substance—Penalty—Referral to assessment and services—Possession of useable cannabis, cannabis concentrates, or cannabis-infused products—Delivery.**

(3)(a) The possession, by a person 21 years of age or older, of useable cannabis, cannabis concentrates, or cannabis-infused products in amounts that do not exceed those set forth in RCW 69.50.360(3) is not a violation of this section, this chapter, or any other provision of Washington state law.

(b) The possession of cannabis, useable cannabis, cannabis concentrates, and cannabis-infused products being physically transported or delivered within the state, in amounts not exceeding those that may be established under RCW 69.50.385(3), by a licensed employee of a common carrier when performing the duties authorized in accordance with RCW 69.50.382 and 69.50.385, is not a violation of this section, this chapter, or any other provision of Washington state law.

(4)(a) The delivery by a person 21 years of age or older to one or more persons 21 years of age or older, during a single 24 hour period, for noncommercial purposes and not conditioned upon or done in connection with the provision or receipt of financial consideration, of any of the following cannabis products, is not a violation of this section, this chapter, or any other provisions of Washington state law:

(i) One-half ounce of useable cannabis;

(ii) Eight ounces of cannabis-infused product in solid form;

(iii) 36 ounces of cannabis-infused product in liquid form; or

(iv) Three and one-half grams of cannabis concentrates.

(b) The act of delivering cannabis or a cannabis product as authorized under this subsection (4) must meet one of the following requirements:

(i) The delivery must be done in a location outside of the view of general public and in a nonpublic place; or

(ii) The cannabis or cannabis product must be in the original packaging as purchased from the cannabis retailer.

(6) The possession by a qualifying patient or designated provider of cannabis concentrates, useable cannabis, cannabis-infused products, or plants in accordance with chapter 69.51A RCW is not a violation of this section, this chapter, or any other provision of Washington state law.

**Wash. Admin. Code § 314-55-015**

**General information about licenses.**

(2) All applicants, licensees, and employees working in each licensed establishment must be at least 21 years of age. No one under 21 years of age may enter or remain on a cannabis licensed premises except as provided in RCW 69.50.357.

**Wash. Admin. Code § 314-55-020**

**Cannabis license qualifications and application process—Licensing change requests.**

Each cannabis license application is unique and evaluated individually. The board may inquire and request documents regarding all matters in connection with the cannabis license application.

(1) **Cannabis license qualification criteria and application process.** To be issued a license, all cannabis license applicants must meet the qualifications required by the board. The board will verify that the proposed business meets the minimum requirements for the type of cannabis license requested. The qualifications and application process for a cannabis license include:

(d) **A residency check to confirm Washington state residency.** Under RCW **69.50.331** (1)(b), all applicants applying for a cannabis license must have resided in the state of Washington for at least six months prior to applying for a cannabis license.

**Wash. Admin. Code § 314-55-083**

**Security and traceability requirements for cannabis licensees.**

The security requirements for a cannabis licensee are as follows:

(1) **Display of identification badge.** All licensees and employees on the licensed premises shall be required to hold and properly display an identification badge issued by the licensed employer at all times while on the licensed premises and engaged in the transportation of cannabis. The identification badge must list the licensee's trade name and include the person's full and legal name and photograph. All licensees and employees must have their state issued identification available to verify the information on their badge is correct.

(a) All nonemployee visitors to the licensed premises, other than retail store customers, shall be required to hold and properly display an identification badge issued by the licensee at all times while on the licensed premises.

(b) A log must be kept and maintained showing the full name of each visitor entering the licensed premises, badge number issued, the time of arrival, time of departure, and the purpose of the visit.

(c) All log records must be maintained on the licensed premises for a period of three years and are subject to inspection by any WSLCB employee or law enforcement officer, and must be copied and provided to the WSLCB or law enforcement officer upon request.

(d) Employees, visitors, and other persons at a cannabis licensed premises, including persons engaged in the transportation of cannabis, must provide identification to a WSLCB enforcement officer upon request.

(2) **Alarm systems.** At a minimum, each licensed premises must have a security alarm system on all perimeter entry points and perimeter windows. Motion detectors, pressure switches, duress, panic, and hold-up alarms may also be used.

(3) **Surveillance system.** At a minimum, a licensed premises must have a complete video surveillance system with minimum camera resolution of 640 x 470 pixels or pixel equivalent for analog. The surveillance system storage device and/or the cameras must be internet protocol (IP) compatible. All cameras must be fixed and placement must allow for the clear and certain identification of any person and activities in controlled areas of the licensed premises. All entrances and exits to an indoor facility must be recorded from both indoor and outdoor,

or ingress and egress vantage points. All cameras must record continuously 24 hours per day and at a minimum of 10 frames per second. The surveillance system storage device must be secured on the licensed premises in a lockbox, cabinet, closet, or secured in another manner to protect from employee tampering or criminal theft. All surveillance recordings must be kept for a minimum of 45 days on the licensee's recording device. All videos are subject to inspection by any WSLCB employee or law enforcement officer, and must be copied and provided to the WSLCB or law enforcement officer upon request. All recorded images must clearly and accurately display the time and date. Time is to be measured in accordance with the U.S. National Institute Standards and Technology standards. Controlled areas include:

(a) Any area within an indoor, greenhouse or outdoor room or area where cannabis is grown, or cannabis or cannabis waste is being moved within, processed, stored, or destroyed. Rooms or areas where cannabis or cannabis waste is never present are not considered control areas and do not require camera coverage.

(b) All point-of-sale (POS) areas.

(c) Twenty feet of the exterior of the perimeter of all required fencing and gates enclosing an outdoor grow operation. Any gate or other entry point that is part of the required enclosure for an outdoor growing operation must be lighted in low-light conditions. A motion detection lighting system may be employed to light the gate area in low-light conditions.

(d) Any room or area storing a surveillance system storage device.

(4) **Traceability:** To prevent diversion and to promote public safety, cannabis licensees must track cannabis from seed to sale. Licensees must provide the required information on a system specified by the WSLCB. All costs related to the reporting requirements are borne by the licensee. Cannabis seedlings, clones, plants, lots of useable cannabis or trim, leaves, and other plant matter, batches of extracts, cannabis-infused products, samples, and cannabis waste must be traceable from production through processing, and finally into the retail environment including being able to identify which lot was used as base material to create each batch of extracts or infused products. The following information is required and must be kept completely up-to-date in a system specified by the WSLCB:

(a) Key notification of "events," such as when a plant enters the system (moved from the seedling or clone area to the vegetation production area at a young age);

(b) When plants are to be partially or fully harvested or destroyed;

(c) When a lot or batch of cannabis, cannabis extract, cannabis concentrates, cannabis-infused product, or cannabis waste is to be destroyed;

(d) When useable cannabis, cannabis concentrates, or cannabis-infused products are transported;

(e) Any theft of useable cannabis, cannabis seedlings, clones, plants, trim or other plant material, extract, infused product, seed, plant tissue or other item containing cannabis;

(f) All cannabis plants eight or more inches in height or width must be physically tagged and tracked individually;

(g) A complete inventory of all cannabis, seeds, plant tissue, seedlings, clones, all plants, lots of useable cannabis or trim, leaves, and other plant matter, batches of extract, cannabis concentrates, cannabis-infused products, and cannabis waste;

(h) All cannabis, useable cannabis, cannabis-infused products, cannabis concentrates, seeds, plant tissue, clone lots, and cannabis waste must be physically tagged with the unique identifier generated by the traceability system and tracked;

(i) All point-of-sale records;

(j) Cannabis excise tax records;

(k) All samples sent to an independent testing lab, any sample of unused portion of a sample returned to a licensee, and the quality assurance test results;

(l) All vendor samples provided to another licensee for purposes of education or negotiating a sale;

(m) All samples used for testing for quality by the producer or processor;

(n) Samples containing useable cannabis provided to retailers;

(o) Samples provided to the WSLCB or their designee for quality assurance compliance checks; and

(p) Other information specified by the board.

**Wash. Admin. Code § 314-55-095**

**Cannabis servings and transaction limitations**

Personal possession limits and transaction limits are detailed in RCW 69.50.360 and 69.50.4013.

(1) For persons age 21 and older and qualifying patients or designated providers who are not entered into the medical cannabis authorization database, cannabis serving and transaction limitations are as follows:

(a) **Single serving.** A single serving of a cannabis-infused product must not exceed 10 milligrams active tetrahydrocannabinol (THC), or Delta 9.

(b) **Maximum number of servings.** The maximum number of servings in any one single unit of cannabis-infused product meant to be eaten or swallowed or otherwise taken into the body is 10 servings or 100 milligrams of active THC, or Delta 9. A single unit of cannabis concentrate cannot exceed one gram.

(c) **Transaction limits.**

(i) A single transaction is limited to:

(A) One ounce of useable cannabis;

(B) Sixteen ounces of cannabis-infused product meant to be eaten or swallowed in solid form;

(C) Seven grams of cannabis-infused extract or cannabis concentrate for inhalation; and

(D) Seventy-two ounces of cannabis-infused product in liquid form for oral ingestion or applied topically to the skin; and

(E) Ten units of a cannabis-infused product otherwise taken into the body.

(ii) A licensee or employee of a licensee is prohibited from conducting a transaction that facilitates an individual in obtaining more than the personal possession amount.

(2) For qualifying patients and designated providers who are entered into the medical cannabis authorization database, serving and transaction limits are as follows:

(a) **Single serving.** Except as provided in chapter 246-70 WAC, a single serving of a cannabis-infused product must not exceed 10 milligrams active tetrahydrocannabinol (THC), or Delta 9.

(b) **Maximum number of servings.** Except as provided in chapter 246-70 WAC, the maximum number of servings in any one single unit of cannabis-infused product meant to be eaten, swallowed or applied is 10 servings or 100 milligrams of active THC, or Delta 9. A single unit of cannabis concentrate cannot exceed one gram.

(c) **Transaction limitation.** A single transaction by a retail store with a medical cannabis endorsement to a qualifying patient or designated provider who is entered into the medical cannabis database is limited to three ounces of useable cannabis, 48 ounces of cannabis-infused product meant to be eaten or swallowed in solid form, 21 grams of cannabis-infused extract or cannabis concentrate for inhalation, and 216 ounces of cannabis-infused product in liquid form meant to be eaten or swallowed.

**Wash. Admin. Code § 314-55-105**

**Cannabis product packaging and labeling.**

(2) **Cannabis concentrates.** The following standards apply to all packaging and labeling of cannabis concentrates:

(e) Cannabis concentrate labels must clearly and visibly provide all of the following information:

(ii) The lot number of the product (the unique identifier number generated by the board's traceability system). This must be the same number that appears on the transport manifest;

(3) **Cannabis edibles in solid form.** The following standards apply to all packaging and labeling of cannabis edibles in solid form:

(f) Labels for cannabis edibles in solid form must clearly and visibly provide all of the following information:

(ii) The lot number of the product (the unique identifier number generated by the board's traceability system). This must be the same number that appears on the transport manifest;

(4) **Cannabis edibles in liquid form.** The following standards apply to all packaging and labeling of cannabis edibles in liquid form:

(g) The following warning statements must be included on all labels for all cannabis edibles in liquid form. The following warning statements must be legible, unobscured, and visible to the consumer:

(ii) "Unlawful outside Washington State;"

(5) **Useable cannabis.** The following standards apply to all packaging and labeling of useable cannabis:

(f) The following warning statements must be included on all labels for all useable cannabis. The following warning statements must be legible, unobscured, and visible to the consumer:

(ii) "Unlawful outside Washington State;"

(6) **Cannabis mix.** Cannabis mix is defined in WAC 314-55-010(22) as an intermediate lot that contains multiple strains of useable cannabis and is chopped or ground so no particles are greater than 3 mm. The following standards apply to all packaging and labeling of cannabis mix:

(f) The following warning statements must be included on all labels for all cannabis mix. The following warning statements must legible, unobscured, and visible to the consumer:

(ii) "Unlawful outside Washington State;"

(7) **Cannabis topicals.** The following standards apply to all packaging and labeling of cannabis topicals:

(f) The following warning statements must be included on all labels for all cannabis topicals. The following warning statements must be legible, unobscured, and visible to the consumer:

(i) "Unlawful outside Washington State;"

**Wash. Admin. Code § 314-55-135**

**Discontinue cannabis sales.**

(1) **Notification:** A licensee must notify the WSLCB's enforcement and education division in writing if the licensee plans to stop doing business for more than 30 days, or if the licensee plans to permanently discontinue cannabis sales.

(2) **Discontinued business:** Sale of cannabis inventory and stock after discontinuance of business. Notwithstanding any other provision of Title 69 RCW or 314 WAC, a producer, processor or retail licensee who permanently discontinues business for any reason shall dispose of the salable inventory and remaining stock to a WSLCB approved licensed business at fair market value. Sales below cost are prohibited. The WSLCB shall require tax expressed as a percent of the total price of the gross sales as reported on the profit and loss statement in the last published monthly report of the WSLCB. In the event of remaining inventory after sale, the licensee shall notify the enforcement and education division of the WSLCB. The enforcement division will establish conditions for destruction or arrange for the removal of product.

(3) **Assumptions:** Assumption of license and purchases by licensee of certain cannabis inventory and stock. In the case of a sale of business with a license, after obtaining the approval of the WSLCB and under the supervision of a representative of the WSLCB, the licensee may sell the entire inventory at a negotiated fair market price. Sales below cost are prohibited.

(4) **Evictions.** A licensee must notify the WSLCB's enforcement and education division immediately in writing upon notice of eviction from a licensed premises. Conditions to temporarily relocate and secure inventory will be established by the WSLCB.

(5) **Abandoned cannabis inventory or product.** In the event a licensee abandons any cannabis on the premises, the property owner or their designated representative should notify the enforcement and education division of the WSLCB. The enforcement division will work with the property owner to arrange for the removal and/or destruction of product. Any sales or distribution of cannabis by an unlicensed person is subject to the criminal provisions of Title 69 RCW.

(6) **Maintaining a licensed location.** Cannabis licenses are associated with a physical location. Persons operating without a WSLCB approved licensed location to produce, process, or sell cannabis will be discontinued.

**Wash. Admin. Code § 314-55-520**

**Category I.**

Violations of a severity that would make a license eligible for cancellation on a first offense. The board may not cancel a license for a single violation, unless it can prove a Category I violation by a preponderance of the evidence.

**Category I**

**Violations of a Severity That Would Make a License Eligible for Cancellation on the First Offense**

| Violation Type | 1st Violation | 2nd Violation in a Two-year Window |
|---|---|---|
| **Cannabis purchased from an unlicensed entity.** WAC 314-55-083(4) | License cancellation | |
| **Cannabis sold to an unlicensed, nonretail source.** **Illegal sales out of the licensed market place.** WAC 314-55-83(4) | License cancellation | |
| **Condition of suspension violation: Failure to follow any suspension restriction while cannabis license is suspended.** WAC 314-55-540 | Original penalty plus 10-day suspension with no monetary option | License cancellation |
| **Transportation or storage of cannabis to or from an unlicensed source, diversion of product, or both.** WAC 314-55-083(4) | License cancellation | |
| **Transportation of cannabis outside of Washington state boundaries.** RCW 69.50.342(1)(k) RCW 69.50.345(10) WAC 314-55-310(1) | License cancellation | |
| **True party of interest (TPI).** Allowing a person to exercise ownership or control if the person would not have qualified | License cancellation | |

| | | |
|---|---|---|
| based on affiliation with a criminal enterprise as described in chapter 69.50 RCW<br>WAC 314-55-035(1) | | |
| **Financier.** Receiving money from a financier that was not disclosed to or approved by the board when the financier has a criminal history demonstrating an affiliation with criminal enterprises, gangs, or cartels; or the money provided by a financier originated from criminal enterprises, gangs, or cartels.<br>WAC 314-55-035(4) | License cancellation | |

**Wash. Admin. Code § 314-55-570**

**Social equity in cannabis program.**

(1) **Definitions.**

(a) **"Disproportionately impacted area (DIA)"** means a census tract within Washington state where community members were more likely to be impacted by the war on drugs. These areas are determined using a standardized statistical equation to identify areas of high unemployment, low income, and demographic indicators consistent with populations most impacted by the war on drugs, including areas with higher rates of arrest for drug charges. The board will provide maps to identify disproportionately impacted areas. The maps will reflect census tracts from different time periods to account for gentrification.

(b) **"Family member"** means:

(i) A biological, adopted, or foster child, a stepchild, a child's spouse, or a child to whom the applicant stands in loco parentis (in place of the parent), is a legal guardian, or is a de facto parent, regardless of age or dependency status;

(ii) Grandchild, grandparent, parent, or sibling of a child as defined in (b)(i) of this subsection;

(iii) Spouse or domestic partner;

(iv) Any individual who regularly resides in the applicant's home or where the relationship creates an expectation that the applicant care for the person and that individual depends on the applicant for care, or that the individual care for the applicant and that the applicant depends on the individual for care.

(c) **"Median household income"** means the most recent median household income within the state of Washington as calculated by the United States Census Bureau.

(d) **"Person"** means a real human being, distinguished from a corporation, company, or other business entity.

(e) **"Preliminary letter of approval"** means an approval letter issued to a social equity program applicant for purposes of securing a grant from the department of commerce and a location and other necessities to complete the licensing process.

(f) **"Social equity program applicant"** means a person(s) who meets the requirements of the social equity program.

(g) **"Social equity contractor"** means a third party responsible to review and score social equity program applications.

(h) **"Social equity licensee"** means a person or entity that holds a social equity cannabis license or any person or entity who is a true party of interest in a social equity in cannabis license as described in WAC 314-55-035.

(i) **"Social equity plan"** means a plan that addresses the following elements including, but not limited to:

(i) A description of how issuing a cannabis retail license to the social equity applicant will meet social equity goals as described in statute;

(ii) The social equity applicant's personal or family history with the criminal justice system, including any offenses involving cannabis; and

(iii) Business plans involving partnerships or assistance to organizations or residents with connections or contributions to populations with a history of high rates of enforcement of cannabis prohibition.

(j) **"Social equity title certificate holder"** means a cannabis retail license title certificate holder that meets the requirements of a social equity program applicant as determined by the social equity contractor, and is unable to open for business in the city or county where the cannabis retail license is located.

(2) **Social equity applicant requirements.**

(a) To be considered for the social equity program under this chapter and RCW 69.50.335, the following requirements must be met by each applicant:

(b) At least a 51 percent majority, or controlling interest, in the applicant, must be held by a person, or persons, who has or have resided in Washington state for six months prior to the application date, consistent with RCW 69.50.331, and meets at least two of the following qualifications:

(i) **Qualification 1:** The social equity applicant or applicants have lived in a disproportionately impacted area in Washington state for a minimum of five years between 1980 and 2010; or

(ii) **Qualification 2:** The social equity applicant or a family member of the applicant has been arrested or convicted of a cannabis offense; or

(iii) **Qualification 3:** The social equity applicant's household income in the year prior to submitting the application was less than the median household income within the state of Washington as calculated by the United States Census Bureau.

(3) **Social equity application process.**

(a) **Application window.**

(i) The board will open the application window for an initial period of 30 calendar days.

(ii) At its sole discretion, the board may reopen the application window:

(A) After initial evaluation of applications is received and locations are still available; or

(B) If additional allotments become available after the initial application window has closed pursuant to RCW 69.50.335.

(b) **Initial application requirements.**

(i) The social equity application must be submitted electronically through the department of revenue's business licensing online application system.

(ii) The social equity applicant must apply to the department of revenue's business licensing service within the 30-day application window. All required information must be completed on the application and payment must be

submitted within the 30-day application window for the application to be accepted.

(iii) The social equity applicant, whether applying as a person, persons, or entity, may apply for a cannabis license only once during each application window described in subsection (4)(c) of this section.

(iv) An application to reinstate the license of a social equity title certificate holder will not be considered a new social equity license application. The social equity title certificate holder may submit an application for a social equity license and an application to reinstate their existing license through the social equity program.

(v) A location address is not required at the time of application.

(c) **Social equity contractor review.** Once the application window is closed, the social equity contractor will evaluate and prioritize all applications received within the 30-day application window.

(i) The social equity applicant must select one county where they wish to operate their business and notify the social equity contractor of their selection in the form and manner required by the social equity contractor.

(ii) The social equity applicant must submit documentation verifying the eligibility requirements described in (c)(D)(viii) of this subsection to the social equity contractor in the form and manner required by the social equity contractor.

(iii) Examples of documentation that may verify eligibility requirements include, but are not limited to:

(A) School records, rental agreements, utility bills, mortgage statements, loan documents, bank records, or tax returns that show the applicant's address(es), or a signed declaration that includes the applicant's address(es) indicating that the applicant resided in a DIA; or

(B) The applicant's arrest or conviction records, or family member's arrest or conviction records and an affirmation of the familial relationship signed by the applicant and the family member; or

(C) The applicant's tax returns demonstrating their income for the prior year; or

(D) Any other documentation that verifies the eligibility requirements described in (c)(D)(viii) of this subsection.

(iv) If additional materials are needed, the social equity applicant will receive a letter electronically from the social equity contractor directing the applicant to submit additional application materials directly to the social equity contractor.

(v) The social equity applicant must submit complete and accurate additional application materials directly to the social equity contractor within 15 business days of the date of the letter. It is the responsibility of the social equity applicant to comply with the application requirements in this section and ensure the application is complete, accurate, and successfully submitted to the social equity contractor.

(vi) If the application is determined to be incomplete by the social equity contractor, the social equity applicant will be provided with 14 days to submit a complete application. The social equity contractor will score the application based on the materials submitted within the time frame.

(vii) The social equity contractor will review the application materials, including the social equity plan provided by the social equity applicant to determine if the applicant meets the requirements of a social equity applicant.

(viii) After the social equity contractor determines that the requirements have been met, the social equity contractor will score social equity applications using the following scoring rubric to prioritize social equity applicants:

| | | |
|---|---|---|
| **Category** | **Eligibility Requirements** | **Point Scale** |
| | 1. Lived in a disproportionately impacted area (DIA) | 40 |
| | 1a. How long have you lived in a DIA?<br>5y – 10y = 20 points<br>10 + years = 40 points | 40 |
| | 2. Convicted of a drug offense? (Self) | 10 |
| | 2a. Convicted of a cannabis offense (Self) | 40 |
| | 3. Convicted of a drug offense? (Family) | 5 |
| | 3a. Convicted of a cannabis offense? (Family) | 5 |
| | 4. If you were convicted of a cannabis offense, what type of sentence did you receive:<br>Fine = 10 points<br>Served probation = 20 points | 80 |

| | | |
|---|---|---|
| | Confined to home = 40 points<br>Served time in jail or prison = 80 points | |
| | 5. Did you or your family member's incarceration keep you from getting employment? | 5 |
| | 6. Did you lose your home or ability to purchase a home or rent a home as a result of your convictions or arrests? | 5 |
| | 7. Is your household income less than the median household income within the state of Washington as calculated by the United States Census Bureau? | 40 |
| | 8. Did you own or operate a medical cannabis dispensary or collective garden, licensed as a business, prior to July 1, 2016 (10 points)?<br>or<br>Did you own and operate a medical cannabis dispensary or collective garden licensed as a business in a DIA (30 points)? | 10<br>30 in a DIA |
| | 9. Have you held or do you currently hold 51 percent majority/controlling interest of a state cannabis (marijuana) retailer license?<br>No = 10 points<br>Yes = 0 points | 10 |
| | **Total Maximum Points** | **310 points** |

(ix) The social equity contractor will provide the board with a list of eligible and scored social equity applicants.

(x) Neither the social equity contractor nor its employees shall benefit from any license or licenses granted as a result of their review.

(d)(i) **Board review.** Social equity applicants that are scored highest by the social equity contractor within the county selected by the social equity applicant will be processed by the board.

(ii) In the event of a tie, the board will use a double blind lottery conducted by an independent third party to identify the application(s) that will be processed.

(e) **Preliminary letter of approval.** Once the social equity applications that will be processed are identified as described in this section, eligible social equity applicants will be issued a preliminary letter of approval.

(4) **Additional provisions.**

(a) **Time restrictions.** There are no time restrictions for a social equity applicant to select and secure a location.

(b) **Ownership changes.** Social equity applicants may not make ownership changes to an application after the application has been reviewed, scored, and prioritized by the social equity contractor.

(c) **Social equity applicants may apply for a social equity license once per application window.** If a social equity applicant applies more than once, the board will accept only the first application.

(d) **License mobility.** Social equity licenses that are currently designated to specific cities may be located anywhere within the county in which the city is located. However, the license may not be transferred outside of that county.

(e) **Qualifying for the social equity program will not result in or guarantee cannabis business license approval.** Social equity applicants must meet all license qualifications in WAC 314-55-077 and this chapter to receive a license.

(f) **License transfer and assumption.** Licenses awarded under this section may not be transferred or assumed within the first year of the license being issued. Licenses awarded under this section may only be transferred to or assumed by individuals or groups of individuals who meet the definition of a social equity program applicant for a period of five years from the date of the initial license was approved.

(5) **Social equity title certificate holders.** A title certificate holder that meets the requirements of a social equity program applicant as determined by the social equity contractor may reinstate their retail cannabis license anywhere within the county that they hold their title certificate.

(6) **Application withdrawal.** The board will withdraw a social equity application if:

(a) The social equity program application or additional materials are determined to be incomplete or incorrect by the social equity contractor;

(b) The social equity program application materials are not timely received by the social equity contractor;

(c) The social equity applicant is not selected to continue with the licensing application process; or

(d) The social equity applicant(s) requests withdrawal of the social equity program application at any time in the application process. The social equity applicant(s) must request withdrawal in writing. The voluntary withdrawal of a social equity program application does not result in a hearing right.