**No. 24-3481**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

Peridot Tree WA, Inc.,

*Plaintiff-Appellant*,

v.

WASHINGTON STATE LIQUOR AND CANNABIS CONTROL BOARD and WILLIAM LUKELA

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Washington
No. 3:23-cv-06111-TMC
Hon. Tiffany M. Cartwright

# BRIEF OF *AMICUS CURIAE* ALLIANCE FOR SENSIBLE MARKETS IN SUPPORT OF APPELLEES WASHINGTON STATE LIQUOR AND CANNABIS CONTROL BOARD AND WILLIAM LUKELA

Jason Horst
Horst Legal Counsel, PC
1600 South Main Street, Suite 225
Walnut Creek, CA 94596
Phone: (415) 871-6567
E-mail: jason@horstcounsel.com

*Attorneys for Amicus Curiae*,
Alliance for Sensible Markets

## CORPORATE DISCLOSURE STATEMENT

Amicus is a non-profit organization that does not have a parent corporation or issue stock.

Date: September 20, 2024

*/s/ Jason Horst*
Jason Horst
Horst Legal Counsel, PC
1600 South Main Street, Suite 225
Walnut Creek, CA 94596
Phone: (415) 871-6567
E-mail: jason@horstcounsel.com

*Attorneys for Amicus Curiae*
Alliance for Sensible Markets

# TABLE OF CONTENTS


**Page**

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... v

INTEREST OF *AMICUS CURIAE* .......... 1

SUMMARY OF THE ARGUMENT .......... 3

FACTUAL BACKGROUND .......... 5

I. Washington has established cannabis social equity programs to mitigate the impacts its own participation in the War on Drugs, directing benefits towards those whom the State has harmed .......... 5

A. Social equity programs arise out of public and governmental assessment of the war on drugs as a deeply harmful policy failure implemented by state and local law enforcement .......... 5

B. It is well-documented that Washington crafted its social equity program expressly to remediate identified harms of the Drug War .......... 8

1. The Washington Legislature enacted the Program with the express intention of mitigating the impacts its Drug War era conduct in Washington State .......... 8

2. The Washington Legislature enacted the Program with express intent and justifications related to the Drug War in Washington State .......... 9

3. Washington's Program is only one of many social equity programs that are, by necessity, directed toward those individuals whom states harmed during the War on Drugs .......... 11

DISCUSSION .......... 14

II. The Court should not affirm the District Court on the basis that the dormant Commerce Clause is inapplicable to the state-licensed cannabis industry, both because it *does* apply, and because the Court can affirm without reaching this constitutional question ..................14

A. The dormant Commerce Clause applies to the state-licensed cannabis industry ..........................................................................................15

1. The dormant Commerce Clause serves as a foundational component of our federalist system of government, restraining states from interfering with interstate commerce ...................................................15

2. As Congress has not suspended the dormant Commerce Clause in unmistakably clear terms, the doctrine applies to commerce in state-licensed cannabis markets.........................................................................17

3. Allowing states to discriminate against interstate commerce in licensed cannabis markets would undermine Congress..................................................20

4. Congress has authorized DOJ to reschedule cannabis out of total prohibition...............................................24

5. Federal courts regularly apply constitutional principals to cases involving the state-licensed cannabis industry, notwithstanding the CSA.............................................25

B. The Court should not rule on the dormant Commerce Clause's applicability, because even if it does apply, Appellant's inability to satisfy the Program's Historical Residency Condition precludes its claims ..........................................................................................26

1. Under the Constitutional Avoidance Doctrine, the Court should not resolve the question whether the dormant Commerce Clause applies if it can dispose of the case without doing so ...........................................28

2. Washington's Historical Residency Criteria achieves legitimate, nondiscriminatory governmental purposes and are lawful under the dormant Commerce Clause 29

3. Appellant cannot maintain its claims, because its allegations make clear that Appellant can satisfy only one of the three legitimate Qualifying Conditions under the Program ........ 36

CONCLUSION ........ 39

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ashwander v. Tenn. Valley Auth.*,
297 U.S. 288 (1936) .................................................................. 28

*Beezley v. Fremont Indem. Co.*,
804 F.2d 530 (9th Cir. 1986).................................................... 37

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986) .................................................................. 30

*City of Las Vegas v. Clark County*,
755 F.2d 697 (9th Cir.1985)...................................................... 37

*Cook v. Miller*,
914 F. Supp. 177 (W.D. Mich. 1996) ........................................ 33

*Dennis v. Higgins*,
498 U.S. 439 (1991) .................................................................. 16

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008) .................................................................. 30

*Gibbons v. Ogden*,
22 U.S. 1 (1824) ........................................................................ 15

*Granholm v. Heald*,
544 U.S. 460 (2005) ........................................................... 16, 30

*Green v. Miss United States of Am., LLC*,
52 F.4th 773 (9th Cir. 2022) ..................................................... 28

*Gonzales v. Raich*,
545 U.S 1 (2006) ........................................................................ 20

*Hughes v. Oklahoma*,
441 U.S. 322 (1979) .................................................................. 16

*Maine v. Taylor*,
477 U.S. 131 (1986) .......................................... 18, 19, 20, 33

*Mann v. Gullickson*,
No. 15-cv-03630, 2016 WL 6473215
(N.D. Cal. Nov. 2, 2016) (unpublished) .................................. 25

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*,
45 F.4th 542 (1st Cir. 2022) .......................................... 23, 21

*Perry v. Newsom*,
18 F.4th 622 (9th Cir. 2021) .................................................. 37

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) .................................... 15, 14, 29, 30, 31

*Rescue Army v. Mun. Ct. of L.A.*,
331 U.S. 549 (1947) ............................................................ 28

*Sensoria, LLC v. Kaweske*,
581 F. Supp. 3d 1243 (D. Colo. 2022) ..................................... 25

*South-Central Timber Development, Inc. v. Wunnicke*,
467 U.S. 82 (1984) ......................................................... 17, 22

*Spokeo v. Robins*,
578 U.S. 330 (2016) ............................................................ 38

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ....................................................... 33, 29

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
588 U.S. 504 (2019) ............................................................ 15

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ............................................................ 28

## Constitutional Provisions

U.S. Const. art. III, § 2 .......... 37

## Federal Rules

Fed. R. Civ. P. 12(b)(6). .......... 37

## Federal Statutes & Regulations

21 U.S.C. § 801, *et. seq*. .......... 3

21 U.S.C. § 801(6) .......... 20

Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, § 531, 136 Stat. 49 (2022) .......... 23

## Washingtoin Statutes & Regulations

2020 Wash. Sess. Laws 1710-1711 .......... 8, 9, 32

Wash. Admin. Code § 314-55(2)(b)(i)-(iii) .......... 13

Wash. Rev. Code § 43.06D.020 .......... 11

Wash. Rev. Code § 69.50.335 .......... 8, 9, 13, 32

Wash. Rev. Code § 69.50.335(6)(a) .......... 9, 10, 35

## Other Sources

Black, Lester, *'Perfect Storm': Illegal California pot keeps showing up in New York*, SFGATE (April 5, 2023), available at https://www.sfgate.com/cannabis/article/california-cannabis-in-new-york-17878097.php ........ 21

Cannabis Regulators Association, https://www.cann-ra.org/ ........ 22

Coyne, Christopher J., and Hall, Abigail R., *Four Decades and Counting: The Continued Failure of the War on Drugs*, CATO INSTITUTE, available at https://www.cato.org/policy-analysis/four-decades-counting-continued-failure-war-drugs ........ 6

Garland, Merrick B., Drug Enforcement Administration, *Schedules of Controlled Substances: Rescheduling of Marijuana*, Docket No. DEA-1362, at 1 (2024), available at https://www.dea.gov/sites/default/files/2024-05/Scheduling%20NPRM%20508.pdf ........ 24

Franklin, Danny, *American Attitudes on the War on Drugs*, June 9, 2021, BULLY PULPIT INTERACTIVE, available at https://assets.aclu.org/live/uploads/document/BPI-ACLU_WoD_Public_Release_Memo_060221_Updated060821_FINAL.pdf ........ 6

Mikos, Robert, *Interstate Commerce in Cannabis*, 10 BOSTON UNIV. L. REV. 857 ........ 19

Minority Cannabis Business Association, *MCBA Cannabis Social Equity Report - 2022*, p. 2, available at https://cannabislaw.report/wp-content/uploads/2022/02/MCBA-Arcview-Equity-report.pdf ........ 12, 13

MJBizDaily Staff, *Cannabis MSO Green Thumb Industries announces share-buyback program*, MJBIZDAILY (September 16, 2024), available at https://mjbizdaily.com/cannabis-mso-green-thumb-industries-announces-share-buyback-program/ ........ 21

Morrison, Aaron, *50-year war on drugs imprisoned millions of Black Americans*, July 26, 2021, ASSOCIATED PRESS, available at https://www.pbs.org/newshour/nation/50-year-war-on-drugs-imprisoned-millions-of-black-americans ........................................ 6

Sacco, Lisa N., *Drug Enforcement in the United States: History, Policy, and Trends*, CONGRESSIONAL RESEARCH SERVICE, pp. 5-17 (2014), available at https://crsreports.congress.gov/product/pdf/R/R43749/4 .................. 7

Sacco, Lisa N., et al., *The Evolution of Marijuana as a Controlled Substance and the Federal-State Policy Gap*, CONGRESSIONAL RESEARCH SERVICE, pp. 11-13 (2022), available at https://crsreports.congress.gov/product/pdf/R/R44782#_Toc101528625 ............................................................................................ 21

Schroyer, John, *Legal California cannabis is 'flooding' unlicensed New York shops*, CRAIN'S NEW YORK BUSINESS (March 28, 2023), available at https://www.crainsnewyork.com/cannabis/legal-california-cannabis-flooding-unlicensed-new-york-shops ............. 21

Wash. St. Liquor and Cannabis Control Bd., *Archived DIA Maps*, available at https://lcb.wa.gov/se/archived-maps ..................... 10, 35

Wray, Henry R., U.S. Gov't Accountability Off., *War on Drugs: Federal Assistance to State and Local Drug Enforcement*, Report No. GGD-93-86 (April 29, 1993), available at https://www.gao.gov/assets/ggd-93-86.pdf ....................................... 7

## INTEREST OF *AMICUS CURIAE*[1]

The Alliance for Sensible Markets ("Amicus") is a non-profit coalition of business and advocacy leaders committed to a thriving, just, sustainable, and broadly beneficial legal cannabis industry. Meaningful opportunities for the participation of the black and brown communities that were the most impacted by the unjust war on drugs are critical to the development of such a national cannabis market. Social equity programs like Washington's offer such opportunities and are an essential component of a just legal cannabis industry.

This case presents but one of a growing number of legal challenges to state and local social equity programs throughout the country. Indeed, Appellant Peridot Tree WA Inc.'s ("Appellant") affiliates have filed similar suits challenging the programs in California, Maryland, and New York.[2] The defendants in these cases, like Washington, have

---

[1] No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae, their members, or their counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

[2] See *Peridot Tree Inc. et al. v. City of Sacramento, et al.*, No. 22-16783 (9th Cir.); *Peridot Tree Inc. v. City of Sacramento et al.*, No. 2:22-cv-00289 (E.D. Cal.);

largely responded by contending that, due to the federal illegality of cannabis, the dormant Commerce Clause does not apply to state-licensed cannabis markets. To the extent that federal courts adopt such a position, it would reinforce the growing fractionalization of state-licensed cannabis markets that should be cohering toward the inevitable future of national regulation, undermining the development of a sensible national cannabis market. Amicus thus has a significant interest in the outcome of this case.

Amicus files this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). All parties consent to the filing of this brief.

---

*Variscite Inc. et al. v. City of Los Angeles et al.*, No.2:22-cv-08685 (C.D. Cal.); *Justyna Jensen v. Maryland Cannabis Administration*, No. 24-1216 (4th Cir.); *Justyna Jensen v. Maryland Cannabis Administration et al.*, No. 1:24-cv-00273 (D. MD); *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, No. 1:23-cv-01599 (N.D.N.Y.).

## SUMMARY OF THE ARGUMENT

Like Appellees Washington State Liquor and Cannabis Control Board (the "WSLCB") and William Lukela (together, "Appellees"), many of the governments defending against challenges to cannabis social equity programs brought under the dormant Commerce Clause have argued that the doctrine does not apply to state-licensed cannabis markets due to the continued federal illegality of cannabis under the Controlled Substances Act.[3] The law is otherwise.

The dormant Commerce Clause *does* apply to prohibit protectionist governmental interference with interstate commerce in the state-legal cannabis industry. Unless Congress makes its intent to suspend the dormant Commerce Clause "unmistakably clear," which it has not, the doctrine applies. The Supreme Court has recognized the dormant Commerce Clause as a critical component of the United States' federalist system of government, which operates to prevent trade wars and protectionist behavior among the several states and preserves Congressional authority over interstate commerce.

---

[3] 21 U.S.C. § 801, *et. seq*. (the "CSA").

Washington and states like it, however, can successfully defend against challenges to their social equity programs like the one at bar without throwing the dormant Commerce Clause out the window. These programs' are defensible on their own terms as legitimate governmental efforts at restorative justice, not anti-competitive discrimination against interstate commerce.

Understood in this context, Appellee's social equity program (the "Program") can survive application of the dormant Commerce Clause, which does not preclude all state action with incidental impacts on interstate commerce. The Program is rooted in restorative justice and is deliberately tailored to redress the wrongs that Washington inflicted on its own residents. In particular, provisions of the Program designed to favor individuals who historically resided in "disproportionately impacted areas" within Washington are not illegitimate discrimination against interstate commerce; rather, they are reasonable non-discriminatory measures taken to effect Washington's expressly-stated objectives of remedying the effects of its own harmful conduct.

Because the Program's application criteria based on applicants' historical residency in disproportionately impacted areas of Washington

do not violate the dormant Commerce Clause, Appellant must establish that it can satisfy two of three legitimate qualifying conditions for Program applicants in order to maintain its claims. Appellant has not done so. As a result, Appellant's claims must fail, regardless of whether the dormant Commerce Clause applies. The Court thus need not reach the constitutional question whether the doctrine applies in the context of state-licensed cannabis markets in the present case.

## FACTUAL BACKGROUND

### I. Washington has established cannabis social equity programs to mitigate the impacts its own participation in the War on Drugs, directing benefits towards those whom the State has harmed

#### A. Social equity programs arise out of public and governmental assessment of the war on drugs as a deeply harmful policy failure implemented by state and local law enforcement

The proliferation of social equity programs throughout the United States arises out of a growing recognition that the "War on Drugs" that began in the 1970s was a policy failure of massive proportions. It was (and, to a significant extent, remains) deeply damaging to American

communities, with the affects felt most acutely by communities of color.[4] Millions of Americans—again, disproportionately black and brown—have been imprisoned for drug-related crimes, while drug treatment was deemphasized.[5] The failure of the War on Drugs in not just an academic talking point. According to a poll conducted by Bully Pulpit Interactive, as of 2021, 83% of Americans believed that the War on Drugs had failed; only 12% believed it had been a success.[6]

Cannabis social equity programs typically involve the state or local government's repudiation of the War on Drugs, as well as direct or tacit acknowledgment of the substantial roles that these governments—particularly law enforcement—played in enabling and perpetuating the

---

[4] Morrison, Aaron, *50-year war on drugs imprisoned millions of Black Americans*, July 26, 2021, ASSOCIATED PRESS, available at https://www.pbs.org/newshour/nation/50-year-war-on-drugs-imprisoned-millions-of-black-americans (last visited on September 18, 2024).

Coyne, Christopher J., and Hall, Abigail R., *Four Decades and Counting: The Continued Failure of the War on Drugs*, CATO INSTITUTE, available at https://www.cato.org/policy-analysis/four-decades-counting-continued-failure-war-drugs (last visited September 18, 2024).

[5] *Id.*

[6] Franklin, Danny, *American Attitudes on the War on Drugs*, June 9, 2021, BULLY PULPIT INTERACTIVE, available at https://assets.aclu.org/live/uploads/document/BPI-ACLU_WoD_Public_Release_Memo_060221_Updated060821_FINAL.pdf (last visited September 18, 2024.

War on Drugs.[7] State and local law enforcement received billions of dollars in federal funds to support enforcement of United States drug laws since the 1980s. Local law enforcement have had tremendous impact in carrying out the Drug War in their own communities.[8]

Local jurisdictions have come to recognize the facts above, and many are attempting to find ways to address the damage they inflicted on their communities, including through the establishment of cannabis social equity programs. Lawmakers building such programs have also recognized that not all communities' experiences were the same. In constructing social equity programs, lawmakers often identify specific communities that have historically faced disproportionate enforcement and direct programs' benefits toward these communities. Such benefits can include not only cannabis industry-related benefits like priority

---

[7] See Sacco, Lisa N., *Drug Enforcement in the United States: History, Policy, and Trends*, CONGRESSIONAL RESEARCH SERVICE, pp. 5-17 (2014), available at https://crsreports.congress.gov/product/pdf/R/R43749/4 (last visited September 18, 2024).

[8] Wray, Henry R., U.S. Gov't Accountability Off., *War on Drugs: Federal Assistance to State and Local Drug Enforcement*, Report No. GGD-93-86 (April 29, 1993), available at https://www.gao.gov/assets/ggd-93-86.pdf (last visited September 19, 2024).

licensing, but also directing fiscal resources towards disproportionately impacted areas through community reinvestment efforts.

### B. It is well-documented that Washington crafted its social equity program expressly to remediate identified harms of the Drug War

#### 1. The Washington Legislature enacted the Program with the express intention of mitigating the impacts its Drug War era conduct in Washington State

Washington's Legislature established the Program "in the interest of remedying harms resulting from the enforcement of cannabis-related laws in disproportionately impacted areas."[9] The Legislature found that both those with cannabis arrests and convictions and those who have resided in areas of high poverty rates "suffer long-lasting adverse consequences, including impacts to employment, business ownership, housing, health, and long-term financial well-being."[10] It thus concluded "that additional efforts are necessary to reduce barriers to entry to the cannabis industry for individuals and communities most adversely impacted by the enforcement of cannabis-related laws. . . . [and that] creating a social equity program will further an equitable cannabis

[9] Wash. Rev. Code § 69.50.335 (2020); 2020 Wash. Sess. Laws 1710-1711.
[10] *Id.*

industry by promoting business ownership among individuals who have resided in areas of high poverty and high enforcement of cannabis-related laws."[11]

The Legislature thus created the Program, stating two specific "social equity goals": "(i) Increasing the number of cannabis retailer, producer, and processor licenses held by social equity applicants from disproportionately impacted areas; and (ii) Reducing accumulated harm suffered by individuals, families, and local areas subject to severe impacts from the historical application and enforcement of cannabis prohibition laws."[12]

### 2. The Washington Legislature enacted the Program with express intent and justifications related to the Drug War in Washington State

The "disproportionately impacted areas" referenced in the Program are identified regions "within Washington state where community members were more likely to be impacted by the war on drugs."[13] The Program requires the WSLCB, in consultation with the state's office of equity, to identify disproportionately impacted areas

[11] *Id.*
[12] *Id.*
[13] Wash. Rev. Code § 69.50.335(6)(a).

"using a standardized statistical equation to identify areas with demographic indicators consistent with populations most impacted by the war on drugs," including the rates of people living below the federal poverty line, who did not graduate from high school, who are unemployed, and who receive public assistance.[14]

The WSLCB was diligent and thorough in ensuring that those receiving benefits under the Program would be those who the Legislature intended to reach. In designating particular census tracks as Disproportionately Impacted Areas under the Program, WSLCB accounted for gentrification over time, designating distinct Disproportionately Impacted Areas for the years 1980, 1990, 2000, and 2010.[15]

The cannabis social equity program does not stand alone in Washington's prioritization of equity through government. The same year it established the Program, Washington also formed a broader Office of Equity "for the purpose of promoting access to equitable

---

[14] *Id.*

[15] Wash. St. Liquor and Cannabis Control Bd., *Archived DIA Maps*, available at https://lcb.wa.gov/se/archived-maps (last visited September 19, 2024) ("DIA Maps Page").

opportunities and resources that reduce disparities[] and improve outcomes statewide across state government."[16] Washington's Program, therefore, is rooted in and structured not in a vacuum, but as a piece of a deliberate and express governmental objective of redressing the harm done by the state's own historically disproportionate and disproportionately-impactful enforcement policies during the War on Drugs.

#### 3. Washington's Program is only one of many social equity programs that are, by necessity, directed toward those individuals whom states harmed during the War on Drugs

The vast majority of cannabis social equity programs throughout country are rooted in the same principles as those underlying Washington's Program. As of 2022, 15 of the 36 states to legalize cannabis for medical or adult use had established social equity programs. In its 2022 Cannabis Social Equity Report, the Minority Cannabis Business Association summarized the purpose behind the creation of these social equity programs thus:

---

[16] Wash. Rev. Code § 43.06D.020.

> Cannabis prohibition has deprived impacted individuals access to higher education, housing, employment, and the right to vote. To counter the effects on both individuals and communities, many states and localities have developed and implemented cannabis "social equity programs" with, or following, the legalization of adult use or medical cannabis.[17]

Washington's Program shares many hallmarks with those established in other states. In order to be eligible for benefits under the Program, a prospective licensee must be 51% owned by a qualified social equity applicant. Washington social equity applicants qualify for inclusion in the Program if they can meet two of the following three qualifying conditions (together, the "Qualifying Conditions"):

a. The applicant's historical residency for at least five years between 1980 and 2010 in Disproportionately Impacted Areas within Washington as a qualifying factor (the "Historical Residency Condition");

---

[17] Minority Cannabis Business Association, *MCBA Cannabis Social Equity Report - 2022*, p. 2, available at https://cannabislaw.report/wp-content/uploads/2022/02/MCBA-Arcview-Equity-report.pdf (last visited September 19, 2024 (citing Roberts, Dorothy E., *The Social and Moral Cost of Mass Incarceration in African American Communities*, FACULTY SCHOLARSHIP AT PENN LAW (2004), 583; Morris, S. J. H., *State Cannabis Reform Is Putting Social Justice Front and Center*, BROOKINGS (April 16, 2021)).

b. The applicant or a family member has a previous cannabis-related arrest or conviction (the "Arrest Condition"); and

c. The applicant had a household income of less than Washington's median household income in the year prior to submitting the application (the "Income Condition").[18]

Each of Washington's Qualifying Conditions is of a type frequently seen in cannabis social equity programs around the United States.[19]

Those who can satisfy at least two of the Program's three Qualifying Conditions move on to a competitive scoring process. The competitive scoring process allocates points based upon a variety of factors. Among the factors for which applicants can receive points are historical residency and/or the operation of cannabis dispensaries in disproportionately impacted areas (the "Historical Residency Factors").

---

[18] Wash. Admin. Code § 314-55(2)(b)(i)-(iii); Wash. Rev. Code § 69.50.335; ER-151.

[19] *MCBA Cannabis Social Equity Report*, *supra*, p. 10-14.

# DISCUSSION

## II. The Court should not affirm the District Court on the basis that the dormant Commerce Clause is inapplicable to the state-licensed cannabis industry, both because it *does* apply, and because the Court can affirm without reaching this constitutional question

The District Court held that the dormant Commerce Clause does not apply to protect interstate trade in the state-licensed cannabis markets. For multiple reasons, this court should not affirm the District Court's decision on that basis. First, such a decision would be incorrect as a matter of law. The dormant Commerce Clause applies unless Congress has made unmistakably clear that it does not. Congress has not taken any action to suspend the dormant Commerce Clause as applied to the state-licensed cannabis industry. Thus, the doctrine continues to apply.

Second, the court should not rule on the question at all. This is because, even if the dormant commerce clause does apply to the state-licensed cannabis industry, Appellant's claims fail, because appellant is ineligible for the Program under its Qualifying Conditions. These conditions, including the Historical Residency Condition, are valid under the dormant commerce clause. Thus, under the Constitutional

Avoidance Doctrine, the court should dispose of the case without reaching the broader constitutional question.

### A. The dormant Commerce Clause applies to the state-licensed cannabis industry

#### 1. The dormant Commerce Clause serves as a foundational component of our federalist system of government, restraining states from interfering with interstate commerce

The Supreme Court has long recognized that inherent in the Constitution's Commerce Clause is a "negative power" that precludes states and localities from legislating and regulating in ways that infringes on Congress's commerce power by discriminating against interstate commerce.[20] "Removing state trade barriers was a principal reason for the adoption of the Constitution, and at this point no provision other than the Commerce Clause could easily do that job. The Court has long emphasized the connection between the trade barriers that prompted the call for a new Constitution and its dormant Commerce Clause jurisprudence."[21] Protection from interference with trade conferred by the Commerce Clause also operates as "a guarantee

---

[20] See, e.g., *Gibbons v. Ogden*, 22 U.S. 1 (1824); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 504–05 (2019).

[21] *Tennessee Wine & Spirits*, 588 U.S. at 504–05.

of freedom for private conduct that the State may not abridge."[22] This mandate "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation."[23]

The dormant Commerce Clause is thus rooted in constitutional concerns about the dangers of unchecked state economic protectionism. While courts have recognized that private market participants have protectable rights under the dormant Commerce Clause, the doctrine is concerned primarily with preserving our federalist system against states' natural inclination toward discrimination against interstate commerce.

Thus, in evaluating whether and how to apply the dormant Commerce Clause in this case, the Court must consider not only the

---

[22] *Dennis v. Higgins*, 498 U.S. 439, 450–51 (1991) (citation omitted).
[23] *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–326 (1979)).

interests of private parties participating in the state-licensed cannabis industry. It must also, and foremost, consider the implications that its holding will have on states' ability to usurp Congress' authority over interstate commerce in contravention of a foundational principal preserved in the Constitution.

#### 2. As Congress has not suspended the dormant Commerce Clause in unmistakably clear terms, the doctrine applies to commerce in state-licensed cannabis markets

Because Congress has never taken any action to suspend the dormant Commerce Clause in the context of the state-licensed cannabis industry, it remains applicable. It is well-established that, unless Congress has made it "unmistakably clear" that the doctrine does not apply in a particular context, the dormant Commerce Clause prohibits states from discriminating against interstate commerce.[24]

> Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid. But **because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been "unmistakably clear."** . . . An unambiguous indication of congressional intent is required before a federal statute will

[24] *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984).

> be read to authorize otherwise invalid state legislation . . . . **Absent "a clear expression of approval by Congress,' any relaxation in the restrictions on state power otherwise imposed by the Commerce Clause unacceptably increases 'the risk that unrepresented interests will be adversely affected by restraints on commerce."**[25]

The District Court below reasoned that because Congress has made cannabis completely illegal at a federal level, the dormant Commerce Clause does not preclude Washington from favoring Washington State residents in its state-licensed cannabis program. "[I]t makes little sense," the District Court asserts, that "the dormant Commerce Clause would protect an interstate market that Congress affirmatively prohibited," or "prevent trade wars within that illegal interstate market."[26]

It does not logically follow, however, that by banning cannabis commerce, Congress intended to authorize discrimination against interstate commerce by states that have nonetheless chosen to establish

---

[25] *Maine v. Taylor*, 477 U.S. 131, 138–39 (1986) (emphasis added, internal citation omitted).
[26] ER-010.

regulated cannabis programs.[27] Holding the dormant Commerce Clause inapplicable to the state-licensed cannabis markets would create a constitutional blind spot in which states are free to license, regulate, *and indeed encourage*, participation in a multi-billion dollar consumer goods industry, and then regulate that industry indifferent to the adverse effects on the unrepresented, out-of-state interests that the dormant Commerce Clause is designed to protect. There is no other context in which courts have immunized such state and local governmental conduct, *even where Congress has criminalized the activity in question*.

In *Maine v. Taylor*, for example, the Supreme Court applied the dormant commerce clause despite the fact that the state law at issue restricted conduct that was also criminal under federal law.[28] In fact, the Court found that Maine's prohibition on the importation of bait fish from out of state—the violation of which Congress had criminalized—required the "more demanding scrutiny" applied under the dormant

[27] See Mikos, Robert, *Interstate Commerce in Cannabis*, 10 BOSTON UNIV. L. REV. 857, 877.
[28] 477 U.S. 131, 139 (1986).

Commerce Clause to state laws that directly discriminate against interstate commerce.[29] *Maine v. Taylor* thus supports the application of the dormant Commerce Clause to state-licensed cannabis markets in the absence of Congress' unmistakably clear suspension of the doctrine, notwithstanding federal prohibition of cannabis under the CSA.

### 3. Allowing states to discriminate against interstate commerce in licensed cannabis markets would undermine Congress

Moreover, sanctioning state discrimination against interstate commerce in no way serves to further Congress' objectives in passing the CSA. The CSA unambiguously treats intrastate cannabis commerce as an inextricable piece of the federally-illegal, interstate cannabis market.[30] The Supreme Court has held that an individual medical cannabis patient's home grow sufficiently impacted the interstate market for cannabis that the Commerce Clause empowered Congress to reach such activity through the CSA.[31] Yet in the face of the CSA's prohibition of cannabis, the overwhelming majority of states have

[29] *Taylor*, 477 U.S. at 138 (citing *Pike*, 397 U.S. at 142).
[30] 21 U.S.C. § 801(6) (stating "Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic".)
[31] *Gonzales v. Raich*, 545 U.S 1, 22-23 (2006).

nonetheless legalized the medical and/or adult use of cannabis, undermining Congress' effort to outlaw the plant under the CSA.[32] Giving such states *carte blanche* to discriminate in favor of their own residents, however, would only serve to further undermine Congress by trampling on its authority over interstate commerce.

The state-licensed cannabis industry already is, in reality as well as in law, an interstate market. While each state's cannabis program currently prohibits interstate sales, those frequenting unlicensed cannabis "bodegas" in New York City can frequently find cannabis products from the West Coast on their shelves.[33] The industry's largest businesses engage in numerous state markets and are commonly

---

[32] Sacco, Lisa N., et al., *The Evolution of Marijuana as a Controlled Substance and the Federal-State Policy Gap*, CONGRESSIONAL RESEARCH SERVICE, pp. 11-13 (2022), available at https://crsreports.congress.gov/product/pdf/R/R44782#_Toc101528625 (last visited September 18, 2024).

[33] Schroyer, John, *Legal California cannabis is 'flooding' unlicensed New York shops*, CRAIN'S NEW YORK BUSINESS (March 28, 2023), available at https://www.crainsnewyork.com/cannabis/legal-california-cannabis-flooding-unlicensed-new-york-shops (last visited September 19, 2024); Black, Lester, *'Perfect Storm': Illegal California pot keeps showing up in New York*, SFGATE (April 5, 2023), available at https://www.sfgate.com/cannabis/article/california-cannabis-in-new-york-17878097.php (last visited September 19, 2024).

referred to as "multi-state operators" or "MSOs."[34] The Cannabis Regulators Association ("CANNRA"), a nonprofit organization that fosters collaboration and coordination among cannabis regulators and lawmakers, includes members from every state in which cannabis has been legalized in any form.[35]

Given the realities above, it is unclear how empowering states to promulgate laws favoring intrastate commerce over interstate commerce serves Congress's interest in preserving its Constitutional authority under the Commerce Clause. It is simply not plausible that the existence of the current interstate cannabis market has alluded Congress. If Congress wished to render the dormant Commerce Clause inapplicable to the cannabis industry, it has an established mechanism for doing so—the unmistakably clear suspension of its limitations.[36]

---

[34] See, e.g., MJBizDaily Staff, *Cannabis MSO Green Thumb Industries announces share-buyback program*, MJBIZDAILY (September 16, 2024), available at https://mjbizdaily.com/cannabis-mso-green-thumb-industries-announces-share-buyback-program/ (last visited September 19, 2024).

[35] See Cannabis Regulators Association, https://www.cann-ra.org/ (last visited September 19, 2024).

[36] *South-Central Timber Development*, 467 U.S. at 91.

Congress has not availed itself of this tool. The courts are not empowered to do it for them.

In fact, a number of federal courts from across the country, most notably the First Circuit in *Northeast Patients' Group v. Figueroa*,[37] have found that Congress' repeated passage of the Rohrabacher-Farr Amendment[38] prohibiting the use of Department of Justice ("DOJ") funds to enforce the CSA against state medical cannabis programs undermines any assertion that Congress is committed to full cannabis prohibition. So, not only has Congress been silent on whether the dormant Commerce Clause applies, it has taken express actions that would weigh against inferring any Congressional intent to suspend its protections.

---

[37] *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022).

[38] See Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, § 531, 136 Stat. 49 (2022) (providing that "[n]one of the funds made available under this Act to the Department of Justice may be used, with respect to [states with medical cannabis programs], to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana").

#### 4. Congress has authorized DOJ to reschedule cannabis out of total prohibition

Since *Northeast Patients Group* was decided, the Department of Justice ("DOJ"), through the Drug Enforcement Administration ("DEA"), has proposed that cannabis be rescheduled from schedule 1 to schedule 3 under the CSA.[39] As of the writing of this brief, no final rule has been published making such rescheduling official. But the fact that the CSA authorizes the Executive Branch to unilaterally reschedule cannabis without congressional action further undermines reliance on the CSA as support for the assertion that the dormant Commerce Clause is inapplicable to state-licensed cannabis markets.

Under schedule 3, cannabis products could theoretically be approved through FDA's new drug application process and sold in interstate commerce through licensed pharmacies. Unquestionably, the dormant Commerce Clause would apply to preclude state and local protectionism under such a scenario, despite the fact Congress will have done nothing to change the status quo. Although the District Court

---

[39] Drug Enforcement Administration, *Schedules of Controlled Substances: Rescheduling of Marijuana*, Docket No. DEA-1362, at 1 (2024), available at https://www.dea.gov/sites/default/files/2024-05/Scheduling%20NPRM%20508.pdf (last visited September 19, 2024).

stated that "it makes little sense why the dormant Commerce Clause would prevent trade wars within [an] illegal interstate market," what would truly make little sense is if the line between Congressional and state authority over commerce is set based on where *the DOJ* decides to schedule cannabis under the CSA.

#### 5. Federal courts regularly apply constitutional principals to cases involving the state-licensed cannabis industry, notwithstanding the CSA

Applying the dormant Commerce Clause to the state-legal cannabis industry is further consistent with the manner in which federal courts have adjudicated controversies involving cannabis industry parties. Notwithstanding the federally-illegal status of cannabis, federal courts have found that they can adjudicate cases involving participants in the legal cannabis industry and even award relief where doing so would not require ordering or encouraging violations of the CSA.[40] Just as a federal court can award contractual damages where doing so would not order or encourage violations of the CSA, a federal court can strike down protectionist state statutes and

---

[40] See, e.g., *Sensoria, LLC v. Kaweske*, 581 F. Supp. 3d 1243, 1248-1262 (D. Colo. 2022) (citing *Mann v. Gullickson*, No. 15-cv-03630, 2016 WL 6473215, at *7 (N.D. Cal. Nov. 2, 2016).

hold that, while states obviously need not license businesses to conduct commercial cannabis activity, if states choose to do so, they may not violate the dormant Commerce Clause in the process.

For these reasons, this Court should reject the District Court's finding that the dormant Commerce Clause is inapplicable to state-licensed cannabis markets. The Court should, however, still affirm the District Court's dismissal of Appellant's claims, as those claims depend on Appellant's ability to successfully challenge provisions of the Program, such as the Historical Residency Condition, that are not protectionist in nature, but rather narrow means of accomplishing legitimate governmental interests, as discussed below.

### B. The Court should not rule on the dormant Commerce Clause's applicability, because even if it does apply, Appellant's inability to satisfy the Program's Historical Residency Condition precludes its claims

The discussion above makes clear that, should the Court decide whether the dormant Commerce Clause applies to the state-licensed cannabis industry, it should hold the doctrine applicable. Because the Court need not do so in order to resolve the present case, however, the Court should not reach that question at all.

Here, Appellant's factual allegations (taken as true) do not establish that it could have satisfied two of the three Qualifying Conditions necessary to reach the competitive stage of Washington's licensing process. While Appellant contends that the Historical Residency Condition is invalid under the dormant Commerce Clause, that condition is facially neutral and furthers Washington's legitimate governmental interest in remedying the disproportionate impact of the State's conduct during the War on Drugs. Directing the Program's benefits in part toward individuals who were a part of communities most impacted by this conduct—*wherever those individuals currently reside*—does not discriminate against interstate commerce.

Thus, the Dormant Commerce clause does not relieve Appellant of the need to satisfy the Program's Qualifying Conditions. Because Appellant does not allege that it can do so, its claims fail as a matter of law. The Court should thus affirm on this basis and avoid broader constitutional questions.

#### 1. Under the Constitutional Avoidance Doctrine, the Court should not resolve the question whether the dormant Commerce Clause applies if it can dispose of the case without doing so

The Supreme Court has long "followed a policy of strict necessity in disposing of constitutional issues."[41] As Justice Brandeis first articulated: "The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."[42] Here, as established below, the record makes clear that, even assuming that the dormant Commerce Clause does apply, Appellant's claims cannot stand. Each of the claims ultimately relies on the premise that the Historical Residency Condition and/or the Historical Residency Factors violate the dormant Commerce Clause (assuming it applies), which they do not. Given this fact, the Court need not reach the question broader constitutional question of whether the dormant Commerce Clause applies to state-licensed cannabis markets in order to dispose of the case, and it should not.

---

[41] *Rescue Army v. Mun. Ct. of L.A.*,331 U.S. 549, 568 (1947).

[42] *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). See also *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450–51 (2008); *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 809-810 (9th Cir. 2022).

### 2. Washington's Historical Residency Criteria achieves legitimate, nondiscriminatory governmental purposes and are lawful under the dormant Commerce Clause

Critically, not all provisions of the Program challenged by Appellant are evaluated identically under dormant Commerce Clause analysis. Two of Appellant's four claims against Respondents are based on the Current Residency Requirement. Appellant's two other claims, however, are based on the provisions of the Program that purportedly favor Washington residents over out-of-state residents, namely the Historical Residency Condition and the Historical Residency Factors (together, the "Historical Residency Criteria"). With regard to these latter causes of action, Appellant has not stated a claim, because even assuming that the dormant Commerce Clause applies, the Historical Residency Criteria are legitimate exercises of the State's legislative authority.

The test for evaluating state laws under the dormant Commerce Clause was outlined by the Supreme Court in *Pike v. Bruce Church, Inc.*[43] Courts' analysis divides challenged statutes into two categories: (1) statutes that "directly regulate[] or discriminate[] against interstate

---

[43] 397 U.S. 137, 142 (1970).

commerce or . . . favor in-state economic interests over out-of-state interests",[44] and (2) even-handed statutes with only incidental effects on interstate commerce.[45] If a statute falls under the former category, it may still be upheld where the government can show that the statute "advance[s] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."[46]

Here, the Historical Residency Criteria do not violate the dormant Commerce Clause under either prong of the *Pike* test. The criteria, which are similar to historical residency provisions in cannabis social equity programs around the country, do not directly discriminate against interstate commerce. They should thus be subjected to far lighter scrutiny than laws that do. Even under the heightened scrutiny reserved for such facially discriminatory measures, however, the Historical Residency Criteria pass constitutional muster because they

---

[44] *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986).
[45] *Id.*; *Pike*, 397 U.S. at 142.
[46] *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005)).

further a legitimate—indeed, compelling—governmental interest and are narrowly tailored to achieve that interest.

**a. The Historical Residency Criteria do not facially discriminate against interstate commerce**

A requirement that an applicant have historically resided in certain financially-distressed and over-policed regions within the state does not directly discriminate against interstate commerce. The Historical Residency Criteria can be satisfied by those who have not lived in Washington for decades. While it is possible that the criteria will have the incidental effect of enhancing the prospects of those that live in the state, relative to those who do not, they do not have that effect on their face. Such even-handed statutes "will be upheld" notwithstanding such incidental impacts on interstate commerce "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."[47]

Any burden imposed on interstate commerce by the Historical Residency Criteria is minor. The criteria do not preclude even out-of-state applicants *who have never set foot in Washington*, as such

[47] *Pike*, 397 U.S. at 142.

applicants could establish eligibility for the Program using the two other Qualifying Conditions.

#### b. The Historical Residency Criteria accomplish legitimate local purposes that cannot be adequately served by reasonable nondiscriminatory alternatives

The Historical Residency Criteria have nothing at all to do with limiting interstate commerce and everything to do with redressing wrongs that the State itself has acknowledged causing, and they are vital to achieving this underlying objective of the Legislature in creating the Program.[48] Absent their inclusion, Appellees would have no ability to ensure that the Program's benefits flow to those for whom the Program was developed in the first place.

Therefore, even if the Historical Residency Criteria's favoring of those who have previously spent significant time in the state *does* constitute direct discrimination against interstate commerce (which it does not), these criteria should nonetheless be upheld as accomplishing

[48] Wash. Rev Code § 69.50.335; 2020 Wash. Sess. Laws 1710-1711 (stating that "remedying harms resulting from the enforcement of cannabis-related laws in disproportionately impacted areas" and facilitating the participation of individuals from such areas in the state's emerging cannabis industry are core governmental purposes behind the Program.

a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.

There is no question that the Program's goals represent legitimate governmental interests. The Supreme Court has held that governmental measures to remedy instances of past discrimination that violate the Constitution are compelling enough to justify even rarely-permissible race-based governmental action (which the Program *does not* include).[49] "The Commerce Clause . . . does not elevate free trade above all other values."[50] In fact, at least one district court has upheld a directly-discriminatory state residency requirement where the state had a legitimate, non-protectionist purpose in enacting the residency requirement and there was no evidence of substantial impact on interstate commerce outside of plaintiff's own case.[51]

As discussed above, in enacting the Program, Washington has made express findings regarding the dramatic long-term impacts of its prior drug policies. Remediation of such affects is an inherently

---

[49] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023).
[50] *Maine v. Taylor*, 477 U.S. 131, 151 (1986).
[51] *Cook v. Miller*, 914 F. Supp. 177, 181 (W.D. Mich. 1996).

legitimate governmental interest. To hold otherwise—that the dormant Commerce Clause prevents states and local governments from redressing their own acknowledged wrongful conduct because they only wronged those who resided in their boundaries—would be an odd result indeed.

Further, the Legislature could not likely have effected the Program's goals through less discriminatory measures than adoption of the Historical Residency Criteria. The Program is, in significant part, an acknowledgement of Washington's discrimination against those living in Disproportionately Impacted Areas. The Program's goals cannot be achieved without facilitating the ability of members from these communities—whether past or present Washington residents—to realize its benefits.

Moreover, Washington has taken great pains to equitably identify the areas most impacted by its implementation of the War on Drugs, employing standardized statistical analysis and taking considerable time and effort to ensure the Program's benefits were tied to the

historical harms.[52] And the process continues. Just a year after the initial maps were published, the Program's website was updated to state that the maps that used for the 2023 application process are now "obsolete," and the WSLCB has provided drafts of new maps.[53]

It would be impossible for Washington to conduct the same careful and in-depth analysis on a national scale. Nor does the dormant Commerce require such a nationwide program in order to permit Washington to address *its own misconduct, committed within its own borders*. Appellant appears to contend the Program's refusal to treat its 51% owner's historical residency in a disproportionately impacted area in Michigan for more than five years as equivalent to historical residency in a Disproportionately Impacted Area in Washington offends the Commerce Clause. But the Program does not seek to redress the nationwide impact of the War on Drugs, only those impacts that Washington caused.[54] In fact, it is undisputed that there are no

---

[52] *Id.*; Wash. Rev. Code § 69.50.335(6)(a).
[53] DIA Maps Page, *supra*, n.16.
[54] While the inclusion of certain criteria, such as the Arrest Condition and Income Condition, suggest that Respondents were far from indifferent to the harms of the

disproportionately impacted areas in Michigan as that term is defined under Washington law. It is thus unclear how Appellant is defining the term.

Any disparate impact caused by the Historical Residency Criteria is mitigated by the presence of the other two Qualifying Conditions and scoring factors, which are entirely indifferent to whether applicants have ever lived in the state. These non-residency-based criterial allow for applicants who cannot satisfy the Historical Residency Criteria to obtain licenses through the Program.

### 3. Appellant cannot maintain its claims, because its allegations make clear that Appellant can satisfy only one of the three legitimate Qualifying Conditions under the Program

#### a. Appellant cannot state a claim based on the Historical Residency Criteria because those criteria are lawful under the dormant Commerce Clause

Because the Historical Residency Criteria constitute legitimate, nondiscriminatory governmental actions, Appellant's cannot state a claim based their purported unconstitutionality under the dormant Commerce Clause. Appellant's first and second causes of action rest on

---

War on Drugs outside of Washington, there is no evidence that remedying these harms was a primary motivating purpose behind the Program.

the premise that the Historical Residency Criteria impermissibly discriminate against interstate commerce. Because they do not so discriminate, the Court should affirm the dismissal of these claims for failure to state a claim under Rule 12(b)(6).[55]

#### b. Appellant lacks standing to pursue its claims based on the Current Residency Requirement, as any injury in fact suffered by Appellant is not traceable to that requirement

Appellant must have standing under Article III of the Constitution in order to pursue its claims.[56] For standing to exist as to Appellant's third and fourth causes of action related to the Current Residency Requirement, Appellant must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and 3) that is likely to be redressed by a favorable judicial

---

[55] While the District Court dismissed the claims in question, along with Appellant's other claims, on different grounds, the Court "may affirm the district court on any basis fairly supported by the record." *Beezley v. Fremont Indem. Co.*, 804 F.2d 530, 530, n. 1 (9th Cir. 1986) (citing *City of Las Vegas v. Clark County*, 755 F.2d 697, 701 (9th Cir.1985)).

[56] U.S. Const. art. III, § 2; *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021).

decision."[57] Appellant, the party invoking jurisdiction, "bears the burden of establishing these elements."[58]

The facts alleged by Appellant only establish that it can meet one of the three Qualifying Conditions, the Arrest Condition. Appellant does not allege an ability to satisfy the Income Condition.[59] Nor does Appellant allege that it can satisfy the Historical Residency Condition.

In ruling on Appellant's Motion for Preliminary Injunction, the District Court found that Appellant satisfied all standing requirements. It rejected Appellees' contention that Appellant could not satisfy the injury in fact requirement for standing because it could not have scored high enough on the State's ranking criteria to obtain a license, stating that "[e]xclusion from the competitive process is itself a concrete injury."[60] The Court further found that the WSLCB's "decision to reject

---

[57] *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).
[58] *Id.*
[59] Amicus notes that both Respondents' briefing in the District Court and in its Answering Brief contain an unsupported representation that Appellant's application for the Program asserted that Appellant could satisfy the Income Condition. The application itself, however, is not in the record, and neither Appellant's original or amended complaint in this matter, nor any briefing by Appellant contends that it is able to satisfy the Income Condition.
[60] ER-023 – ER-027. See *Spokeo*, 578 U.S. at 338.

Peridot's application for failure to meet the residency requirements caused Peridot's exclusion from the competitive process."[61]

Because Appellant has not established an ability to meet two of the three Qualifying Conditions, however, it has not established that any injury is traceable to enforcement of the Current Residency Requirement. Such injury is only traceable to Respondents' enforcement of the Current Residency Requirement if Appellant would have otherwise been eligible for the Program. Appellant, however, has failed to establish as much and has thus failed to sufficiently establish standing. The Court should thus affirm the District Court's dismissal of Appellant's third and fourth causes of action on that basis, rather than reach the question of the dormant Commerce Clause's applicability.

## CONCLUSION

For the foregoing reasons, Amicus urges the Court not to accept Appellees' invitation to hold the dormant Commerce Clause inapplicable to state-licensed cannabis markets. The doctrine does apply, because Congress has not suspended it. Washington's Program,

---

[61] ER-026.

however, is a legitimate exercise in restorative justice, not a protectionist discrimination against interstate commerce.

Date: September 20, 2024

*/s/ Jason Horst*
Jason Horst
Horst Legal Counsel, PC
1600 South Main Street, Suite 225
Walnut Creek, CA 94596
Phone: (415) 871-6567
E-mail: jason@horstcounsel.com

*Attorneys for Amicus Curiae*
Americans for Sensible Markets

## CERTIFICATE OF COMPLIANCE

I certify that:

This brief complies with the length limitations of Fed. R. App. P. 29(a)(5) and Ninth Circuit Rule 32-1 because this brief contains 6,923 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word in 14-point Century Schoolbook font.

Date: September 20, 2024

*/s/ Jason Horst*
Jason Horst
Horst Legal Counsel, PC
1600 South Main Street, Suite 225
Walnut Creek, CA 94596
Phone: (415) 871-6567
E-mail: jason@horstcounsel.com

*Attorneys for Amicus Curiae*
Alliance for Sensible Markets

## CERTIFICATE OF SERVICE

I certify that on September 20, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: September 20, 2024

*/s/ Jason Horst*
Jason Horst