**CASE NO. 24-3481**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

PERIDOT TREE WA, INC., a Washington corporation,

*Plaintiff and Appellant,*

v.

WASHINGTON STATE LIQUOR AND CANNABIS CONTROL BOARD and WILLIAM LUKELA,

*Defendants and Respondents.*

Appeal from an Order of the United States District Court for the Western District of Washington, No. 3:23-cv-06111-TMC
Honorable Tiffany M. Cartwright

# APPELLANT'S REPLY BRIEF

JEFFREY M. JENSEN, PC
Jeffrey M. Jensen (SBN 262710)
jeff@jensen2.com
9903 Santa Monica Blvd. #890
Beverly Hills, CA 90212
Tel: (310) 909-7043
Attorneys for Plaintiff

# TABLE OF CONTENTS

**Page**


ARGUMENT ..... 1

A. The Circuit Must Reverse the Order Granting Motion to Dismiss ..... 1

1. The DCC Applies to Illegal Interstate Markets ..... 1

a. Respondents' argument that the residency requirement keeps criminals out of cannabis fails ..... 3

b. Respondents' parade of horribles shows they do not understand the dCC ..... 9

2. Respondents' Analysis of Caselaw Shows Respondents Do Not Understand the DCC ..... 17

a. Northeast Patients Group ..... 18

b. Prudential Insurance Company v. Benjamin ..... 19

c. Sligh v. Kirkwood ..... 21

d. Cole Memorandum ..... 22

B. The Circuit Must Reverse the Order Denying the Preliminary Injunction ..... 23

1. Appellant Faces Irreparable Harm ..... 23

2. The Balance of Equities and the Public Interest Favor an Injunction ..... 27

C. Respondents' Amicus Concedes Everything Necessary for the Circuit to Reverse Both Orders ..... 29

1. Six-Month Residency Requirement ..... 29

2. Five Year Residency Requirement ..... 30

a. The first tier dCC analysis applies ..... 31

b. The law fails the first tier dCC analysis because it does not advance its purpose ....................34

c. The law fails the first tier dCC analysis because alternate methods exist....................34

d. The law fails the first tier dCC analysis because the DIA definition is unrelated to cannabis harm ....................35

e. Respondents cannot satisfy the second tier dCC analysis ........36

f. Race-based affirmative action....................36

3. Standing....................39

CONCLUSION ....................41

CERTIFICATE OF COMPLIANCE....................42

CERTIFICATE OF SERVICE ....................43

# TABLE OF AUTHORITIES

**Page(s)**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ....................................39
*ARMLA One, Inc. v. Los Angeles*, No. 2:20-CV-07965-SB-RAO, 2021 WL 3017518, at *2 (C.D. Cal. Apr. 2, 2021)..........................................................17
*Atl. Prince, Ltd. v. Jorling*, 710 F. Supp. 893 (E.D.N.Y. 1989) ..............................31
*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023).........................................................23
*Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)...............................................13
*Black Star Farms LLC v. Oliver*, 600 F.3d 1225 (9th Cir. 2010)...........................31
*Borges v. Cnty. of Mendocino*, No. 20-CV-04537-SI, 2022 WL 1137084 (N.D. Cal. Apr. 18, 2022) ..........................................................................................17
*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ....................................38
*Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349 (1951) ...............................12
Engrossed S.V. 755, 81st Leg., Reg. Sess. (Or. 2021) ...........................................15
*Fam. Winemakers of California v. Jenkins*, 592 F.3d 1 (1st Cir. 2010)..................31
*Finch v. Treto*, No. 22 C 1508, 2022 WL 2073572 (N.D. Ill. June 9, 2022) ..........25
*Gonzales v. Raich*, 545 U.S. 1 (2005).........................................................................1
*Grandpa Bud, LLC v. Chelan Cnty. Washington*, No. 2:19-CV-51-RMP, 2020 WL 2736984, at *4 (E.D. Wash. May 26, 2020) .......................................................16
*Granholm v. Heald*, 544 U.S. 460 (2005)..............................................................10
*Greenwood v. Green Leaf Lab LLC*, No. 3:17-CV-00415-PK, 2017 WL 3391671 (D. Or. July 13, 2017) ...........................................................................................17
*James v. City of Costa Mesa*, 700 F.3d 394 (9th Cir. 2012)....................................16
*Lo v. Cnty. of Siskiyou*, 558 F. Supp. 3d 850 (E.D. Cal. 2021) ..............................17
*Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 812 (E.D. Mich. 2021)....................30
*Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021)....................25
*Lull v. Cnty. of Placer*, No. 217CV2216KJMEFBPS, 2019 WL 4747647 (E.D. Cal. Sept. 30, 2019) ...........................................................................................17
*Maryland Hemp Coalition v. Moore*, No. C-21-CV-23-348 (Cir. Ct. Wash Cty, MD, Oct. 12, 2023) ...........................................................................................39
*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018)),..................................................................................................28
*New York v. United States*, 505 U.S. 144 (1992).....................................................3
*NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020).........................................................................................30
*Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93 (1994) ..............................................................................................................31

*Peridot Tree, Inc. v. City of Sacramento*, 2022 WL 10629241 ..............................26
*Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916 (9th Cir. 2024)..................15
*Pharmacann Ohio, LLC v. Ohio Dept. Commerce*, No. 17-cv-10962, 2018 WL 7500067 (Oh. Common Pleas 2018)...................................................................38
*Prudential Ins. Co. v. Benjamin*, 328 U.S. 408 (1946)................................. 1, 2, 19
R.C.W. § 43.06.495...........................................................................................9
R.C.W. §69.50.335(6)(a) ......................................................................... 32, 36, 37
R.C.W. §69.50.401(1)........................................................................................11
R.C.W. §69.50.4013...........................................................................................11
*Racioppi v. Bosov*, No. 2:20-CV-03797-FMO-JC, 2021 WL 3811012 (C.D. Cal. Mar. 12, 2021)...............................................................................................17
*Shulman v. Kaplan*, 58 F.4th 404 (9th Cir. 2023)...............................................16
*Siva Enterprises v. Ott*, No. 218CV06881CASGJSX, 2018 WL 6844714 (C.D. Cal. Nov. 5, 2018) .............................................................................................17
*Sligh v. Kirkwood*, 237 U.S. 52 (1915)...............................................................21
*South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018)................................30
*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)...............................................................................................38
*Tarr v. USF Reddaway, Inc.*, No. 3:15-CV-02243-PK, 2018 WL 659859 (D. Or. Feb. 1, 2018) ..............................................................................................17
*TCR Holdings, LLC v. Nye County*, No. 2:09-CV-00433 (D. Nev. 2010)..............14
*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2471 (2019) .................................................................................................... 29, 30
*U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362 (C.D. Cal. 2014).......5
*Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022)..........28
W.A.C. § 314-55-570(2) ........................................................................ 30, 33, 40
W.A.C. §314-55-020(1)(d) ....................................................................................29
W.A.C. §314-55-110(4)(d) ....................................................................................11
Wash. Admin. Code § 314-55-570(2)(b)...............................................................9

# ARGUMENT

## A. The Circuit Must Reverse the Order Granting Motion to Dismiss

Washington violates the dormant Commerce Clause ("dCC") in two ways. ***First***, Washington requires all owners of businesses applying for Licenses to reside in Washington for the six months preceding the application. W.A.C. §314-55-020(1)(d). ***Second***, Washington requires businesses applying for Licenses to be 51% owned by an individual who lived in a Disproportionately Impacted Area ("DIA") in Washington for five years between 1980 and 2010. W.A.C. §314-55-570(2).

### 1. The DCC Applies to Illegal Interstate Markets

The District Court and Respondents confuse the roles of the federal and state governments. Under the ***Commerce Clause***, the Constitution ***grants*** the ***federal*** government the power to regulate interstate markets—including the illegal interstate market in cannabis. *Gonzales v. Raich*, 545 U.S. 1, 15 (2005).

Under the ***dCC***, the Constitution ***prohibits*** the ***states*** from discriminating in commerce that affects interstate markets. *Prudential Ins. v. Benjamin*, 328 U.S. 408, 423 (1946). The dCC contains no grant of power to states to regulate interstate commerce, whether the market is federally legal or illegal. *Id*. States may regulate interstate commerce only if the regulation passes the first or second tier dCC analysis.

Respondents concede the Commerce Clause's grant of power to the federal government is distinct from the dCC's prohibition on state regulation of interstate markets:

> [T]he Supreme Court has long warned ***against*** equating Congress's affirmative Commerce Clause authority and the implied prohibitions on state power under the dormant Commerce Clause. *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 423 (1946). That is because the Commerce Clause grants Congress "plenary and supreme authority" over interstate and foreign commerce, including the power to both "promote and to prohibit interstate commerce." *Id.* at 423, 434. ***This authority is "entirely distinct from the implied prohibition of the commerce clause," which limits state power with respect to "matters within the field of commerce, once this is defined."*** *Id*. at 423. While this distinction is not "always clearly observed," ***"to blur them, and thereby equate the implied prohibition with the affirmative endowment is altogether fallacious. There is no such equivalence."*** *Id.*

(Answering Brief, 30 (emphasis added).)

Thus, states are free to make cannabis illegal under state law. States are also free to repeal state laws making cannabis illegal and leave enforcement of federal cannabis laws to the federal government under the anticommandeering principle.

*See New Jersey Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 472 (2018). States are not free, however, to treat cannabis as a legal article of commerce and grant business licenses to their residents, but discriminate against out-of-state residents for those licenses in violation of the dCC. Congress exercising its affirmative grant of power under the Commerce Clause to regulate interstate commerce in cannabis does not somehow transfer to the states an affirmative grant of power to regulate interstate commerce.

#### ***a. Respondents' argument that the residency requirement keeps criminals out of cannabis fails***

Respondents argue the residency requirement is "aimed at preventing diversion of cannabis out-of-state or into illegal channels and to prevent criminal elements from overtaking regulated state cannabis markets." This argument fails for multiple reasons.

***First*, *Respondents' argument does not go to whether the dCC applies to cannabis licenses***; it goes to whether the dCC analysis is satisfied by Washington having a local purpose that cannot be served by nondiscriminatory means. The District Court, however, never reached the merits because it concluded the dCC does not apply to cannabis.

***Second***, Respondent's argument that Washington's residency requirement prevents criminals from entering the cannabis market ***is ludicrous because***

***Respondents require applicants to be majority owned by persons with criminal convictions***.

In fact, Respondents give more points to applicants who served time in prison for cannabis than to applicants who were merely fined or placed on probation. (Order MTD, ER-006.) Persons who served time in prison for cannabis are almost always cannabis traffickers, not people who possessed cannabis for personal use. When President Biden pardoned all people convicted of simple possession of cannabis under federal law last year, nobody was freed from prison because nobody was in federal prison for simple possession nationwide.[1]

The ridiculousness of Respondents' argument is further highlighted because ***Respondents award additional points to applicants who were convicted of crimes for dangerous drugs like heroin***, which is illegal under federal ***and Washington*** law. (Order, ER-010.)

***Moreover, Respondents proposed combining the score categories of cannabis convictions and other drug convictions so that heroin traffickers would***

[1] https://apnews.com/article/biden-marijuana-pardons-clemency-02abde991a05ff7dfa29bfc3c74e9d64.

***be on equal footing with cannabis convicts***.[2] Only in response to public outcry did Respondents retract that recommendation.[3]

***Third***, Respondents do not explain to the Circuit their conclusory statement that the residency restriction is "aimed at preventing diversion of cannabis out-of-state or into illegal channels and to prevent criminal elements from overtaking regulated state cannabis markets." (Answering Brief, 24.)

At the District Court, Respondents argued their investigators cannot travel outside Washington to investigate applicants' backgrounds, and can access only local databases. (Opposition to PI, ER-170.) That is nonsense because Washington requires only six months' residency for a License. Thus, Respondents can investigate and ensure applicants who moved to Washington six months earlier have no disqualifying events in their background prior to moving to Washington. Respondents do not explain why they cannot conduct the same investigation for nonresidents. Likewise, Respondents do not explain why most states do not have residency requirements, and those states are able to background check applicants.

---

[2] The court can take judicial notice of government websites. *U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F.Supp.3d 1362, 1381 (C.D. Cal. 2014). https://lcb.wa.gov/sites/default/files/publications/Social_Equity/DRAFT%20Social%20Equity%20Application%20Scoring%20Rubric%202024.pdf.

[3] Page 5, https://lcb.wa.gov/sites/default/files/publications/Research%20Team/Research%20Program_SE%20Draft%20Rules%20Survey_8192024.pdf.

At the District Court, Respondents argued the residency requirement prevents federal prosecution of Washington cannabis businesses. The District Court accepted this statement in a clearly erroneous factual finding. Respondents and the District Court relied entirely on paragraph 11 of the Declaration of Respondents' Licensing Director. (Order, ER017.) The Declarant cites ***no authority whatsoever—not a single study, report, etc***.—for her ***pure speculation*** that residency requirements prevent federal prosecution of Washington cannabis businesses. (Declaration, ER-149.) Her conclusory statement flies in the face of reality, ***as most states do not require residency, yet Respondents do not offer a single example from anywhere in the country of the federal government prosecuting a state licensed cannabis retailer because the owners reside outside the state***.

At the District Court, Respondents argued "states without residency requirements tend to experience an overproduction of cannabis, which leads to diversion to other states." The District Court accepted that argument. (Order, ER017.) ***But the Declaration cites only one article (which is hearsay) and that article does not say that residency requirements prevent diversion of cannabis.*** (Declaration, ER-153 ¶20 (citing SER-28.) ***The article states "it is almost impossible to make a comparison" of diversion between states with residency requirement and states without***. (SER-28.)

Moreover, the article does not say states without residency restrictions tend to have overproduction of cannabis. It notes only that Oregon has no residency restriction and also has an oversupply of cannabis. (SER-28.) ***Whether a state has an oversupply of cannabis depends on whether the state granted too many cultivation licenses or allowed licensees to grow in too much square footage. The residency of the owners has nothing whatsoever to do with the amount of cannabis grown.***

***Fourth***, Respondents' conclusory statement that the residency requirement prevents illegal cannabis in Washington is easily disprovable. The Washington State Institute for Public Policy "found no evidence to suggest that specific regulations of legal cannabis supply systems systematically affect illicit cannabis supply."[4] Washington law enforcement stated that illegal cannabis operations are "just out in the open, because everywhere you drive in the county you see the fencing, and everybody just assumes it must be just another legal grow going on."[5] Some illegal operations are "part of a network with connections to California and Thailand, who had purchased six properties in the Okanogan area." *Id*. Within the

---

[4] Page 7, https://www.wsipp.wa.gov/ReportFile/1708/Wsipp_Suppressing-Illicit-Cannabis-Markets-After-State-Marijuana-Legalization_Report.pdf.

[5] https://www.npr.org/2018/05/16/610579599/despite-legalization-marijuana-black-market-hides-in-plain-sight.

last two years, Washington law enforcement stated, "we are seeing an increase in black market marijuana."[6]

Respondents concede the "war on drugs" has failed. Yet Respondents argue that restricting Licenses to residents will kill the illegal cannabis market when decades of federal and state criminal enforcement could not.

***Fifth***, Respondents' conclusory statement that residency requirements prevent legal Washington cannabis from being diverted to other states is easily disprovable. A 2024 study concluded that "A prominent example [of closely linked states] is Washington and Oregon, which are almost perfectly integrated into a single market."[7] An earlier study "conclude[d] that prior to Oregon's market opening, 11.9% of marijuana sold in Washington was diverted to other states. In the two months after Oregon opened, about 7.5% of marijuana was diverted, totaling 445 kilograms of the substance."[8] An industry association, in a story from

---

[6] https://www.peninsuladailynews.com/news/paper-mill-helps-destroy-black-market-marijuana/.

[7] https://onlinelibrary.wiley.com/doi/full/10.1111/ajae.12488.

[8] https://www.nber.org/system/files/working_papers/w23762/revisions/w23762.rev0.pdf.

2023 and 2018, stated "the potential for diversion is no longer a risk, it's a certainty…."[9]

#### b. *Respondents' parade of horribles shows they do not understand the dCC*

##### i. *Cannabis*

Respondents argue that if the dCC applies to Licenses, Washington will have to allow cannabis products to cross state lines. ***This case has nothing to do with cannabis crossing state lines.*** Whether a restriction on cannabis products crossing state lines can withstand the dCC analysis is a different question with a different local purpose and different potential nondiscriminatory alternatives.

Moreover, despite Respondents' representations to this Court, Washington is eager to join interstate commerce in cannabis products (which, again, is not presented in this case). Washington law allows its governor to enter into interstate trade agreements with other states for cannabis sales. R.C.W. §43.06.495.

In any event, Respondents' arguments regarding cannabis crossing state lines are flawed. ***Out-of-state retailers***. Respondents' argue, "Because Washington allows cannabis to be sold to Washington residents by Washington retailers, if dCC protections applied to the market, the State could be required to

---

[9] https://mjbizdaily.com/washington-state-cannabis-supply-hits-new-low-spurs-calls-change/.

allow sales to its residents from out-of-state cannabis businesses[.]" (Answering Brief, 25.)

Respondents offer no citation for the proposition that Washington must allow businesses not licensed by Washington to open cannabis retailers in Washington. Such an argument is equivalent to saying a company may obtain a liquor license in another state and open a bar in Washington without a Washington liquor license. Appellant has not made such an argument, and it would fail because Washington is allowed to require Licenses for businesses operating in the state. Appellant has only argued, as required by the dCC, that because Respondents issue Licenses for cannabis retailers, Respondents must allow nonresidents to fairly compete for those Licenses.

***Shipping***. Respondents cite *Granholm v. Heald*, 544 U.S. 460 (2005) for the proposition that if the dCC applies to cannabis licenses, Washington will have to allow out-of-state cannabis business to ship cannabis to Washington customers. Respondents misunderstand *Granholm*.

*Granholm* does not require a state to allow wine sales by shipment. Rather, it provides that a state that allows shipments cannot discriminate against out-of-state businesses. In *Granholm*, a California winemaker challenged a Michigan law that permitted Michigan winemakers to ship wine directly to consumers but

prohibited out-of-state winemakers from shipping wine directly to consumers, and a similar New York law. The Supreme Court struck both laws.

Plaintiff is not aware of any jurisdiction that allows cannabis sales by shipment. Washington prohibits any sales outside of licensed brick-and-mortar dispensaries. *See* R.C.W. §69.50.401(1), R.C.W. §69.50.4013, W.A.C. §314-55-110(4)(d); Washington State Liquor and Cannabis Board Enforcement Bulletin No. 20-01 (Feb. 26, 2020)[10]; Washington State Liquor and Cannabis Board Bulletin (Feb. 17, 2022).[11] No cannabis sales may occur in Washington by shipment and this argument is a red herring.

***Labeling and testing***. Respondents make the inane argument that the dCC would jeopardize state labeling and testing requirements. ***This case has nothing to do with cannabis products crossing state lines.*** Besides, manufacturers routinely use different labels for products in different states due to state requirements for everything from mattresses[12] to cleaning products.[13]

Equally unavailing is Respondents' argument that the dCC would jeopardize state requirements for testing cannabis before sale. The Supreme Court rejected

---

[10] https://content.govdelivery.com/accounts/WALCB/bulletins/27df9f1.

[11] https://content.govdelivery.com/accounts/WALCB/bulletins/30b1f2d.

[12] https://www.cpsc.gov/s3fs-public/15BCampbellCPSC.En_.pdf?3Mke6e54IAvMen7h841int2aautCzR.w.

[13] Cal. Health & Safety Code §108950.

this argument in the very case Respondents cite in a futile attempt to support their argument, *Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349 (1951).

In *Dean Milk*, a city ordinance made it unlawful to sell milk unless it was pasteurized within five miles of Madison. *Id*. at 350. The plaintiff sold milk that was pasteurized more than five miles away in Chicago. *Id*. at 353.

The Court accepted Madison's contention that Madison's ordinances for pasteurizing milk were more rigorous than Chicago's. *Id*. The Court agreed that milk regulation was within Madison's health and safety powers and that there are "difficulties in sanitary regulation of milk and milk products originating in remote areas …" *Id*.

Nevertheless, the Court struck the ordinance because "[by] erecting an economic barrier protecting a major local industry against competition from without the State, Madison plainly discriminates against interstate commerce. This it cannot do, even in the exercise of its unquestioned power to protect the health and safety of its people, if reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are available." *Id*. at 354.

Madison for milk, like Washington for cannabis, could have implemented several nondiscriminatory methods of processing. Madison could have passed an ordinance that "imposes no geographical limitation on location of milk sources and processing plants but excludes from the municipality milk not produced and

pasteurized conformably to standards as high as those enforced by the receiving city." *Id*. at 355. Alternatively, "If the City of Madison prefers to rely upon its own officials for inspection of distant milk sources, such inspection is readily open to it without hardship for it could charge the actual and reasonable cost of such inspection to the importing producers and processors." *Id*.

"To permit Madison [or Washington] to adopt a regulation not essential for the protection of local health interests and placing a discriminatory burden on interstate commerce would invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause. Under the circumstances here presented, the regulation must yield to the principle that 'one state in its dealings with another may not place itself in a position of economic isolation.'" *Id*. at 356 (quoting *Baldwin v. G.A.F. Seelig*, 294 U.S. 511, 526 (1935)).

***But again, cannabis products crossing state lines is not presented by this case.***

***ii. Sex Trafficking***

Respondents argue "Nevada has legalized prostitution as a matter of state law. But this cannot mean that [Nevada] must now permit trafficking of… sex workers into their state[] by operation of the dormant Commerce Clause. This very well could be the consequence of applying dormant Commerce Clause

protections to illegal interstate markets." (Answering Brief, 26-27 (statute omitted).)

Respondents are incorrect. A federal court already determined the dCC applies to prostitution in Nevada. Nye County allows prostitution only in licensed brothels, and the County Code required brothel owners to be residents of Nevada for six months before applying for a brothel license. *See* Order [Dkt. #80], *TCR Holdings, LLC v. Nye County*, No. 2:09-CV-00433 (D. Nev. 2010) (Request for Judicial Notice, Ex. 1).[14] The court enjoined the law under the dCC.

Because Nevada grants business licenses to operate brothels, Nevada must allow nonresidents to apply for the licenses. Nevada does not have to permit sex trafficking within its borders, as sex trafficking is an issue distinct from business licenses.

***iii. Heroin***

Respondents argue that if the dCC applies to illegal markets, then Washington must permit trafficking of heroin into the state because Oregon decriminalized most Schedule I drugs.

Appellant notes that, despite Respondents' pearl clutching about heroin in the Answering Brief, they favor heroin convicts for Licenses, as discussed above.

---

[14] Appellant submitted with the Request for Judicial Notice ("RJN") the *TCR Holdings* orders not available on Westlaw.

Moreover, Respondents factual assertion is incorrect, and their own citation shows Oregon did not decriminalize heroin trafficking. Engrossed S.V. 755, 81st Leg., Reg. Sess. (Or. 2021). Oregon decriminalized possession of a small amount of heroin and other drugs for personal use. *Id*. §§ 36, 40, 41. Possession of more than a small amount it is a misdemeanor and possession of a "substantial amount" it is a felony. *Id*.

Regardless, Respondents' legal assertion is incorrect and it shows their lack of understanding of the dCC. A state may make it illegal for all persons (residents and nonresidents) to sell an item because there is no different treatment of residents and nonresidents. *Sligh v. Kirkwood*, 237 U.S. 52 (1915).

***iv. Other rights***

Respondents make the irrelevant argument that federal courts have held for defendants in cannabis cases raising other federal rights. That is Respondents' attempt to revive an argument the Ninth Circuit rejected in *Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916 (9th Cir. 2024).

There, the district court abstained from exercising jurisdiction over a dCC challenge to Sacramento's cannabis licensing program. The district court reasoned that "federal district courts [have] express[ed] unease with disputes about state cannabis regulations" because of the Controlled Substances Act. 2022 WL 10629241, at *8 (E.D. Cal. Oct. 18, 2022).

Respondents simply selected cases not cited in the *Peridot Tree v. Sacramento* briefing to argue once again that federal courts will not vindicate federal rights in cases involving cannabis. Respondents first cite *Shulman v. Kaplan*, 58 F.4th 404 (9th Cir. 2023), where one co-owner of a cannabis business brought RICO claims against the other co-owner. The Ninth Circuit noted that standing for a RICO claim requires damage to the plaintiff's "property." *Id*. at 409-410. The Court concluded that because RICO and the CSA were passed contemporaneously, a cannabis business is not within the "property" protected by RICO. *Id*. at 410. A RICO claim between private parties is far afield from Appellant's constitutional claim against Respondents as government regulators.

Respondents cite *James v. City of Costa Mesa*, 700 F.3d 394 (9th Cir. 2012), ***a case which supports Appellant's position that the dCC applies to cannabis***. The Ninth Circuit did ***not*** hold that the equal protection clause is inapplicable to cannabis claims against the government. Rather, the Circuit concluded that the defendants did not violate the Equal Protection Clause because there had been no unequal treatment of the plaintiffs based on the facts. *Id*. at 405. Thus, *James* shows the Circuit will enforce a party's constitutional rights against the government, provided they are properly stated on the facts.

Respondents cite *Grandpa Bud v. Chelan County Washington*, 2020 WL 2736984, at *4 (E.D. Wash. May 26, 2020). There, the court ruled against the

plaintiff's due process claim because the plaintiff had no federally protected property right to possess cannabis. Whether a federal property right to possess cannabis exists is irrelevant to this case, as Appellant did not bring a due process claim.

Moreover, Respondents ignore the many cases where federal courts in the Ninth Circuit heard cannabis cases against both governments and against private parties. *See, e.g., Greenwood v. Green Leaf Lab LLC*, 2017 WL 3391671 (D. Or. July 13, 2017); *Lo v. Cnty. of Siskiyou*, 558 F. Supp. 3d 850 (E.D. Cal. 2021); *ARMLA One, Inc. v. Los Angeles*, 2021 WL 3017518 (C.D. Cal. Apr. 2, 2021); *Siva Enterprises v. Ott*, 2018 WL 6844714 (C.D. Cal. Nov. 5, 2018); *Racioppi v. Bosov*, 2021 WL 3811012 (C.D. Cal. Mar. 12, 2021); *Lull v. Cnty. of Placer*, 2019 WL 4747647 (E.D. Cal. Sept. 30, 2019); *Borges v. Cnty. of Mendocino*, 2022 WL 1137084 (N.D. Cal. Apr. 18, 2022); *Tarr v. USF Reddaway, Inc.*, 2018 WL 659859, at *2 (D. Or. Feb. 1, 2018).

**2. Respondents' Analysis of Caselaw Shows Respondents Do Not Understand the DCC**

Appellant addressed the precedent cases in the opening brief and will not rehash the arguments here. Appellant addresses only Respondent's additional points.

a. ***Northeast Patients Group***

Respondents argue the First Circuit "erroneously blurred the distinction between Congress's affirmative authority under the Commerce Clause and limits on state authority under the dormant Commerce Clause." Respondents argue "The First Circuit relied primarily on the Supreme Court's decision in *Gonzales,* which held that Congress did not exceed its affirmative Commerce Clause authority…"

Respondents are incorrect. The majority cited *Gonzales* twice—once in the introduction and once for the factual finding that an interstate market in cannabis exists. 45 F.4th at 547. The majority never relied on *Gonzales* as the reason to strike Maine's residency requirement. (Notably, the dissent, upon whom Respondents rely, also cited *Gonzales*.)

The First Circuit gave a detailed explanation of the difference between the ***Commerce Clause***, which is an ***affirmative grant*** of power to the ***federal government*** to regulate commerce if an interstate market exists, and the ***dCC***, which is a ***restriction*** on the ***states'*** ability to discriminate against out-of-state business interests. *Id*. at 545.

After explaining that the dCC is a restriction on the states' ability to discriminate against out-of-state businesses in interstate commerce, the First Circuit cited *Gonzales* for the proposition that interstate commerce in cannabis exists notwithstanding the Controlled Substances Act. *Id*. at 547 ("Specifically, in

*Gonzales*, the Supreme Court considered whether… marijuana is a 'fungible commodity for which there is an established, *albeit illegal*, interstate market.") (quoting *Gonzales*, 545 U.S. at 18). In other words, the First Circuit cited *Gonzales* for the ***factual finding*** that an interstate market in cannabis exists, not for any legal analysis under the Commerce Clause.

Satisfied that an interstate market in cannabis exists, the First Circuit applied the ***dCC*** to prohibit ***state*** discrimination against out-of-state ownership of cannabis dispensaries. *Id*. at 558.

b. ***Prudential Insurance Company v. Benjamin***

Respondents cite *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408 (1946) for the proposition that "the Supreme Court has long recognized that Congress's affirmative Commerce Clause authority is in no way equivalent to the implied prohibitions on state power under the dormant Commerce Clause."

In *Prudential*, the plaintiff challenged a tax that South Carolina levied on out-of-state insurance companies but not on South Carolina insurance companies. *Id*. at 411-12. That discriminatory tax was permissible because Congress, in the McCarran Act, expressly authorized the states to control taxation of insurance companies and stated that any silence by Congress should not be interpreted as imposing a barrier to state regulation or taxation of insurance companies. *Id*. at 429. Thus, the ***dCC*** did not prevent the ***states*** from imposing discriminatory taxes

on insurance companies because the ***federal government*** used its authority under the ***Commerce Clause*** to enact a law that authorized the states to discriminate in such taxes. *Id*. at 430.

Prudential did not understand the difference between the Commerce Clause and the dCC. Prudential argued that the dCC (which applies only to states) prohibited the federal government from passing laws that allow states to impose discriminatory taxes on insurance companies. *Id*. at 411. Prudential argued that the Commerce Clause "of its own force" prohibits Congress from affirmatively authorizing any economic discrimination that would violate the dCC. *Id*. at 422.

The Court in *Prudential* clarified the difference between the Commerce Clause and the dCC. "The commerce clause is in no sense a limitation upon the power of [federal] Congress over interstate and foreign commerce. On the contrary, it is… a grant to Congress of plenary and supreme authority over those subjects." *Id*. at 423. The dCC, by contrast, "confines only the powers of the states. And the two areas are not coextensive." *Id*. Because the federal government had used its Commerce Clause power to pass a law that expressly authorized the states to impose discriminatory taxes on insurance companies, the dCC was inapplicable.

*Prudential* would be relevant to this case only if Congress had authorized the states to discriminate in cannabis licensing, thereby rendering the dCC inapplicable.

**c. *Sligh v. Kirkwood***

Respondents cite *Sligh v. Kirkwood*, 237 U.S. 52 (1915) for the statement that fruit unfit for consumption is not a legitimate subject of trade or commerce and is not within the protection of the Commerce Clause. Respondents analogize fruit unfit for consumption to cannabis, and argue that cannabis is not a legitimate subject of trade or commerce and is not within the protection of the Commerce Clause.

*Sligh* presents the ***opposite*** situation from this case: the state made a product illegal, and the federal government did not. Florida used its police powers to make it a crime to sell fruit unfit for consumption. *Id*. at 57-58. A state's police power to prevent the sale of unfit foods "is well established." *Id*. at 59.

Because Florida banned the sale of fruit unfit for consumption, the fruit was not an item of legitimate commerce in the state. *Id*. at 59-60. Florida's ban on the sale of such fruit did not offend the dCC because nobody, whether a Florida resident or an out-of-state party, could sell the fruit. *Id*. at 504. Thus, the state law did not discriminate between Florida businesses and out-of-state businesses.

***d. Cole Memorandum***

Respondents argue Washington must prevent cannabis from crossing state lines because the Cole Memorandum identifies a priority of "Preventing the diversion of marijuana from states where it is legal under state law in some form to other states." ***First, Respondents' argument does not go to whether the dCC applies to cannabis***; it goes to whether the dCC analysis is satisfied because the law serves a legitimate local purpose that cannot be served by other means.

Second, Appellant does not ask the Court to permit transfers of cannabis products across state lines. Whether cannabis can cross state lines under the dCC is a different question that would involve a different local purpose and different nondiscriminatory alternatives.

Third, ***this case is about out-of-state persons owning Washington dispensaries, which is not identified as a risk factor in the Cole Memorandum.*** Most states permit nonresidents to own all or part of cannabis businesses, yet Respondents did not offer a single example of the federal government prosecuting a state-licensed cannabis retailer that was complying with state law.

Fourth, the Cole Memorandum was repealed years ago.

## B. The Circuit Must Reverse the Order Denying the Preliminary Injunction

### 1. Appellant Faces Irreparable Harm

The Order acknowledges that a constitutional violation is an irreparable harm. (*See* Order, ER-32 ("It is true that when a plaintiff establishes a likelihood of success on the merits of a constitutional claim, 'that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation.'" (citing *Baird*, 81 F.4th at 1040).) The Order concedes, by stating the inverse, that if the dCC applies to cannabis, Appellant has shown an irreparable harm. (*Id*. at ER-34 ("Peridot has not shown irreparable harm ***beyond*** the risk of a possible-but-unlikely constitutional violation.") (emphasis added.)

The Circuit must reverse the Order because the district court abused its discretion in denying the preliminary injunction. "A district court abuses its discretion [in denying a preliminary injunction] if it bases its decision on an erroneous legal standard… A district court bases its decision on an erroneous legal standard if it… misapprehend[s] the law with respect to the underlying issues in the litigation." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quotation marks and citation omitted). Here, the district court applied the wrong legal standard in concluding the dCC does not apply to cannabis licenses.

"It is well-established that the first factor [a likelihood of success] is especially important when a plaintiff alleges a constitutional violation and injury.

***If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation***." *Baird*, 81 F.4th at 1040; *Melendres*, 695 F.3d at 1002; *Am. Trucking Associations,* 559 F.3d at 1058.

In addition, Appellant faces multiple irreparable harms independent of the constitutional violation. ***First***, Appellant cannot obtain monetary damages in lieu of an injunction. At the hearing on the preliminary injunction, the district court offered Respondents the opportunity to waive the Eleventh Amendment and Respondents declined.

> THE COURT: … I am also interested in your position as to whether monetary damages are available in a situation if the plaintiff names somebody in their personal capacity.
>
> MR. PITEL: Certainly not willing to concede that monetary damages would be available.
>
> …
>
> Mr. JENSEN: … I had a note that I made myself to ask if they were willing to waive the Eleventh Amendment defenses if they are going to rely on damages available, but I guess they've already answered that by saying they're not willing to do that.

(Transcript, ER-51, 54.) As Respondents will not make monetary damages available, Appellant will be left without a remedy if the Court permits Respondents to issue all Licenses.

***Second***, Appellant will suffer the irreparable harm of a reduced chance of entering the Washington cannabis market. Respondents concede they will issue at most 52 more Licenses. Thus, Appellant will be excluded from consideration for at least 45% of the available Licenses if the Court does not enjoin the current application program.

Moreover, Appellant will not be eligible for the next round of Licenses, as Washington requires all owners of applicants to live in Washington for six months before the application.

Additionally, Appellant may not qualify for any Social Equity requirements Respondents impose, as Respondents have not published the program requirements yet. (Answering Brief, 38.) A reduced chance of receiving a cannabis license is an irreparable harm. *See Finch*, 2022 WL 2073572, at *16; *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021).

Respondents allege that Appellant "failed to show it would score high enough to win one of the eight available King County licenses …" Respondents' argument is unavailing because Respondents removed Appellant's application from consideration altogether without scoring Appellant's application. (ER-219.)

Respondents concede: "If an applicant was not qualified, Ponder did not score the applicant." (Answering Brief, 15.) Because Respondents never scored Appellant's application, any claim Respondents make as to the score Appellant's application would have received is pure speculation.

Respondents did not even score the applications themselves to insulate themselves from allegations of bias. Respondents hired Ponder, an independent company, to score the applications. (Order, ER-020.) Thus, Respondents' allegations of whether Appellant would score high enough to win a License are entitled to no weight because Respondents had no control over scoring.

Furthermore, Respondents' argument has been tried and rejected in other jurisdictions. In New York, the state argued against the preliminary injunction by claiming the plaintiff's score was too low to obtain a license. *Variscite NY One, Inc. v. New York*, 2023 WL 1420662, at *5 (N.D.N.Y. Jan. 31, 2023). The court rejected this argument because "'[e]ven if [d]efendants could show they would deny [plaintiff]'s application…, [plaintiff] still has standing to maintain this lawsuit and have the unconstitutional program enjoined,'…" *Id*. Likewise, in Sacramento, the court rejected the city's argument that the plaintiff lacked standing because the city might have denied the plaintiff's application in favor of a more qualified application. *Peridot Tree, Inc. v. City of Sacramento*, 2022 WL 10629241, at *3 (reversed on other grounds).

***No delay***. Appellant's actions are detailed in the Opening Brief pages 52-54. Appellant's principals did not learn about the application program until around the time it opened in March 2023. Appellant had no reason to challenge Washington's residency requirement when Washington was not accepting applications. When Appellant's application was denied in September 2023, Appellant began contacting Washington local counsel ***two days later***. Appellant brought this case well within the statute of limitations and did not unreasonably delay.

**2. <u>The Balance of Equities and the Public Interest Favor an Injunction</u>**

***Prohibitory Injunction***. Respondents claim Appellant seeks a mandatory injunction. Respondents are incorrect.

In the district court, Appellant sought a prohibitory injunction, as Respondents acknowledge. Appellant's Motion for TRO/Preliminary Injunction states: "Plaintiffs ask this Court to issue and TRO and a preliminary injunction to prevent Defendants from issuing any Licenses under their unconstitutional Application Program held from March 1, 2023 to April 27, 2023." (Motion, ER-235; *see also* Proposed Order [Dkt. #9].)

At the Circuit, Appellant continues to seek a prohibitory injunction. If Respondents issued any Licenses after Appellant filed the Complaint on December 4, 2023, they are properly unwound under a prohibitory injunction. "Even if the [cannabis] licensing process had begun sometime after the filing of [the plaintiff's]

complaint, the injunction would still be classified as prohibitory." *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232, 239 (N.D.N.Y. 2022) (citing *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

To the best of Appellant's knowledge, Respondents did not issue any Licenses before Appellant filed the Complaint on December 4, 2023. The Court should order Respondents to rescind any Licenses they issued after that date.

If Respondents did issue any Licenses before December 4, 2023, the Court can follow the procedure the New York state court used in enjoining their cannabis licensing program, as Appellant discussed in the Opening Brief. (Opening Brief, 58-59.)

***Cole Memorandum***. Respondents again argue that they must follow the Cole Memorandum "to avoid federal prosecution of state-licensed cannabis businesses abiding by state law." The Cole Memorandum, which was repealed years ago, is addressed above. It does not identify out-of-state ownership of a cannabis business as a priority. Rather, it addresses cannabis products crossing state lines. Respondents' argument ignores reality, as most jurisdictions do not require residency for cannabis licenses but Respondents cannot offer a single example of the federal government prosecuting a state-licenses business because it had out-of-state ownership.

The District Court also stated the balance of harms favors Respondents because "Washington forbids licensees from operating outside of the state, RCW § 69.50.325, or advertising cannabis across state lines, RCW § 69.50.369(4)." (Order, ER-034.) This case has nothing to do with products crossing state lines; to Appellant's knowledge, no state, including the many states that permit out-of-state ownership, allow their cannabis licensees to operate outside the state; and this case has nothing whatsoever to do with advertising.

## C. Respondents' Amicus Concedes Everything Necessary for the Circuit to Reverse Both Orders

The District Court did not address the merits of the dCC challenge in either Order. (Orders, ER003-036.) Instead, the District Court ruled the dCC does not apply.

Amicus asks the Circuit to go beyond the Orders and reach the merits. If the Circuit does so, the Circuit should conclude the residency requirements violate the dCC.

### 1. Six-Month Residency Requirement

All owners of business applying for Licenses must reside in Washington for the six months before the application. W.A.C. §314-55-020(1)(d).

A statute that discriminates against out-of-state business interests on its face; in practical effect; or by its purpose falls into the first tier dCC analysis. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2471 (2019). Here, all

three alternatives are satisfied because the law requires Washington residency by its plain language.

When a law falls into the first tier analysis, the government bears the burden of proving the law "advance[s] a legitimate local purpose that ***cannot*** be adequately served by reasonable nondiscriminatory alternatives." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (emphasis added); *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 101 (1994).

The government's burden is nearly impossible to prove, and courts "generally str[ike] down the statute without further inquiry." *Tennessee Wine*, 139 S. Ct. at 2471 (2019). This includes residency preferences in cannabis licensing programs because "State laws that discriminate against interstate commerce face 'a virtually per se rule of invalidity.'" *NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *11 (D. Me. Aug. 14, 2020); *Lowe*, 544 F. Supp. 3d at 812.

**2. Five Year Residency Requirement**

Applicants must be 51% owned by a "Social Equity" individual who meets two out of three qualifiers: (1) ***resided in a DIA "in Washington" for five years before 2010***; (2) convicted of a cannabis crime in any state; and (3) low income. W.A.C. § 314-55-570(2).

#### *a. The first tier dCC analysis applies*

A law falls into the first tier dCC analysis if it discriminates on its face; in practical effect; or in its purpose.

***On its face***, the law requires residency in a DIA "in Washington."

Amicus argues the DIA requirement is facially neutral because it "can be satisfied by those who have not lived in Washington for decades." Amicus is incorrect, and the law is not facially neutral, because to establish a dCC violation, a plaintiff need not show that the alleged discriminatory conduct was a complete barrier to out-of-state business interests. "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994); *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010).

A law discriminates if it causes in-state business interests to constitute a larger share, and out-of-state interests to constitute a smaller share, of the market. *Fam. Winemakers of California v. Jenkins*, 592 F.3d 1, 10 (1st Cir. 2010); *Atl. Prince, Ltd. v. Jorling*, 710 F. Supp. 893, 895 (E.D.N.Y. 1989).

One need only ask, if the requirement of five years' residency in a Washington DIA is facially neutral, why did Washington's legislature require

residency in Washington rather than Michigan, where Appellant's majority owner lives?

***In practical effect***, the law discriminates because Washington residents are more likely to have lived in a Washington DIA for five years before 2010 than residents of other states.

Moreover, Appellant believes—and plans to explore in discovery—that residents of DIAs are less mobile, and therefore less likely to move out of Washington, than residents of other areas. A DIA is a census tract in the top 15% in at least two categories: (i) people living in poverty; (ii) people did not graduate from high school; (iii) unemployment; or (iv) people receiving public assistance. R.C.W. §69.50.335(6)(a).

***By its purpose***, favoring Washington residents is the only explanation for requiring residency "in Washington."

Amicus proposes its own purpose for the residency requirement. ***Amicus's proposed purpose is of no moment because neither the Washington Legislature nor Respondents ever offered Amicus's proposed purpose***.

Amicus's proposed purpose for the law is to benefit the people "whom the State has harmed." (Amicus Brief, 5.) But Respondents never argued the purpose of the Social Equity Program—or the DIA requirement specifically—was to remedy ***Washington's*** enforcement of drug laws.

Rather, Respondents and the District Court agree the purpose is provided by the law itself. (Order, ER-017; Answering Brief, 12-13.) The law provides its purpose as benefitting people adversely related by cannabis laws, ***with no limit to Washington***. 2020 Wash. Sess. Laws Ch. 236 § 1(1) (purpose of "reduc[ing] barriers to entry to the cannabis industry ***for individuals and communities most adversely impacted by the enforcement of cannabis-related laws***" and "establishing a cannabis industry that is equitable and accessible ***to those most adversely impacted by the enforcement of drug-related laws, including cannabis-related laws***.")

As further evidence that Washington did not intend to remedy only its own enforcement of cannabis laws, the second Social Equity qualifier is a cannabis conviction ***from any state***. W.A.C. § 314-55-570(2).[15]

Even if Amicus's proposed purpose were correct notwithstanding the above, it would support Appellant's argument that the law discriminates in its purpose. By admitting the purpose of the law is to benefit persons subject to Washington's laws, Amicus admits the purpose is to benefit Washington residents over nonresidents.

[15] *See also* RJN Exhibit 4 (email and declaration of authenticity not introduced in District Court because Amicus raises the argument for the first time on appeal).

### *b. The law fails the first tier dCC analysis because it does not advance its purpose*

The law fails the dCC analysis because it does not advance its own purpose. The law's purpose is providing opportunities for individuals impacted by the war on drugs, without any limitation to individuals harmed by Washington's laws. The residency restriction is not needed to advance that purpose, and instead impedes that purpose with respect to 49 of the 50 states.[16]

Amicus argues—without citing ***any*** authority—that it would be impossible for Respondents to identify DIAs nationwide. (Amicus Brief, 35.) Amicus's pure speculation is entitled to no weight.

Moreover, Amicus is incorrect. Nevada's social equity program accepts residency in a DIA in any state, and Nevada provides online instructions and a map for applicants to determine whether their area of residence is a DIA.[17]

### *c. The law fails the first tier dCC analysis because alternate methods exist*

The law fails the dCC analysis because Respondents cannot meet their burden to prove their local purpose cannot be served by a nondiscriminatory alternative. It is not Appellant's burden to disprove, but for example, Washington

---

[16] Appellant does not concede that prioritizing persons convicted of violating drug laws over non-criminals is a legitimate local purpose.

[17] Nevada Cannabis Compliance Board, https://ccb.nv.gov/wp-content/uploads/2022/07/Updated-Social-Equity-Methodology-.pdf/

could give persons convicted of cannabis crimes tax rebates, or college tuition assistance, or job training programs.

Amicus unwittingly concedes that Respondents cannot satisfy the dCC analysis because other means exist to satisfy Washington's local purpose. Amicus wrote: "The cannabis social equity program does not stand alone in Washington's prioritization of equity through government" and "Washington's Program, therefore, is rooted in and structured not in a vacuum, but as a piece of a deliberate and express governmental objective…" (Amicus Brief, 10-11.) By conceding the residency restriction does not stand alone and is a piece of a government program, Amicus concedes that other alternatives exist to meet the purpose.

#### *d. The law fails the first tier dCC analysis because the DIA definition is unrelated to cannabis harm*

Washington's DIA requirement fails the dCC analysis because DIAs are unrelated to Washington's purpose of benefitting "those most adversely impacted by the enforcement of drug-related laws, including cannabis-related laws."

DIAs have nothing to do with enforcement of cannabis laws. Rather, the requirements relate to poverty, high school graduation, unemployment, and public assistance.

A DIA is in the top 15% of at least two:

(i) people living in poverty
(ii) people who did not graduate from high school
(iii) unemployment
(iv) people receiving public assistance

R.C.W. §69.50.335(6)(a).

Thus, the DIA requirement does nothing to further Washington's stated purpose.

***e. Respondents cannot satisfy the second tier dCC analysis***

Even if the Court were to apply the second tier test, excluding DIAs in 49 of the 50 states is not an incidental burden.

***f. Race-based affirmative action***

Amicus raises race-based affirmative action for the first time. Neither party nor the District Court raised affirmative action.

Amicus, without stating so directly, asks this Court to uphold Washington's DIA restriction as race-based affirmative action. (Amicus Brief, 1 ("Meaningful opportunities for the participation of the black and brown communities that were the most impacted by the unjust war on drugs are critical to the development of such a national cannabis market.").

Yet Amicus disclaims its own argument, stating "race-based governmental action (which the Program ***does not*** include)." (*Id*. at 33.)

The Washington Social Equity in Cannabis Task Force prepared a report to the Governor for developing the Social Equity Program in December 2022.[18]

Its recommendation for DIAs:

% unemployment+
Median Income+
Number of Drug Convictions+
(2.9×% Black Residents)+
(1.6×% Latina/o/x Residents) +
(1.6×% Indigenous Residents)
=DIA.[19]

Its proposed score:

Lived in a DIA
Black-50 points
Hispanic-25 points
Native-10 points.[20]

It is not clear to Appellant whether Respondents incorporated the Task Force's proposal into the definition of DIA. Respondents' website states: "The legislature gave the agency some additional authority to determine the DIAs" but the minimum requirements are R.C.W. §69.50.335(6)(a)(i-iv).[21]

---

[18] HB 2870 and HB 1443 established the Task Force in 2020. The President of the Senate and the Speaker of the House appoint the members.

[19] Page 22 https://app.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=SECTF%20Final%20Report_f7c4efbe-f0c2-4f88-b56b-d69191268b07.pdf.

[20] *Id*. at 49.

[21] https://lcb.wa.gov/se/dia-maps.

Race classifications may be used only to remedy "specific, identified instances" of prior unconstitutional or unlawful discrimination. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 495, 505 (1989).

For race-based preferences in licensing, the government must have evidence of prior discrimination in the industry. *Richmond*, 488 U.S. at 500, 505.

Neither Respondents nor Amicus attempt to argue Washington discriminated in granting retail cannabis licenses in the past. Instead, Amicus argues the war on drugs impacted the black and brown communities the most.

First, prior discrimination in one area cannot support remedial discrimination in another. *Richmond*, 488 U.S. at 505. Thus, discrimination in enforcement of criminal laws cannot support racial preferences in the granting of business licenses. This includes racial preferences in cannabis licenses. *Pharmacann Ohio, LLC v. Ohio Dept. Commerce*, No. 17-cv-10962, 2018 WL 7500067 (Oh. Common Pleas 2018).

Second, Respondents argue discrimination in the war on drugs generally, not just cannabis. As above, race discrimination in enforcement of other drug laws cannot support racial preferences in cannabis licenses.

Third, racial preferences must be narrowly tailored to achieve their goal. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Classifications cannot be overbroad. *Students*, 600 U.S. at 216.

Washington's DIA is overbroad because it assumes all individuals in a geographic area were harmed by the enforcement of cannabis laws without any analysis as to the individuals. A Maryland court held licensing only persons who lived in DIAs could not pass ***rational basis*** review. *Maryland Hemp Coalition v. Moore*, (Cir. Ct. MD, Oct. 12, 2023) (RJN, Ex. 5). The court concluded the "licensing scheme is based on an assumption that everyone residing in a community that had a history of a disproportionately high rate of marijuana charges was disproportionately affected … Under this scheme, it is irrelevant whether the applicant was actually impacted … Ensuring that only a few may even apply for the grant of a lucrative license is wholly irrelevant to achieving the goals of this statute." *Id*. at 9-10.

**3. Standing**

The Circuit should not consider Amicus's standing argument. The District Court addressed standing at length following the parties' extensive briefing. (Order, ER-023-027.) Neither party appealed standing.

Amicus did not receive consent to argue standing. Amicus sought consent only to argue (1) the dCC applies to cannabis and (2) DIA does not violate the dCC. (Motion to Supplement Record.)

Amicus argues Appellant lacks standing to challenge the six-month residency requirement because Appellant did not allege low income. Amicus is factually incorrect. The First Amended Complaint states, "Plaintiff meets all requirements for a License except the unconstitutional requirements that favor Washington residents." (ER-076.) Low income is not one of the requirements that favors Washington residents. Thus, Appellant alleged that it satisfied the low income requirement. (Respondents, who received Appellant's application, did not argue to this District Court or to this Court that Appellant does not satisfy the low income condition.)

Amicus is legally incorrect. Low income is not required for Respondents' Social Equity Program. An applicant's 51% owner must satisfy ***two of*** (1) residency in a Washington DIA, (2) cannabis arrest, (3) low income. W.A.C. § 314-55-570(2). Appellant alleged its 51% owner (1) resided in a Michigan DIA (2) was arrested for cannabis, (3) low income. (Decl. Gay, ER-198.) Thus, ignoring Respondents' unconstitutional requirement that the DIA be in Washington rather than Michigan, Appellant satisfies two of the three conditions even ignoring his low income.

## CONCLUSION

The Court should reverse both Orders and remand with instructions to grant a preliminary injunction.

DATED: October 22, 2024

JEFFREY M. JENSEN, PC

By: /s/ Jeffrey M. Jensen
Jeffrey M. Jensen
Attorney for Plaintiff and Appellant

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that, according to the word count provided by Microsoft Word, the body of the foregoing brief contains 7,887 words, which is less than the 7,900 words permitted by Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-2. The text of the brief is in 14-point Times New Roman, which is proportionately spaced. *See* Fed. R. App. P. 32(a)(5)(6).

DATED: October 22, 2024 JEFFREY M. JENSEN, PC

By: /s/ Jeffrey M. Jensen
Jeffrey M. Jensen
Attorney for Plaintiff and Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2024, I caused the foregoing document entitled **APPELLANT'S REPLY BRIEF** to be filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: October 22, 2024 JEFFREY M. JENSEN, PC

By: /s/ Jeffrey M. Jensen
Jeffrey M. Jensen
Attorney for Plaintiff and Appellant